**Deposition of:**

## James Crosby

**Case:**

## Angela Zorich vs. St. Louis County, et al

**Date:**

## 03/30/2018



# 360 Litigation Services
10097 Manchester Rd, Ste 102
St. Louis, Missouri  63122

360LitigationServices.com
314-394-2206

**EXHIBIT**

tabbies

B

Case: 4:17-cv-01522-PLC    Doc. #: 29-2    Filed: 06/11/18    Page: 2 of 151 PageID #: 226

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

1
              UNITED STATES DISTRICT COURT

2
             EASTERN DISTRICT OF MISSOURI

                 EASTERN DIVISION

3

4

5
ANGELA ZORICH,

6
     Plaintiff,

7
v.

                   4:17-cv-1522PLC

8
ST. LOUIS COUNTY, et al.

9
     Defendants.

10
_____/

11

12
               DEPOSITION OF

               JAMES CROSBY

13
       Taken on Behalf of Defendants

14

15
DATE TAKEN:   March 30, 2018

16
TIME:        9:00 a.m. - 12:20 p.m.

17
PLACE:       Anderson Reporting

              10 South Newnan Street, Suite 1

18
              Jacksonville, Florida  32202

19

20
    Examination of the witness taken before:

21

22
     Cindy Danese, Notary Public

23

24

25

Case: 4:17-cv-01522-PLC    Doc. #: 29-2    Filed: 06/11/18    Page: 3 of 151 PageID #: 227

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

1                          A P P E A R A N C E S

2

3

4

5              APPEARANCES FOR THE PLAINTIFF

6                  NICOLE A. MATLOCK, ESQUIRE
         JEROME J. DOBSON, ESQUIRE (via telephone)
7            DANIEL KOLDE, ESQUIRE (via telephone)
             5017 Washington Place, 3rd Floor
8               St. Louis, Missouri  63108
                     (314) 621-8363
9               nmatlock@dobsongoldberg.com

10

11

12

13              APPEARANCE FOR DEFENDANTS

14                PRISCILLA F. GUNN, ESQUIRE
                 Assistant County Counselor
15              41 South Central, Ninth Floor
                 Clayton, Missouri  63105
16                    (314) 615-7042
                   pgunn@stlouisco.com

17

18

19

20

21

22                        -  -  -

23

24

25

Deposition of James Crosby

Case: 4:17-cv-01522-PLC    Doc. #: 29-2    Filed: 06/11/18    Page: 4 of 151 PageID #: 228

Angela Zorich vs. St. Louis County, et al

1

                            I N D E X

2

3   WITNESS:
                                                    PAGE NO.

4   JAMES CROSBY

5       Direct Examination by Ms. Gunn
                                                        4
6       Cross-Examination by Ms. Matlock
                                                       120
7

8

9                               - -

10

11                  DEFENDANTS' EXHIBIT INDEX

12  NO.         DESCRIPTION
                                                    PAGE NO.
13

14  A       Report
                                                        6
15  B       Fee Schedule
                                                       11
16  C       Article
                                                       27
17  D       Use of Force Directive
                                                       32
18  E       Article
                                                      109
19  F       Article
                                                      110
20  G       CV
                                                      110
21  H       Notice of Deposition
                                                      112
22

23

24                              - - -

25

Deposition of James Crosby

Case: 4:17-cv-01522-PLC    Doc. #: 29-2    Filed: 06/11/18    Page: 5 of 151 PageID #: 229

Angela Zorich vs. St. Louis County, et al

1                    JAMES CROSBY,

2  having been produced and first duly sworn as a witness,

3  and after having responded "I do" to the oath,

4  testified as follows:

5                    DIRECT EXAMINATION

6  BY MS. GUNN:

7       Q    Mr. Crosby, I'm Priscilla Gunn, and I

8  represent St. Louis County and four St. Louis County

9  police officers in a lawsuit that Angela Zorich has

10  filed.  You've been retained as an expert witness in

11  that case; is that correct?

12      A    Yes.

13      Q    Who initially contacted you to retain you?

14      A    Attorney Dan Kolde.

15      Q    Had you ever worked with Mr. Kolde before or

16  heard of him before?

17      A    Not before this case, no.

18      Q    Do you know how he got your name?

19      A    I'm not sure.  Probably from doing an Internet

20  search for somebody about dogs and aggression and

21  police involvement.

22           MS. MATLOCK:  Sorry.  I'll object.  The

23       question calls for speculation.

24  BY MS. GUNN:

25      Q    Have you spoken to attorney Steve Riles?  Do

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

1    you know who he is?

2         A    No.

3         Q    Or -- well, Nicole Matlock is here with you

4    today, correct?

5         A    Yes.

6         Q    And also have you worked with Mr. Jerome

7    Dobson before?

8         A    I don't know who he is.

9         Q    When Mr. Kolde contacted you, what did he tell

10   you?

11        A    Mr. Kolde explained that this was a case

12   wherein the St. Louis County Police Department -- I

13   think you have a county police department there, right,

14   it's not the sheriff's office --

15        Q    Correct.

16        A    -- had served a search warrant on a

17   residential property and, in the course of a dynamic

18   entry by the SWAT Team, had shot and killed a pet dog.

19        Q    Anything else that he told you?

20        A    We had a number of conversations as to the

21   actual -- you know, the general gist of the case.

22             When he explained that this had to do with

23   actually using a SWAT Team to serve a search warrant

24   for a municipal ordinance violation, which I had to

25   have him explain, because that was such a foreign

1    concept to me, that you'd use a SWAT Team for a

2    property violation.  I had never heard of such a thing.

3        Q    I'm just asking you what he told you.

4        A    Yeah, well, that's what he told me.  And I

5    questioned him.

6             He explained that the dog was a pet, had been

7    inside, and that the apparently lead officer on the

8    SWAT Team had discharged his automatic weapon with a

9    couple of bursts into the dog and had killed the dog

10   right there.

11       Q    Now, you prepared a report; is that correct?

12       A    Yes, I did.

13            MS. GUNN:  Can you mark this?

14   BY MS. GUNN:

15       Q    You have a copy in front of you?

16       A    Yes, I have a copy of my report.

17            MS. GUNN:  Just mark it as Crosby Exhibit A.

18            (Defendants' Exhibit A was marked for

19       identification.)

20   BY MS. GUNN:

21       Q    You have Crosby Exhibit A in front of you; is

22   that correct?

23       A    Yes.

24       Q    And it is the report dated July 8, 2016; is

25   that correct?

Case: 4:17-cv-01522-PLC   Doc. #: 29-2   Filed: 06/11/18   Page: 8 of 151 PageID #: 232

Deposition of James Crosby
Angela Zorich vs. St. Louis County, et al

1      A      That's correct.

2      Q      In the report, you list the materials that you

3  have reviewed in connection with this case.  It's on --

4  I don't know what page it is.  It says Materials

5  Reviewed, and there's a list of materials that you

6  reviewed; is that correct?

7      A      That's correct.

8      Q      Have you reviewed any other materials that you

9  used to render your opinions other than is listed?

10     A      There were a couple of documents that the

11  County has apparently provided quite recently,

12  including the department -- for the St. Louis County

13  Police Department, Department General Order 10-29 and

14  some attached documents regarding use of force, a copy

15  of the Missouri Revised Statutes and there's a number

16  of pages to that.  Those were recently received.  The

17  St. Louis County Police Department reports and search

18  warrant logs I already had.  There was also -- let me

19  see if -- the Tactical Operations Procedure was

20  included before.

21            That's pretty much it.  I have Zavorka's

22  deposition and Zorich's transcript of deposition.

23            So other than the additions that the County

24  has sent quite recently regarding the statutes and so

25  forth.

1          MS. MATLOCK:  Mr. Crosby, I just want to

2     remind you to answer the question that's asked.  I

3     believe she was asking about documents that you

4     used to form your opinion.

5          THE WITNESS:  Okay.  To form my opinion, no.

6     My initial opinion, these were the documents, and

7     so forth, that I had available to me at the time

8     that I used to form that opinion.

9   BY MS. GUNN:

10        Q     Did you have the entire deposition transcript

11   of Officer Zavorka?

12        A     I believe so.  I show page 1 through 108,

13   which includes the closure by the court reporter, so

14   I'm assuming that's complete.

15        Q     And you have not reviewed Officer Rinck's

16   deposition; is that correct?

17        A     No, I have not.

18        Q     And have you reviewed the depositions of

19   Joseph Zorich or --

20        A     No.  I was not provided those at the time and

21   have not seen those.

22        Q     -- or Bridget Haman or Isaiah Zorich, correct?

23        A     No.

24        Q     It says on here that you reviewed some

25   excerpts from -- deposition excerpt titled Zavorka

1    regarding planning for presence of dog on property?

2        A    Yes.  That is a single page excerpt that also

3    goes back to the deposition.

4        Q    Is it a page from the deposition; is that what

5    that is?

6        A    Yes, it's a page from the deposition.

7        Q    So it's page -- it looks like page 55 and 56?

8        A    Yes.

9        Q    Okay.  All right.  And so nothing else that

10   you reviewed; is that correct?

11       A    No.

12       Q    Did you receive any -- do you have any written

13   correspondence with any of the Plaintiffs or their

14   attorneys in this case?

15       A    No.  The only correspondence I have would be

16   emails between myself and Mr. Kolde, and he instructed

17   me that he would be providing those as within the rules

18   and so forth.

19       Q    Do you have copies of those?

20       A    No.  Mr. Kolde advised that he would provide

21   whatever emails are proper and to be provided under the

22   rules of the Court.

23       Q    But you did receive his emails --

24       A    Yes.

25       Q    -- and --

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

1    A    -- I received emails from him, yes.

2    Q    Okay.  And you didn't print them because Mr.

3 Kolde told you not to; is that correct?

4    A    I didn't print them because I don't know what

5 is discoverable and what is not, so I left that to Mr.

6 Kolde.

7    Q    Okay.  Anything else in writing that you

8 received from --

9    A    No.

10    Q    And did you receive anything in writing from

11 Ms. Matlock or from Mr. Riles or any other attorneys

12 other than Mr. Kolde?

13    A    I don't know who Mr. Riles is.  The only

14 correspondence between myself and Ms. Matlock was

15 setting up meeting today.

16    Q    And you met with her this morning before the

17 deposition?

18    A    Yes.

19    Q    What did you talk about this morning?

20    A    We talked about her flight in, and went over

21 the basic rules of deposition to make sure that I

22 understood them.

23    Q    Have you ever discussed the substance of your

24 report with her?

25    A    No.

Deposition of James Crosby

Case: 4:17-cv-01522-PLC   Doc. #: 29-2   Filed: 06/11/18   Page: 12 of 151 PageID #: 236

Angela Zorich vs. St. Louis County, et al

1     Q     So the only person that you discussed the
2   substance of the report with, the only attorney would
3   be Mr. Kolde; is that correct?

4     A     That's correct.

5     Q     Did Mr. Kolde ask you to make any revisions to
6   this July 8 report, July 2016 report?

7     A     I have made no revisions to this report.

8     Q     And then you have a fee, I assume, that you
9   charged?

10    A     Yes.

11    Q     Okay.  And what is your fee?

12    A     The base fee, when I agreed to take this case,
13  was a flat fee of $3,000.  Here's a copy of my current
14  fee sheet.  The price has gone up.  But it was a flat
15  fee of $3,000, and then $1,000 a day for court, if
16  necessary.  I don't break it down into hours.  For me
17  it's just easier to do it by flat fee.  Deposition is
18  $200 an hour, $600 minimum.

19          MS. GUNN:  Can you mark Crosby B.

20          (Defendants' Exhibit B was marked for
21      identification.)

22  BY MS. GUNN:

23    Q     So you handed me Crosby B, is that correct --

24    A     Yes.

25    Q     -- which is the fee schedule that was in place

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

```
 1    at the time?

 2        A    No.  That's the fee schedule that's in place

 3    now.  I was looking for the document for the one at

 4    time.  Mr. Kolde, I'm sure, has a copy of it in his

 5    file.  I couldn't find it on my laptop this morning.

 6        Q    To date, how much have you charged the

 7    Plaintiff?

 8        A    The flat fee is $3,000.

 9        Q    Do you advertise your expert services

10    anyplace?

11        A    No.  I can be found on the Web because I have

12    a blog, but I don't advertise anywhere, no.

13        Q    Okay.  The materials that you've provided

14    indicate that you train on dangerous dogs; is that

15    correct?

16        A    That's correct.

17        Q    And you train on dog aggression and dangerous

18    dogs; is that correct?

19        A    That's correct.

20        Q    So you would agree that dogs can be dangerous.

21        A    Oh, yes.

22        Q    And they can seriously hurt people and even

23    kill people.

24        A    Killing people is very rare, but they can.

25        Q    And you have investigated deaths caused by
```

1   dogs.

2        A    Correct.

3        Q    How many killings of people by dogs have you

4   investigated, would you say?

5        A    Myself on site, around 25, a little bit over.

6        Q    And then have you investigated situations

7   where people have been seriously injured by dogs?

8        A    Yes.

9        Q    So do you consider yourself an expert on

10  animal behavior?

11       A    Yes.  I am certified as a canine behavior

12  consultant and have been accepted as an expert in

13  animal behavior and dog aggression in many state and

14  several federal court districts.

15       Q    It looks like your email address is

16  canineaggression@gmail.com; is that right?

17       A    That's correct.

18       Q    Now, are pit bulls a breed that are known for

19  their aggressive behavior?

20       A    Not particularly, no.  In fact, pit bull is

21  not a breed.  American Pit Bull Terrier is a breed.

22  Pit bull is a generic type of dog that encompasses a

23  number of breeds.

24       Q    Do you know what kind of dog Kiya Zorich was?

25       A    From the pictures that I looked at, she seems

Case: 4:17-cv-01522-PLC    Doc. #: 29-2    Filed: 06/11/18    Page: 15 of 151 PageID #: 239

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

1    to be a mix.

2        Q    What kind of mix?

3        A    Could be any number of things.  Visual

4    identification has been proved through a number of

5    studies to be less than 25-percent accurate for

6    determining primary breed, much less whether it's a

7    pure bred.  So I don't know what breeds.

8        Q    Well, you're familiar with the term "pit

9    bull," right?

10       A    Yes.

11       Q    What are the breeds of dogs that people

12   consider to be pit bulls?

13       A    There are a lot of dogs with particular

14   physical characteristics, such as the blocky heads and

15   short fur that people lump together as pit bulls.

16           MS. MATLOCK:  I'll object, calls for

17       speculation.

18           You've answered.

19   BY MS. GUNN:

20       Q    Have pit bulls killed more people over the

21   years than any other breed?

22           MS. MATLOCK:  Objection, again calls for

23       speculation, and is outside the copy of his

24       expert's retention.

25           Go ahead.

1    THE WITNESS:  Claims have been made as such;

2    however, there are a number of scientific factors

3    that make that an invalid claim.  Identification of

4    the breeds of dogs involved is speculative at best.

5    I can say that I have seen dogs identified as

6    alleged pit bulls that DNA and other identification

7    have shown were mixes of other breeds, so that is a

8    false statement.

9  BY MS. GUNN:

10    Q    Well, you've seen literature out there that

11  says that pit bulls have killed more people than any

12  other breed.

13    A    Yes, and most of that literature goes back to

14  a particular website that is hosted by a woman who is

15  not a behavior scientist of any sort and whose previous

16  occupation was as a psychic, known as the Lady

17  Starlight.

18    MS. MATLOCK:  Mr. Crosby, I'll just remind you

19    to answer the question that's been asked.

20  BY MS. GUNN:

21    Q    Well, there's more literature other than from

22  Lady Starlight that has indicated that pit bulls have

23  killed more people than any other breed.

24    A    There is no scientific literature that has

25  established such a fact.  There is popular literature

Case: 4:17-cv-01522-PLC   Doc. #: 29-2   Filed: 06/11/18   Page: 17 of 151 PageID #: 241

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

1   that is not based in fact that is an urban legend or

2   myth, whatever you want to call it.

3       Q    Okay.  Well, there is popular literature out

4   there that says that pit bulls have killed more people

5   than any other breed.

6            MS. MATLOCK:  I object to this line of

7        questioning in the sense that it calls for

8        speculation.

9   BY MS. GUNN:

10      Q    Would you agree with that?

11      A    I would agree that there's also popular

12  literature that says people are abducted by aliens.

13           Popular literature cannot be relied upon as

14  scientific.

15      Q    That's not my question.

16           My question is:  There is a wealth of popular

17  literature out there that states that pit bulls have

18  killed more people than any other breed.  Would you

19  agree with that?

20      A    There are unsubstantiated rumors that have

21  been published that claim that.

22      Q    Okay.  Are dogs that are aggressive with other

23  dogs more likely to be aggressive towards people?

24      A    Not necessarily.

25      Q    Is there any correlation?

1    A    Not necessarily.

2    Q    Is there a correlation?

3    A    No, not particularly.

4    Q    What is your current position or what do you
5    do for a living right now?

6    A    I am a retired police lieutenant.  I do
7    consulting work on various dog-related issues,
8    including aggression, behavior, investigation.

9         I'm also currently writing a standard
10   curriculum for police dog encounters backed by the
11   National Sheriff's Association and the National Law
12   Enforcement Commission on Animal Abuse.

13   Q    Is that curriculum completed?

14   A    It's in the final stages of completion and
15   approval by the Department of Justice.

16   Q    Are you associated with the Animal Care and
17   Protective Services for the City of Jacksonville at
18   this time?

19   A    Yes, I am on contract with the City of
20   Jacksonville as a consultant.  I served as the
21   effective chief of Animal Care and Protective Services
22   during 2016, and they have renewed my contract to
23   retain me as a consultant with them.

24   Q    But you are no longer the chief of Animal Care
25   and Protective Services; is that correct?

Case: 4:17-cv-01522-PLC    Doc. #: 29-2    Filed: 06/11/18    Page: 19 of 151 PageID #: 243

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

1    A    No.  They hired a full-time chief.

2    Q    And you live in Jacksonville, Florida?

3    A    Yes.

4    Q    And that's where we are right now?

5    A    Yes.

6    Q    How long have you lived here?

7    A    Since 1967.

8    Q    And you have not been a police officer since

9    1999; is that correct?

10    A    That is correct.

11    Q    Do you currently have any responsibilities for

12    law enforcement with the City of Jacksonville?

13    A    No.

14    Q    Is the Jacksonville Sheriff's Office the same

15    thing as the City of Jacksonville Police Department?

16    A    Yes.  It's a consolidated agency where the

17    Jacksonville Sheriff's Office is the city police and

18    the county sheriff's office.

19    Q    And the city of Jacksonville is located within

20    Jacksonville county; is that correct?

21    A    No.  Duval County and the City of Jacksonville

22    consolidated governments in 1967.

23    Q    Okay.

24    A    So the city limits is the county line.  Duval

25    is the name of the county.

Case: 4:17-cv-01522-PLC   Doc. #: 29-2   Filed: 06/11/18   Page: 20 of 151 PageID #: 244

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

1    Q    But there's no land outside of the city of

2    Jacksonville that's in the county; is that what you're

3    saying?

4    A    There are three small beach communities that

5    have their own cities within our city, and in those

6    jurisdictions we function as the county sheriff's

7    office.

8    Q    Now, did you develop a curriculum for -- you

9    told me about the standard curriculum that you're

10   writing right now for police officers, correct?

11   A    Yes.

12   Q    What's the name of it?

13   A    It's going to be called Law Enforcement Dog

14   Encounter Training.

15   Q    And when will this be completed?

16   A    We're going to be releasing it in June at the

17   National Sheriffs' Association convention.  I'm hoping

18   to have it completed for full review long before that.

19   Q    And have you developed any other curriculums

20   for law enforcement officers other than this one that's

21   going to be completed in June?

22   A    As far as dog encounters?

23   Q    Correct.

24   A    I did teach to the Holly Hill Police

25   Department here in Florida a four-hour segment on safe

Case: 4:17-cv-01522-PLC    Doc. #: 29-2    Filed: 06/11/18    Page: 21 of 151 PageID #: 245

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

1  dog encounters and interactions.

2      Q    Any other curriculums that you have developed

3  for law enforcement agencies?

4      A    Specifically to dog encounters, no.

5      Q    For anything other than dog encounters?

6      A    Oh, yes.  I've taught investigation of fatal

7  dog attacks and dealing with aggressive dogs all over

8  the United States and Canada, England, Australia, in

9  Italy, in Poland.

10     Q    Okay.  So investigation of fatal dog attacks

11  where dogs kill people?

12     A    Yes.

13     Q    So you're teaching police how to investigate

14  those fatal dog attacks?

15     A    Police and animal control officers how to

16  investigate those attacks and what factors go into

17  those situations.

18     Q    Into fatal dog attacks?

19     A    Correct.

20     Q    Okay.  And what kind of things are you talking

21  about?

22     A    Everything from physical evidence gathering,

23  to evaluation of dog behavior, to recognizing dangerous

24  dog versus non-dangerous dog behavior, to the use of

25  behavioral evidence.  I've also taught as part of that

Deposition of James Crosby

Case: 4:17-cv-01522-PLC    Doc. #: 29-2    Filed: 06/11/18    Page: 22 of 151 PageID #: 246

Angela Zorich vs. St. Louis County, et al

1    the recognition of dog body language and assessment of

2    whether a dog is a threat or not.

3        Q    So this dangerous dog body language and

4    assessing whether or not a dog is a threat or not, does

5    that go -- was that developed in connection with the

6    curriculum for investigating fatal dog attacks?

7        A    It was developed as part of that and as part

8    of the teaching I also do on dog behavior and safely

9    interacting with dogs for animal control, law

10    enforcement personnel, evaluation of the dogs for

11    shelters.

12        Q    So what I'm trying to find out is:  Have you

13    ever developed like a standard curriculum, like a

14    course or something to teach law enforcement officers

15    how to recognize -- a stand alone, apart from

16    investigating fatal dog attacks, some curriculum about

17    recognizing dangerous dogs or --

18        A    Yes.  I've -- I've --

19        MS. MATLOCK:  I'll just object to the form of

20        the question --

21    BY MS. GUNN:

22        Q    Do you understand what I'm asking?  I know it

23    was a long question, but --

24        A    Yes.  Yes, I have.  I've presented at a number

25    of animal control and law enforcement seminars and

1  gatherings and so forth on -- for law enforcement, for

2  animal control, for trainers, on recognizing dog body

3  language and recognizing when a dog is exhibiting a

4  threat and when a dog is exhibiting warning behaviors.

5       Q     And strictly to law enforcement?

6       A     Law enforcement has been included.  It's been

7  law enforcement, animal control.  I've also done so to

8  -- we've had attorneys that have attended the training.

9       Q     What law enforcement agencies have you --

10  prior to April of 2014, April 29, 2014 to be specific,

11  what law enforcement agencies have you specifically

12  been involved in training on aggressive dog behavior?

13       A     I don't have a list of the actual agencies.  I

14  have been presenting seminars that various law

15  enforcement agencies have attended since -- well, in

16  2005 was probably the earliest, and that was to the

17  Georgia Bar Association/Institute of Continuing Legal

18  Education in Georgia, and that was on cruelty cases and

19  prosecutions.

20       Q     Okay.

21       A     And there have been a scattering of --

22       Q     Okay.  Tell me what other ones.

23       A     Okay. Let's see.  A seminar in 2005 on

24  dealing with aggressive, traumatized and difficult

25  dogs.  There were some --

Case: 4:17-cv-01522-PLC    Doc. #: 29-2    Filed: 06/11/18    Page: 24 of 151 PageID #: 248

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

1      Q      To who?

2      A      To the St. Tammany Humane Society and St.

3  Tammany Parish's Animal Services in Covington,

4  Louisiana, and there were law enforcement attendees

5  there along with animal control.

6      Q      What law enforcement?

7      A      I don't know what agencies were there.  I

8  didn't keep attendance records.

9      Q      Have you presented to any police departments

10  or sheriff's departments or strictly police enforcement

11  -- and I'm not talking about animal control -- prior to

12  April 29, 2014?

13      A      Again, I've presented a number of seminars

14  which police officers have attended.  Not specifically

15  to a single police department, but where multiple

16  agencies were able to attend and send personnel to.

17      Q      Can you tell me some of the law enforcement

18  agencies who attended some of your seminars prior to

19  that date?

20      A      Well, for instance, I've presented at the

21  National Dangerous Dog Summit in Denver, Colorado in

22  2006.  There were officers from various Denver area

23  agencies who attended that seminar.  I don't know

24  exactly which ones or from who.

25          Most of the -- for instance, in 2007, I

Case: 4:17-cv-01522-PLC    Doc. #: 29-2    Filed: 06/11/18    Page: 25 of 151 PageID #: 249

Deposition of James Crosby                                    Angela Zorich vs. St. Louis County, et al

1    presented about fatal dog attacks in Kansas City,

2    Missouri.  There were law enforcement officers that

3    attended that.  I don't know which ones.

4        Q    What was the name of the organization that you

5    presented --

6        A    That particular one was hosted by the Kansas

7    City Dog Advocates at their Midwest Canine Legislation

8    Conference in Kansas City.

9            I presented in 2007 to the Calgary Animal and

10   Bylaw Services in Calgary, Alberta, Canada, which was

11   also attended by law enforcement officers.

12           In 2008, I presented on a dangerous dogs forum

13   for the Texas Animal Control Association in Dallas,

14   which was also attended by Dallas area police officers.

15           I presented to the SPCA of Texas, which

16   included police officers.

17           I taught at the National Animal Control

18   Association in Spokane, Washington in 2008.  Some

19   police officers attended from that area.

20           There have been, like I said, numerous

21   seminars and educational presentations I have given

22   that have included police officers across the United

23   States and in several other countries.

24       Q    Have you ever presented in Missouri outside of

25   Kansas City?

Case: 4:17-cv-01522-PLC    Doc. #: 29-2    Filed: 06/11/18    Page: 26 of 151 PageID #: 250

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

1    A    Yes.  I'm trying to find the dates.  It was

2  actually in Springfield, Missouri.  In 2012, I

3  presented a seminar for law enforcement officers titled

4  Investigating Fatal Dog Attacks in Springfield,

5  Missouri.  Part of that presentation includes the

6  assessment and recognition of canine body language and

7  the use of said body language in being able to safely

8  assess a dog.

9    Q    And what organization did you make this

10  presentation to in Springfield?

11    A    It was sponsored by a trainer by the name of

12  Jennifer Kimberlin.  I don't remember her company name.

13  But it was specifically invited and involved animal

14  control and law enforcement officers from around

15  Missouri who attended.  I don't have a list of those

16  attendees.

17    Q    Any other presentations in Missouri?

18    A    I'm looking.  Also, I also presented a public

19  access seminar on dog bite investigations, in fact the

20  same year, in Springfield.

21    Q    And who did you present that to?

22    A    It was through the same organization.  And

23  that was open to the public and law enforcement.

24          Trying to see if there's anything else

25  specifically limited to Missouri.

```
 1              New York, England.  Ohio is not that close,

 2   but I presented in Ohio; New York; Washington, D.C.;

 3   New Jersey; Atlanta.

 4              I don't recall another specific presentation

 5   in Missouri.  I know that in just a couple of weeks I

 6   will be back in Springfield, Missouri presenting

 7   seminars again.

 8        Q    For the same organization?

 9        A    The same people are bringing me back in, yes.

10        Q    The trainer, okay.

11              Do you have a counterpart?  Are there other

12   people out there that do the same thing that you do?

13        A    Very few.  And there's nobody that does quite

14   exactly what I do.

15        Q    Is there anyone else who teaches and trains on

16   how to recognize aggressive dog behavior?

17        A    Oh, certainly.

18              MS. MATLOCK:  I'll just object to these, calls

19        for speculation.

20              Go ahead.

21              THE WITNESS:  Certainly.  Dr. Randall Lockwood

22        with the ASPCA; Dr. Cynthia Bathurst, who is the

23        director of Safe Humane Chicago --

24   BY MS. GUNN:

25        Q    The director of what?
```

Deposition of James Crosby

Case: 4:17-cv-01522-PLC    Doc. #: 29-2    Filed: 06/11/18    Page: 28 of 151 PageID #: 252

Angela Zorich vs. St. Louis County, et al

1    A    The organization's called Safe Humane Chicago.

2    Q    And what is that?

3    A    That is a humane organization in Chicago that

4    back in 2011 worked with the Department of Justice and

5    produced a video training series on dog encounters for

6    police.

7         They also produced the document called The

8    Problem of Dog-Related Incidents and Encounters through

9    the Department of Justice Community Oriented Policing

10   Service in 2011 that has been distributed nationally.

11   Q    You are handing me a document; is that right?

12   A    Yes.

13   Q    Can I have this?

14   A    They can make copy of it for you, yes.

15   Q    Okay.  Well, can we mark it or --

16   A    Sure.

17        MS. GUNN:  Crosby C.

18        (Defendants' Exhibit C was marked for

19        identification.)

20   BY MS. GUNN:

21   Q    I'm handing you Crosby C; is that right?

22   A    Yes.

23   Q    And this is an article that you provided for

24   me?

25   A    That's an authoritative document that was

Case: 4:17-cv-01522-PLC    Doc. #: 29-2    Filed: 06/11/18    Page: 29 of 151 PageID #: 253

Deposition of James Crosby                                        Angela Zorich vs. St. Louis County, et al

1    produced by the Department of Justice Community

2    Oriented Policing Services from 2011 that gave specific

3    directions and recommendations on police encounters and

4    interactions with dogs during police operations.

5    That's been recognized as a national standard since

6    2011.

7              Along with that, there is a video course that

8    the same organization produced that has been widely

9    distributed.

10             MS. MATLOCK:  Ms. Gunn, if you're going to ask

11        him questions about it, could we make copies?

12             MS. GUNN:  Sure.  I mean, I don't know if I am

13        or not, but I'm just kind of...

14   BY MS. GUNN:

15        Q    And then you've highlighted some -- you have

16   some --

17        A    Right.

18        Q    -- some things that you've highlighted.  I

19   mean, at some point I will want to make a copy of it.

20        A    To return to your question about others who

21   train, the San Diego County Police Department has a

22   rather widely developed training program.

23             The State of California Commission on Police

24   Officers Standards and Training has a specific course

25   on canine dog -- police and canine encounters that has

Case: 4:17-cv-01522-PLC   Doc. #: 29-2   Filed: 06/11/18   Page: 30 of 151 PageID #: 254

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

1    been disseminated around the state.

2             The state of Colorado has a mandatory training

3    program for canine and police encounters.

4             Dr. Randall Lockwood, who I mentioned, has

5    been teaching for a number of years across the country,

6    but particularly in the D.C. Metro-Maryland area on

7    proper interactions between dogs and police officers

8    for police agencies.

9             There is a Lieutenant Perea -- P-e-r-e-a --

10   out in California.  I believe he's with -- I believe

11   he's -- he's either with Los Angeles or San Francisco,

12   I don't recall.  He has a program that has been out for

13   quite a while.

14       Q    And who is that directed to?

15       A    It's for police officers.

16       Q    Well, I mean, does he limit the -- I mean, is

17   there a particular geographical area where he --

18       A    My understanding is he does not limit a

19   geographical area.

20            There is a gentleman by the last name of

21   Osorio -- O-s-o-r-i-o -- based in Texas who has been

22   available and trained police officers on canine

23   encounters from Texas, to California, to Idaho, to the

24   Midwest, to Florida and the East Coast.  He's been

25   doing that, I believe, since 2007-2009 area.

Deposition of James Crosby

Case: 4:17-cv-01522-PLC    Doc. #: 29-2    Filed: 06/11/18    Page: 31 of 151 PageID #: 255

Angela Zorich vs. St. Louis County, et al

1    That's just a few that come off the top of my

2    head.

3        Q    Now, you mentioned the state of Colorado.  Are

4    there any other law enforcement agencies that you know

5    of that have mandatory training for dog aggression, dog

6    behavior?

7        A    Yes.  There are six states that mandate at

8    this point that their officers do so.  Colorado,

9    Tennessee, I believe New York state.  I don't remember

10    reliably exactly all six states.

11        I know California, when they developed their

12    course for POST for recertification, they have

13    recommended it, and I'm not sure if they actually

14    passed the legislation requiring it.

15        The Los Angeles Police Department has had

16    their own training program -- I'm not sure who does it

17    -- for quite a number of years.

18        The Atlanta Police Department has a program

19    taught by Officer Amy Soldner -- S-o-l-d-n-e-r -- to

20    the Atlanta Police Department for their law enforcement

21    officers on the recognition of body language and

22    aggression and proper responses and use of proper

23    tactics.

24        Q    And when did Colorado's training become

25    required?

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

1    A    It became mandatory, I want to say, 2016,

2    perhaps.

3    Q    And how about Tennessee's?

4    A    Tennessee's goes back to, I think, something

5    around 2011.

6    Q    How about New York's?

7    A    I'm not sure.

8    Q    And you said California has a program, but

9    you're not sure if it's mandatory.

10    A    Correct.

11    Q    And then Los Angeles, when did they start

12    having a program --

13    A    Well, Los Angeles issued their first, that I'm

14    aware of, directive regarding police officer

15    interaction with dog encounters in a document called

16    Directive Number 7, issued in July 2009, wherein they

17    set out the proper policies for Los Angeles Police

18    Department.  So that's been in existence for 10 years.

19    Q    And you handed me a document about the

20    Los Angeles Use of Force Tactics Directive; is that

21    right?

22    A    That's correct.

23    Q    Can I mark this, please?

24    A    Sure.

25        MS. GUNN:   Crosby D.

Case: 4:17-cv-01522-PLC    Doc. #: 29-2    Filed: 06/11/18    Page: 33 of 151 PageID #: 257

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

1          (Defendants' Exhibit D was marked for

2          identification.)

3    BY MS. GUNN:

4          Q     And then when did Atlanta begin its program

5    for recognition about dog behavior?

6          A     I'm not sure what year.  It's been quite a few

7    years.

8          Q     Do you know whether it was before or after

9    April 29, 2014?

10         A     I believe it was before 2014.  I want to say

11   it dates back to about 2012.

12         Q     Are you confident about that?

13         A     I'm not absolutely positive, no.

14         Q     Are there any other law enforcement agencies,

15   police departments, sheriff's departments, highway

16   patrol, state highway patrol departments, that you're

17   aware of that have mandatory training on dog encounters

18   for police?

19         A     There are quite a few individual departments

20   that require it.  I don't have an extensive list nor do

21   I have a list of when they began.  This is something

22   that's been evolving since the 2007, 2008, 2009 area

23   across the United States as best practices.

24               It was really solidified in 2011 with the

25   Department of Justice's dissemination of the

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

1  publication I referred to before about dog-related

2  incidents for law enforcement.

3      Q    So you're saying it's best practices to have

4  this training on recognition of dog aggression.

5      A    It's been recognized nationally as best

6  practices since at least 2011.

7      Q    And you're basing --

8      A    The requirements have been added since then.

9      Q    And you're basing the best practices on this

10  Exhibit C, correct?

11      A    Correct.  That was the earliest complete

12  codification of it that I'm aware of.

13      Q    Would you agree that there are quite a few law

14  enforcement agencies in the country that do not have

15  such training at this time?

16      A    I don't know how many do or do not.

17      Q    And you don't know the percentage that do

18  versus the percentage that do not; would you agree with

19  that?

20      A    Yeah, I do not know that percentage.

21      Q    Are you confident that there are a substantial

22  percentage of law enforcement agencies in the country

23  that do not have training on dog encounters for police?

24          MS. MATLOCK:  I'll object to the form of the

25      question as vague and confusing.

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

1          You can answer.

2          THE WITNESS:  I'm aware that there are a

3     number of agencies out there.  Whether it's

4     substantial or not, I don't know how many there

5     are.

6     BY MS. GUNN:

7          Q     And do you know of any law enforcement

8     agencies, city police departments, county police

9     departments or sheriff's departments, highway patrol,

10    those types of law enforcement agencies, university

11    campuses, those kinds of things, that require this kind

12    of training in Missouri?

13         A     I'm not personally familiar with the

14    requirements in Missouri.  There may be.

15         Q     You are associated with the Jacksonville

16    Sheriff's Department; is that correct?

17         A     That's correct.

18         Q     Can you tell us what your -- kind of go

19    through your career with the sheriff's department there

20    in Jacksonville?

21         A     I started as a patrol officer in 1978.  I was

22    in a program leading up to that and going to the

23    academy prior to that in 1977.  I served as a patrol

24    officer for a number of years riding the streets.  I

25    performed many different activities on the street,

1  including investigation of crimes, response to crimes,

2  dealing with all kinds of disputes or normal police

3  cases.

4         Eventually I became a sergeant and became in

5  charge of various squads of police officers and --

6      Q    What year did you become a sergeant?

7      A    Let me see if I wrote it.  I don't remember

8  offhand.  Oh, okay, in '87.  In 1987, I became a

9  sergeant, and I spent '87 to '93 --

10     Q    Were there any particular divisions or areas

11  that you were a supervisor or you were a sergeant over?

12     A    Yes.  I was a sergeant over police or patrol

13  squads.  I was a sergeant in charge of a street crimes

14  task force that operated in our downtown area and

15  targeted street crimes, drug crimes, violent crimes and

16  so forth within a specific area.

17         I was responsible as a sergeant for

18  supervising field training officers and part of the

19  field training supervision program where I had to

20  monitor those officers under my command who were

21  training new officers and made sure that they were

22  following proper training and meeting standards and so

23  forth.

24         My time as a sergeant was all associated with

25  the patrol division, but in various different areas.

1    Q    Okay.

2    A    In '93, I became a lieutenant.  And here

3  that's a watch commander who's in charge of a patrol

4  zone for a specific period of time.  I served as

5  lieutenant through 1999.

6         Part of my responsibilities were not only the

7  day-to-day management of the officers and supervisors

8  under my command, but also investigation of complaints;

9  monitoring and investigating use of force by officers,

10  either proactively or in response to citizen

11  complaints; investigation of other alleged misconduct

12  and misdeeds by the officers under my command; being in

13  charge of overall command for critical incidents and

14  large incidents; responding to serious crime scenes to

15  make sure that my officers and supervisors were doing

16  their jobs.

17         I sat on the firearms review board for the

18  Jacksonville Sheriff's Office reviewing deployment of

19  deadly force.

20         That generally is it.  Basically, anything

21  that was happening in my area during my shift was

22  ultimately my responsibility, both good and bad.

23    Q    While you were with the sheriff's department,

24  did Jacksonville have a SWAT Team or a TAC Team?

25    A    Yes.

1      Q      Did you ever serve on that?

2      A      No.

3      Q      And you never supervised anybody who was

4    associated with the SWAT Team or TAC Team; would you

5    agree with that?

6      A      No.  I did have officers assigned to my

7    command who were also members of the SWAT Team.

8      Q      But you personally didn't supervise their

9    duties while they were doing SWAT or -- do you call it

10   SWAT?

11     A      Yes.

12     Q      Okay.  So when you were a lieutenant or a

13   sergeant, you didn't personally supervise the work that

14   they were doing --

15     A      No, I was not assigned --

16     Q      -- on the SWAT.

17     A      -- to the SWAT Team.

18     Q      Were you ever personally involved in executing

19   a search warrant when you were with the sheriff's

20   department?

21     A      Many times.

22     Q      And under what circumstances would you be

23   involved in executing a search warrant?

24     A      It ranged from apprehension of dangerous

25   wanted felons all the way down to searching for drugs,

1    searching for evidence of other crimes.

2        Q    Were you ever involved in executing a search

3    warrant in a residence?

4        A    Yes, many times.

5        Q    How many times?

6        A    I couldn't even begin to give you a

7    guesstimate over the years.  Most of them were probably

8    in residences; very few were businesses.

9        Q    Did Jacksonville have like a problem

10   properties unit where there would be dedicated officers

11   to enforce code violations, housing code violations?

12       A    Here in Jacksonville, we have a code

13   enforcement department.  However, during my career and

14   still existing now that I've interacted with when I was

15   chief of Animal Care and Protective Services, there's

16   something called the DART Team.  I don't remember what

17   DART stands for, but it's a cooperative effort between

18   the Jacksonville Sheriff's Office, code enforcement,

19   animal control, property inspectors and so forth, that

20   do address problem properties.

21       Q    Were you ever involved with that?

22       A    When I was running animal control, I was

23   involved in overseeing and supervising those officers

24   under my command that were part of that.

25       Q    Was that before or after you left the

1    sheriff's department?

2        A      That was after my retirement from the

3    sheriff's office.

4        Q      And that was when you were working with animal

5    control; is that correct?

6        A      That's correct.  We participated with the DART

7    process.

8        Q      The animal control people did.

9        A      Yes, we did.

10       Q      Okay.  And explain what your participation

11   was.

12       A      When the DART Team, which is similar to your

13   problem properties unit, goes to a property, if

14   previous surveillance on that property has indicated

15   the presence of or potential presence of animals, we

16   send -- or the Jacksonville ACPS sends an animal

17   control officer with them to ensure that the animals

18   are being properly kept, conditions are proper, and

19   also to help assure the safety and protection of both

20   the police, code enforcement and other inspectors that

21   may be accompanying them.

22       Q      Is this when you get complaints about animal

23   treatment?

24       A      The DART Team goes out on a number of types of

25   complaints.  A lot of them are drug houses, or houses

Deposition of James Crosby                                     Angela Zorich vs. St. Louis County, et al

```
 1   that have other criminal activity going on, or houses

 2   and businesses that have been noted to be visibly in

 3   violation of various codes.

 4        Q    What kind of codes?

 5        A    Building codes, sanitation codes.

 6             MS. MATLOCK:  Priscilla, just whenever you get

 7   to a good point, can I have a restroom break?

 8             MS. GUNN:  You can take one now.  That's fine.

 9             MS. MATLOCK:  Thank you.

10             (Brief break.)

11   BY MS. GUNN:

12        Q    So we were talking about this DART program,

13   the DART Team that you had.

14        A    Yes.

15        Q    Your involvement was not when you were a

16   police officers, but was when you were with animal

17   control, correct?

18        A    I was not directly involved as a police

19   officer, although they did conduct operations in the

20   areas in which I worked, so I was aware of them and

21   occasionally had to provide extra police officers for

22   whatever purpose.

23             MS. MATLOCK:  I'm sorry.  Could I just ask

24        what time frame we're talking about?  I'm a little

25        confused.
```

Deposition of James Crosby                                    Angela Zorich vs. St. Louis County, et al

```
 1              MS. GUNN:  I asked him when he was a police

 2         officer.

 3              MS. MATLOCK:  Okay.

 4    BY MS. GUNN:

 5         Q    Do you know whether the DART Team or the code

 6    enforcement department, the sheriff's department, had

 7    the authority to obtain a search warrant for code

 8    violations?

 9         A    We don't get search warrants for code

10    violations.

11              Now, an inspection warrant can be obtained

12    under Florida law provided a residence -- provided it's

13    not being served on an owner-occupied residence.

14              An inspection warrant has to be given notice

15    24 hours before and does not authorize the use of

16    force.

17              A search warrant -- in my experience, I have

18    never known of a search warrant to be exercised with

19    force for a municipal code violation.

20         Q    Do you know whether search warrants are

21    authorized?  Just because you don't know of one, do you

22    know whether they're authorized for code violations?

23         A    To the best of my knowledge --

24              MS. MATLOCK:  I'll object to the form of the

25         question as vague and confusing.
```

1    BY MS. GUNN:

2        Q    For Jacksonville.

3        A    To the best of my knowledge, Florida law does

4    not provide for using search warrants for municipal

5    code violations.

6        Q    And what's the difference between a search

7    warrant and inspection warrant?

8        A    A search warrant can be served, depending on

9    the conditions imposed by the judge and the evaluation

10   of the incident, can be served day or night any day of

11   the week.  It can be served without prior knock and

12   notification.  A search warrant is served to seize and

13   obtain evidence of a crime.

14            An inspection warrant can only be served

15   Monday through Friday in daylight hours.  The

16   inspection warrant, which is what is used for municipal

17   code violations, has to be given 24 hours' notice to

18   the resident or occupant of the structure or business,

19   and is for the purpose of entering to examine for

20   possible code violations.

21       Q    And do you know -- you don't know what

22   Missouri law is then.

23       A    I have read over the Missouri law, and there

24   seems to be a difference between an administrative

25   warrant and a search warrant.  However, I'm not

1   familiar enough with that difference to opine one way

2   or another.

3        Q    And you're not a lawyer, are you?

4        A    No.

5        Q    I want to go back to the DART Team.  So when

6   does animal control become involved in -- or does

7   animal control ever become involved in inspection

8   warrants?

9        A    Yes.  Animal control actually obtains

10  inspection warrants when necessary, and they also

11  participate with the DART Team on inspection warrants

12  and so forth if there is any knowledge of or

13  possibility of animals being present.

14       Q    Anytime an animal is present?

15       A    Anytime an animal is present or likely to be

16  present, the DART Team typically involves an animal

17  control officer with that inspection.

18       Q    When you were a police officer or when you

19  were a -- do you call it a police officer or sheriff?

20  What was your --

21       A    Police officer.

22       Q    When you were a police officer with the

23  sheriff's department, did you have any involvement with

24  animals?

25       A    I was not assigned to animal control.  I did

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

1    encounter animals all the time in my duties.

2        Q    When did you become involved in your animal

3    work?

4        A    That became more focused after my retirement.

5        Q    And why did you leave the sheriff's

6    department?

7        A    Because I had retired with full service and

8    was able to.  Our minimum retirement was 20 years.  I

9    served 22 and a half years and decided that I wanted to

10   spend more time with my kids growing up and was blessed

11   to have had that opportunity.

12       Q    Now, you said that you were on the firearms

13   review board?

14       A    Yes, I served on the firearms review board.

15       Q    What exactly is that?

16       A    That is the board of police supervisors within

17   the Jacksonville Sheriff's Office that examine, along

18   with input from the State Attorney's Office and so

19   forth, the deployment of deadly force or the discharge

20   of firearms in any circumstance.

21       Q    Did you ever review situations where a police

22   officer discharged a firearm at a dog?

23       A    No.

24       Q    That never came up?

25       A    No.  In fact, in my career, I can't remember a

1   police officer here ever shooting a dog, other than --

2   let me back up -- other than dogs that were critically

3   injured and for which we could not get veterinary

4   response.

5           There were officers who, with supervisor

6   approval, used firearms, as provided under Florida law,

7   to euthanize an animal.  Some of those were dogs.

8   There were a couple of horses.

9           But as far as anybody actually shooting a dog,

10  I never shot a dog, nor am I personally aware of any

11  officer on the Jacksonville Sheriff's Office during

12  that period that ever did.

13      Q    When you were with the Jacksonville Sheriff's

14  Office, did you have any training on dog behavior or

15  how to handle aggressive dogs?

16      A    During my career, no.

17      Q    Did you ever get sued while you were a police

18  officer?

19      A    I was named in a suit once in the early 1980s

20  by a person who alleged that his drunk and disorderly

21  arrest was somehow illegal.  The City literally wrote

22  him a $50 check and he went away.  I'm not sure if it

23  was ever actually filed or not.

24      Q    Were you ever disciplined when you were a

25  police officer?

1    A    Yes.

2    Q    For what?

3    A    Not getting a report in on time.  I backed

4  into a tree once.

5         As a lieutenant, a sergeant under my command

6  approved a report that people didn't agree with, and he

7  was given discipline for approving a report because the

8  chief did not agree that the report was written

9  correctly, and I was given a verbal reprimand for not

10  having double-checked the sergeant's report.

11         That's about all I can remember.

12    Q    Have you ever served as an expert witness in a

13  police use-of-force case?

14    A    Police use of force against dogs, yes.

15    Q    Which cases?

16    A    A number of them.  Let's see.  We can start

17  with -- and I'll give you a copy of this -- starting in

18  2011, the case was Criscuolo versus the City of Moses

19  Lake, Washington.

20    Q    And where was that filed?

21    A    In federal court in the Eastern District of

22  Washington.  I believe it was Eastern, Eastern or

23  Central District.

24    Q    And who did you serve as an expert for?

25    A    I was an expert for the owner of the dog's

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

```
 1    attorney.

 2         Q    And what was the attorney's name?

 3         A    Adam Karp, K-a-r-p.

 4         Q    And who were the defendants in the case?

 5         A    The City of Moses Lake Police Department.

 6         Q    And did that involve the shooting of a dog?

 7         A    Yes.

 8         Q    What happened in that case?

 9         A    A dog came over to a canine handler, and the

10    canine handler, instead of properly using less lethal

11    force, discharged his firearm and killed the dog

12    needlessly.

13         Q    What was the outcome in that case?

14         A    The case was -- went to trial and was found in

15    favor of the plaintiff.

16         Q    Do you know what the damages were?

17         A    I don't know.  I don't remember at this point.

18         Q    Okay.  Any other cases where you served as an

19    expert in the use of force by a police officer?

20         A    Yes.  There was Shutts versus the City of

21    Ocoee, which is in Florida.  It was against the City of

22    Ocoee and Orange County Police Departments.

23         Q    And where was that case pending?

24         A    In federal court in Florida.

25         Q    Which federal court?
```

Deposition of James Crosby                                    Angela Zorich vs. St. Louis County, et al

```
 1        A      I think the Central District.  Orlando's in
 2   the middle of the state, so I think that's Central.
 3        Q      And who did you represent, or who did you
 4   testify for?
 5        A      I was hired by the attorney for the plaintiff.
 6        Q      And that was a dog owner?
 7        A      Yes.
 8        Q      What happened in that case?
 9        A      The case was, I believe, dismissed over
10   something about the jurisdictional issues and the
11   liabilities of the City.  I don't remember the actual
12   reason, but it had something to do with procedural
13   issues.
14        Q      Do you know the names of the attorneys?
15        A      I don't remember at this point.
16        Q      Any other cases?
17        A      Yes.  That was a dog bite.
18               Gonzalez versus the City of Pico Rivera,
19   California, in the Southern District of California
20   federal court, police shooting of a dog.
21        Q      What happened there?
22        A      The claim was that the police needlessly shot
23   a dog, a pit bull type, that was basically minding its
24   business in its own yard, and the case was settled in
25   favor of the plaintiff.
```

1    Q    And you represented the plaintiff, I assume?

2    A    Yes, on that particular case, I did.

3    Q    And do you remember the names of any of the

4    attorneys?

5    A    I don't remember off the top of my head.  I

6    think it was -- the attorney's name was Jill Ryther,

7    R-y-t-h-e-r.  I think that was the first case with her.

8    Q    Any other cases?

9    A    Yes.  In 2015, Branson versus the City of

10   Commerce City, Colorado, in federal court in whichever

11   federal district is in the Denver area.  It was a

12   police shooting.

13   Q    And what happened there?

14   A    A police officer shot and killed a dog that

15   was safely on a control stick and controlled by an

16   animal control officer.  The case was settled in favor

17   of the plaintiff, and the award on that case was

18   $262,500, plus $125,000 in legal fees.

19   Q    And you represented the plaintiff in that

20   case?

21   A    Yes, I did.

22   Q    Okay.  Any other case?

23   A    Moore versus the City of Erie, Colorado, in

24   federal court, same jurisdiction, so same district.

25   That was a police officer shot a dog that was in its

1    own front yard, and that case was settled in favor of

2    the plaintiff.

3         Q     And you represented the plaintiff in that

4    case?

5         A     In that case, I did.

6         Q     Any other cases?

7         A     Fisher versus the Adams County police in Adams

8    County, Colorado, in federal district.  That was a case

9    where --

10        Q     Where is Adams County?

11        A     That's Denver or part of Denver.

12        Q     And that's federal court?

13        A     Yes.

14        Q     And what happened in that case?

15        A     The police were responding to a call and a dog

16   was present, and they shot the dog instead of using any

17   kind of less or nonlethal force, and the settlement was

18   in favor of the plaintiff.

19        Q     And you represented the plaintiff in that

20   case?

21        A     Yes, I did.

22              In 2016, there was the Spokane County

23   Sheriff's Department and several of their officers in

24   the federal district in Washington State.

25        Q     And who was the plaintiff in that case?

1    A    Bradley Ray Beck.  I'm sorry.  No, it wasn't.

2  I don't have the name written down here of the

3  plaintiff.  I don't recall off the top of my -- let me

4  mark that as something I need to add to that list.

5    Q    Okay.  Who did you represent in that case?

6    A    I represented the plaintiff in that case, and

7  it was in the federal district in Washington.  It was

8  against the Spokane County Sheriff's Department where

9  they shot and killed a dog, and again the case was

10  settled in favor of the plaintiff.

11    Q    And what was the fact scenario?

12    A    That one I'm trying to remember exactly what

13  the call was, but it was a situation where the

14  officers, instead of even attempting to use any kind of

15  less lethal or nonlethal force methods, went straight

16  to shooting a dog that did not present a valid threat.

17    Q    Did you give a deposition in that case?

18    A    Yes, I did.

19    Q    Did you give depos in all of these other

20  cases?

21    A    Depos and/or reports.  Branson was a depo, I

22  believe.  Moore and Fisher were reports.

23    Q    Okay.  Moore was a report and Fisher was a

24  report.

25    A    Criscuolo was actually testimony and/or

1    deposition.

2        Q    How about Shutts?

3        A    Shutts, I believe we did do deposition.

4        Q    How about Gonzalez?

5        A    Gonzalez was deposition.

6        Q    Are there any other cases?

7        A    Yes.   There was the case of Bryan and Kathryn

8    Thomas versus the sheriff of Palm Beach County,

9    Florida.

10       Q    Where was that case pending?

11       A    That was in the southern federal district of

12   Florida.   That was a police shooting.   We went through

13   depositions on that.   The police shot a dog.   I don't

14   recall the exact circumstances of that at this point,

15   but the case was found -- was settled in favor of the

16   plaintiffs.

17       Q    And you represented the plaintiff?

18       A    Yes.

19            There was Marquez -- M-a-r-q-u-e-z -- versus

20   Officer Michael Robinson of the Pleasant Hill,

21   California Police Department in the federal district of

22   California.

23       Q    Which district in California?

24       A    I'm not sure.

25       Q    What area in California?

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

```
 1      A    Pleasant Hill, I think, was central
 2  California.
 3           That was, again, a police shooting.  That was
 4  settled in favor of the plaintiff.  There were
 5  depositions in that case.
 6      Q    And you represented the plaintiff?
 7      A    Yes.
 8           In 2017, there was Bonnie Lee -- L-e-e --
 9  versus Kern -- K-e-r-n -- County Probation Department.
10  That was a federal case in the Central District of
11  California where a probation officer shot and killed a
12  dog during a probation visit, and that was settled --
13  there were depositions in that, and that was settled in
14  favor of plaintiff.
15      Q    And you represented the plaintiff?
16      A    Yes.
17      Q    Okay.
18      A    Almendarez --  A-l-m-e-n-d-a-r-e-z -- versus
19  the City of Hollywood, Florida in the Southern District
20  of Florida, federal.  Police shooting and killing of a
21  dog.  In that case, the court issued summary judgment
22  and dismissed the case against the plaintiff.
23      Q    And did you have a depo in there?
24      A    Yes, I did.
25      Q    And you represented the plaintiff?
```

Case: 4:17-cv-01522-PLC   Doc. #: 29-2   Filed: 06/11/18   Page: 55 of 151 PageID #: 279

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

1     A     Yes.

2     Q     Okay.  Any other cases?

3     A     Regarding police shootings, no, not that have

4  been resolved.

5     Q     Are there any that you're currently working

6  on?

7     A     There are several in various jurisdictions

8  that are in different stages.

9     Q     What are the cases that are pending?

10    A     They are scattered around and --

11    Q     What are they?

12    A     There are police shootings in different

13  places.  And due to the fact that they're in various

14  stages, I've been told that I should not be disclosing

15  that until such time as the case becomes a matter of

16  record.

17    Q     I'm specifically asking you to tell me what

18  the cases are, and you're refusing to answer?

19    A     I have been told by counsels not to reveal

20  that until the cases are somehow disposed of.

21    Q     So you're refusing to answer my question; is

22  that --

23    A     I am following directions not to answer those

24  questions.

25          MS. GUNN:  I'll certify that.

```
 1              I mean, do you --
 2              THE WITNESS:  That's the advice I've been
 3        given.
 4   BY MS. GUNN:
 5        Q    Given by Ms. --
 6        A    No.  By attorneys in the other cases.
 7        Q    So how many other cases?
 8        A    Probably actively there's probably three or
 9   four.
10        Q    And you've been given advice by all the
11   attorneys in all three or four cases?
12        A    I've been told by those attorneys that it is
13   not proper for me to disclose information or discuss
14   those cases until such cases are closed.
15              In at least two of them, I've had to sign
16   confidentiality notices with the court where the court
17   has directed -- in fact, actually in all four that I
18   can think of, the court has directed that the parties
19   and experts and so forth not discuss the case.
20        Q    Well, where are these cases pending?
21        A    Since I've been told not to discuss them --
22        Q    You can't even --
23        A    -- I'm not going to tell you.
24        Q    You can't even tell me where they're pending?
25        A    I'm not going to tell you when a judge has
```

1   told me not to discuss a case.  And I'm not going

2   discuss a case.  I'm not going to be found in contempt.

3         Q     Are you an expert for the plaintiffs in all of

4   those cases?

5         A     In these particular cases, I have been, yes.

6   I have not been hired by a police department to review

7   any their shootings.

8               I have been an expert for a police department,

9   the police department here in Jacksonville, on the

10  alleged unlawful deployment of a canine against a

11  suspect.

12        Q     In your report, you mentioned that there's a

13  summary of facts that you reviewed?

14        A     Let's see.  That's not a document summary of

15  facts.  According to looking through these and

16  summarizing the facts for a matter of establishing a

17  report, the summary of facts is that on Tuesday, 29

18  April, members of the St. Louis County Police

19  Department served the warrant, and during the service

20  of that warrant they shot a dog.

21              That's part of the police report, that's part

22  of the testimony of the officers, that's part of the

23  testimony of the Plaintiffs.  It's simply the facts of

24  the case.

25        Q     Okay.

```
 1              MS. GUNN:  For the record -- and, Dan, you're

 2       still there -- I am asking for copies of those

 3       emails between you and Mr. Crosby.

 4              MR. KOLDE:  Sure.

 5              MS. GUNN:  And I think I'm entitled to them.

 6       I've asked for them in connection with this.

 7              So you will get them for me?

 8              MR. KOLDE:  Yeah, I'll get them to you,

 9       Priscilla.

10              MS. GUNN:  All right.

11  BY MS. GUNN:

12       Q    Mr. Crosby, what do you know about the

13  occupants of the Zorich house?

14       A    I have spoken to --

15              MS. MATLOCK:  I will just object to the form

16       of the question in that it's not specific to time

17       frame.  I don't know who -- it's speculative as to

18       who lives in the house now.

19  BY MS. GUNN:

20       Q    All right.  So the persons who were living at

21  the house on April 29, 2014.

22       A    I have spoken to Angela Zorich.

23       Q    Oh.  When did you speak to her?

24       A    I've spoken to her a couple of times simply to

25  have her report to me her version of the events.
```

1    Q    Oh.  What did she tell you?

2    A    She told me basically the same thing that she

3    said in her deposition, that she and a couple of family

4    members were present in the house when the search

5    warrant was served, and when the officer came through

6    the door, almost immediately he shot and killed her

7    dog.

8         She explained to me that she had been dealing

9    with Officer Rinck, and that she had explained to

10   Officer Rinck that she would be happy to let him have

11   access to the house as long as it was at a time when

12   her husband was there, and attempted to set such a

13   meeting up.

14        Ms. Zorich said that, according to her, her

15   dog was simply sitting along with one or two of the

16   other occupants of the house when the police came

17   through the front door and nearly immediately shot the

18   dog.  Ms. Zorich's statement was that the dog didn't

19   threaten or menace anybody.

20   Q    And are you accepting her version of facts as

21   true?

22   A    I review the facts and simply accept them as

23   the statements made by the various parties.  I don't

24   accept anybody's statement as necessarily true on the

25   face.  It's her version of what she said she saw.

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

```
1       Q     And you certainly have not read Officer

2   Rinck's deposition, so you don't know what he has to

3   say; is that correct?

4       A     I don't know what Officer Rinck had to say,

5   no.

6       Q     You read Officer Zorich's deposition.

7             MS. MATLOCK:  I'll just object to the form.

8             THE WITNESS:  Zavorka.

9   BY MS. GUNN:

10      Q     Correct?

11      A     Zorich is the Plaintiff.

12      Q     Oh, I'm sorry.  Zavorka.

13      A     Yes, I've read --

14      Q     There's two Zs.  It's confusing.

15      A     I've read his deposition, yes.

16      Q     And he doesn't say the dog was just sitting

17  there, does he?

18      A     No, he does not.

19      Q     So did you accept one version over the other?

20      A     No.

21      Q     Do you know anything about the history, the

22  criminal history or the arrest history, of any of the

23  residents at the time?

24      A     I have not been provided their rap sheets or

25  arrest history.  I do know that they -- on the date in
```

```
 1   question, a couple of people were arrested on

 2   misdemeanor and traffic charges.

 3        Q    So you're talking about outstanding warrants

 4   that they were arrested on?

 5        A    Failure to pay traffic ticket warrants, and I

 6   believe there may have been one misdemeanor assault

 7   warrant.

 8        Q    Are you familiar with any other arrest history

 9   of any of the other occupants?

10        A    No.  I was told by Ms. Zorich that one of the

11   occupants of the home had been previously accused of a

12   robbery.  My understanding from Ms. Zorich was that

13   that accusation was never substantiated and no charges

14   were filed.  I don't know whether that's accurate or

15   not.

16        Q    Would the accusations have a bearing, in your

17   opinion, on risks that the officers would encounter

18   entering the house?

19             MS. MATLOCK:  I'll just object to the form of

20        the question.  It's vague and confusing and might

21        call for an improper hypothetical.

22             But go ahead.

23             THE WITNESS:  Consideration of unsubstantiated

24        accusations has to be considered as simply that,

25        unsubstantiated accusations.
```

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

1   BY MS. GUNN:

2       Q    Are you aware of any prior encounters that any

3   of the residents of the Zorich home had with St. Louis

4   County police prior to April 29, 2014?

5       A    According to the documents and so forth, there

6   were apparently disputes, complaints of drinking, a

7   complaint of somebody urinating in a bush; low level

8   nuisance complaints that are quite common for police

9   departments to handle.

10      Q    Any other information you had about prior

11  encounters with police?

12      A    Apparently there have been -- there were

13  accusations that the people living at the Zorich home

14  were not friendly and perhaps rude and perhaps not

15  particularly cooperative, at least in the officers'

16  perceptions.

17      Q    Do you have a reason to think that those

18  perceptions were unjustified?

19      A    I don't know.

20      Q    And what information did you have about how

21  the occupants were not friendly and not cooperative

22  with the police?

23      A    In the testimony, there's allegations that

24  there was a contentious phone call between Officer

25  Rinck and Ms. Zorich.

1    There were the accusations in the report by

2  Officer Rinck that he had gone to the residence to

3  speak to somebody, and then when he knocked on the

4  door, they did not answer the door and yelled an insult

5  through the door at him.

6    Q    Have you ever served as an expert witness on

7  police policies or procedures before?

8    A    I have never been presented as an expert on

9  police policies and procedures.

10    Q    And have you ever served as an expert on the

11  appropriateness of a search warrant before?

12    A    I've never been asked to be such.

13    Q    You state in your report that the search

14  warrant in this case was issued under the pretense of a

15  municipal code violation.

16    What do you mean by that?

17    A    The search warrant was served for alleged

18  violations of municipal code.

19    Q    Do you have any reason to believe that the St.

20  Louis County had reason to believe that there were --

21  had probable cause to believe that there were code

22  violations connected with that residence?

23    A    The statement of the officer obtaining the

24  warrant, Officer Rinck, and put in for the warrant is

25  that he says he believes a serious and imminent risk

Case: 4:17-cv-01522-PLC    Doc. #: 29-2    Filed: 06/11/18    Page: 64 of 151 PageID #: 288

Deposition of James Crosby                                    Angela Zorich vs. St. Louis County, et al

1    exists to any person on or about the premises because

2    of numerous and serious code violations which need to

3    be abated as soon as possible to avoid any danger to

4    the health, safety and welfare of the community and for

5    anyone on or near this premises.

6          He then tries to justify that by claiming that

7    it somehow is a danger that the gas service is

8    disconnected, and that there was a potentially

9    dangerous deck that could be viewed from in plain view

10   from outside the residence and that that somehow gave

11   probable cause to enter the residence.

12    Q    Do you know whether the absence of gas service

13   to a home creates a safety issue with respect to the

14   residence?

15    A    I'd say absolutely not.  If the home doesn't

16   have gas, there's no chance of a gas leak, there's no

17   chance of a fire, there's no chance of an explosion.

18   It seems to me that the presence of gas would be more

19   dangerous than the absence of gas.

20    Q    Do you know whether there is a code that

21   requires gas service to a residence?

22          MS. MATLOCK:  I'll object to form of the

23          question, and it also calls for speculation.

24          THE WITNESS:  I have heard that there may be

25          such a code in St. Louis County.  I can't imagine

```
 1        why that would be.  That's like saying you have to

 2        have your Direct TV connected.

 3             MS. MATLOCK:  Mr. Crosby, I'll just remind you

 4        to answer specifically the question that she's

 5        asking.

 6             THE WITNESS:  I'm sorry.

 7   BY MS. GUNN:

 8        Q    So you can't think of any safety concerns

 9   associated with not having natural gas connected to a

10   home?

11        A    No, I can't.  In fact, it mentions in the

12   paperwork that, not only was the gas turned off, but it

13   was verified that the gas was turned off, that a plug

14   had been inserted and was still visibly present

15   blocking the service of gas, and that there had been no

16   attempt by the residents to bypass that system and to

17   restore gas.

18             So, no, I cannot think of a single safety

19   reason why -- my house doesn't have gas.  I have no

20   safety risk by not having gas.

21        Q    Do you have natural gas down here in this

22   area?

23        A    Yes.

24        Q    You have all electrical appliances, however.

25        A    Yes.
```

1    Q    You do.

2    A    Uh-huh.

3    Q    So if there are hot water heaters and stove

4  and appliances that are designed for natural gas, how

5  would you get hot water in a house that doesn't have

6  natural gas services?

7    A    I would suggest there's probably a whole bunch

8  of ways.  You could use your electricity to turn on a

9  hot plate.  You could use your microwave to warm up

10  water.  You could start a fire in the backyard and heat

11  up a bin.

12    Q    And do you think those alternative ways of

13  heating up water would cause a health or safety

14  concern?

15    A    I don't --

16        MS. MATLOCK:  I'll object to the form of the

17        question, that it exceeds the scope of this

18        expert's expertise.

19        You can answer.

20        THE WITNESS:  No.  Walmart sells hot plates

21        and electric kettles and so forth for heating water

22        every day all over the United States.  I think if

23        using an electric appliance to heat water was

24        dangerous, that would not be happening.  That's

25        ridiculous.

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

1   BY MS. GUNN:

2       Q    You certainly wouldn't consider yourself to be

3   an expert on codes, building codes, would you?

4       A    I've never been trained on the building codes

5   of St. Louis, no.  I'm familiar with some of the codes

6   here in Jacksonville, but I've never been a code

7   enforcement officer.

8       Q    And as far as that deck is concerned, do you

9   know whether there was anything that was blocking

10  people from walking onto that deck from inside the

11  house?

12           MS. MATLOCK:  I'm going to object, that calls

13      for speculation, and to the form of the question.

14           Go ahead.

15           THE WITNESS:  Other than good sense, I don't

16      know if there were or not.

17  BY MS. GUNN:

18      Q    And would you consider a sliding glass door or

19  a door where someone could walk onto that deck that you

20  saw a picture of, when there are children who -- at

21  least one child who resides in the residence, would you

22  consider that to be a safety issue?

23           MS. MATLOCK:  Again, object to the form of the

24      question and to the scope, that it's outside Mr.

25      Crosby's expertise.

Case: 4:17-cv-01522-PLC    Doc. #: 29-2    Filed: 06/11/18    Page: 68 of 151 PageID #: 292

Deposition of James Crosby                                Angela Zorich vs. St. Louis County, et al

1              Subject to that, you can answer.

2              THE WITNESS:  No.  You can lock a door, it's

3       easy.  Put a stick in it.  Use the little pin that

4       goes in the top of it.

5    BY MS. GUNN:

6       Q    Do you know whether that was done in this

7    case?

8       A    I don't know that it was or was not.

9       Q    In your report, you said that entry was made

10   by forcible use of a battering ram?

11      A    That's what was reported to me, yes.

12      Q    And who reported that to you?

13      A    I believe that was in the -- and actually I

14   don't believe in my report I said that a battering ram

15   was used.  I said it was a forcible dynamic entry.

16   That does not necessarily require the use of a

17   battering ram.

18              (Examining document.)  Okay, I'm sorry.  I

19   did.  It says here, "entry made by forcible use of a

20   battering ram to break open the front door."

21              And I believe that was reported in the

22   officer's deposition that they used the ram to pop the

23   door.  I don't remember exactly where, but I believe

24   that that -- I believe that to be accurate.

25              (Examining document.)  I know the officer

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

1  mentioned the ram officer.  I don't remember exactly

2  where I saw that or where I got that information at

3  this point.

4      Q    Do you know exactly who lived in that home,

5  that residence, on April 29, 2014?

6      A    I know that Angela Zorich did.  I'm not sure

7  who the other legal or regular residents were.

8      Q    Do you know how many children she had at the

9  time?

10      A    I know that there was a child present.  I

11  don't recall whether it was her child, and I don't know

12  how many children she has.  Actually, I take that back.

13  There was, I believe, one teenage -- at least one

14  teenage boy, perhaps two, that were her children.  I

15  don't know how many total she has.  I was thinking of

16  the small child that was there.  But apparently there

17  were two teenage boys.  I believe there was a Joe and

18  someone referred to as Izzy.

19      Q    Do you know whether she had any children under

20  the age of 12?

21      A    I don't know whether -- I don't recall whether

22  she had any children under the age of 12 or not.

23          Again, there was a -- I don't remember exactly

24  who the child was, but there was a young child in the

25  home at the time.

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

1    Q    Have you ever personally applied for a search

2    warrant?

3    A    Many times.

4    Q    And when was the last time?

5    A    Let's see.  Would have been while I was with

6    Animal Care and Protective Services back in 2016.

7    Q    But you didn't apply as a police officer; is

8    that correct?

9    A    I was applying as an animal control officer,

10   and, in accord with Florida Statute, that allows animal

11   control personnel to apply for search warrants.

12   Q    When was the last time you -- or did you ever

13   apply for a search warrant when you were a police

14   officer?

15   A    Many times.

16   Q    And when was the last time you did that?

17   A    Would have been before I retired in 1999.  I

18   can't give you a date.

19   Q    And you've not had any particular training on

20   property maintenance codes, have you?

21   A    No.

22   Q    Do you know whether Jacksonville does have a

23   property maintenance code?

24   A    Yes.

25   Q    Have you ever been consulted in developing a

1  policy on search warrants?

2      A    On search warrants in general, or search

3  warrants regarding animals?

4      Q    Either.

5      A    I have been in discussions with a number of

6  departments on incorporating concerns for animals in

7  search warrant policies, yes.

8      Q    When was the last time you did that?

9      A    Let's see.  I've discussed it with the sheriff

10  of Nye County, Nevada.

11      Q    When?

12      A    Last year.

13      Q    In 2017?

14      A    In 2017.

15          I've discussed it with various attendees at

16  National Sheriffs' Association meetings in 2017 and

17  before about their departments developing such policies

18  and have referred them to other policies such as I've

19  cited, and also things such as the IACP, which is the

20  International Association of Chiefs of Police, policy

21  recommendations for dealing with animals and for

22  dealing with search warrants.

23      Q    The IACP, is that like a well-recognized

24  association?

25      A    Absolutely.  The IACP and the National

Deposition of James Crosby                                Angela Zorich vs. St. Louis County, et al

1    Sheriffs' Association are the two premier law

2    enforcement agencies or law enforcement association

3    agencies across the country for chiefs, administrators,

4    and members of police and sheriff's departments.

5        Q    And they have model policies?

6        A    Yes.

7        Q    And the other is the National Sheriffs'

8    Association?

9        A    Yes.

10           And I actually serve as a subject matter

11   expert on canine encounters with the National Sheriffs'

12   Association.  In fact, I'm the subject matter expert

13   for them.

14       Q    Do you know whether either the IACP or the

15   National Sheriffs' Association had model policies prior

16   to April 29, 2014 that had to do with training on

17   aggressive dogs or search warrants that -- applying for

18   search warrants that took dogs into account?

19           MS. MATLOCK:  I'll object to the form of the

20       question that it's compound.

21           Subject to that, you can answer.

22           THE WITNESS:  I don't know.

23   BY MS. GUNN:

24       Q    Do you know anything about the St. Louis

25   County Police Department?

```
 1     A    Specifically as an agency, no.

 2     Q    Have you done any research on it?

 3     A    No.

 4     Q    Have you ever heard of CALEA?

 5     A    That's the -- yes, I've heard of them.  I

 6  can't remember what it stands for.  It has to do with

 7  training of officers, is what I remember correctly.

 8  There's a bunch of those multi-letter things in the law

 9  enforcement world that all kind of blend together.

10     Q    I mean, do you know what CALEA is?

11     A    I don't remember what that stands for.

12     Q    Do you know what --

13     A    I'm not sure exactly which group that is.

14     Q    Do you know what it does?

15     A    No.  Like I said, I'm not sure exactly which

16  group that is, if that's a group that oversees

17  training, or if that's a group that oversees -- or not

18  oversees, but makes recommendations on policies or

19  procedures.  I don't remember which one CALEA is.

20     Q    Do you know whether it's a recognized

21  organization in law enforcement?

22     A    I know that CALEA is one of the organizations

23  that has been mentioned to me as being recognized.

24  Again, I don't remember what CALEA stands for or what

25  their actual duties are.
```

Deposition of James Crosby                                    Angela Zorich vs. St. Louis County, et al

```
 1      Q     And are you aware that it's an accrediting

 2   association?

 3      A     Again, I don't remember exactly what CALEA

 4   does.

 5      Q     Is the Jacksonville Sheriff's Department

 6   accredited by any accrediting agencies?

 7      A     Yes.  We have been for quite a number of

 8   years.

 9      Q     And what is that?

10      A     I don't know.  I was never part of the

11   accreditation process, so I don't know what the

12   organization is.

13      Q     Do you know when it became accredited?

14      A     Before I retired, so in the '90s.

15      Q     Do you know whether St. Louis County policies

16   on use of force, applying for search warrants, complied

17   with national standards in 2014?

18      A     I don't know.

19      Q     Were you ever in the narcotics or the vice

20   unit with the Jacksonville Sheriff's Department?

21      A     I was never assigned to them permanently.  I

22   did do temporary duty with them on and off for a couple

23   of years.

24      Q     Does the Jacksonville Sheriff's SWAT Team

25   execute high-risk search warrants?
```

```
 1      A      Now they do.

 2      Q      How about --

 3      A      I'm not sure if they do in all cases.

 4      Q      How about in 2014?

 5      A      I don't know whether they do all of them or

 6 not.

 7      Q      What would you consider a high-risk search

 8 warrant?

 9      A      Entering a property for the purposes of going

10 after a dangerous criminal, for instance, or serving a

11 warrant that was specifically searching for firearms or

12 drugs or other felony offenses; cases where you knew

13 there was a serious fugitive likely to be holed up;

14 major cases.

15      Q      What about where the occupants on the inside

16 have been known to -- there's a risk that the police

17 officers inside could be injured due to a history based

18 on the occupants of the residence?

19           MS. MATLOCK:  I'll just object to the form of

20      the question and that it presents an improper

21      hypothetical.

22           Subject to that, you can answer.

23           THE WITNESS:  If one took that kind of an

24      outlook, then every single warrant would be

25      considered high risk, which I disagree with
```

```
 1        strongly, because just because people don't like

 2        you or disagree with you doesn't mean you have the

 3        justification to go in with high levels of force.

 4  BY MS. GUNN:

 5        Q    What about a history of assaultive behavior

 6  and a history of interfering with duties of police

 7  officers?

 8            MS. MATLOCK:  Again, I'll object to the form

 9        of the question and that it calls for an improper

10        hypothetical.

11            THE WITNESS:  Assault is a misdemeanor in the

12        state of Florida and is basically running your

13        mouth.  I wouldn't consider that to be a high-risk

14        behavior.

15            Interfering with police officers, such as was

16        mentioned in this, that's something that over the

17        years we've been very cautious to inform officers

18        that pulling on Superman's cape and running one's

19        mouth is not considered to be justification for

20        expecting force or for making an arrest.

21  BY MS. GUNN:

22        Q    So, in Florida, assault means running your

23  mouth?

24        A    In Florida, assault means threatening behavior

25  that does not involve physical battery.  Or aggravated
```

 1  assault would be pointing or displaying a weapon in

 2  such a manner as to cause the person harm.

 3         But threatening somebody, saying "I'm going to

 4  hurt you," or so forth, that would be assault.  There's

 5  no -- that's a misdemeanor.

 6     Q    Okay.  What about a history of battery where

 7  you'd actually injured people and a history of an armed

 8  robbery, would you consider that to be high risk?

 9         MS. MATLOCK:  I'll just again object to the

10         form of the question.  It seems compound and

11         presents an improper hypothetical.

12         Subject to that, you can answer.

13         THE WITNESS:  For simple battery, that would

14         be something for the officers to consider, but I

15         would not label that as being necessarily high

16         risk.

17  BY MS. GUNN:

18     Q    Would you consider that discretionary based

19  upon the circumstances of the case and how the officers

20  that are encountering it view the situation?

21     A    I would say it was within their discretion

22  based on the nature of the batteries involved and

23  whether that could be reasonably expected to be

24  directed in a dangerous manner towards the police

25  officers.

1    Q    And that is something that police officers

2    should take into account in determining how to execute

3    a search warrant.  Would you agree with that?

4    A    I would say, yes, that those factors should be

5    considered.  I would not personally find simple battery

6    to be a reason to escalate to a high-risk entry.

7    Q    But you would certainly agree that officers

8    have discretion in determining how much risk they may

9    be facing when entering a --

10   A    Yes, I --

11   Q    -- residence.

12        MS. MATLOCK:  Let her finish the question.

13        MS. GUNN:  I finished my question.

14        MS. MATLOCK:  I just want to object to the

15   form of the question that it's vague.

16        Subject to that, you can answer.

17        THE WITNESS:  I would say that a reasonable

18   officer, considering the circumstances presented,

19   does have discretion.

20   BY MS. GUNN:

21   Q    Do Jacksonville's policies allow officers to

22   use deadly force against an animal that creates a

23   danger to an officer?

24   A    A danger of what?

25   Q    A danger of being attacked.

1      A    Okay.  Are you talking about a danger of being

2  lunged at, barked at, or being bitten?

3      Q    Being attacked by.

4      A    Define "attack."

5          MS. MATLOCK:  Mr. Crosby, if you don't

6      understand the question, then you can ask her to

7      rephrase, but it's not a -- you don't need to ask

8      her a question in response to her question.

9          THE WITNESS:  You need to rephrase and define

10     what you mean by "attack."

11  BY MS. GUNN:

12     Q    Being bitten by.

13     A    Okay.  I'm not sure what Jacksonville's

14  policies state at this moment.

15     Q    Were you involved in developing the policies?

16     A    No.

17     Q    Have you been involved in developing any

18  policies for police departments?

19     A    When I was on the sheriff's department, I was

20  involved and had some input on developing policies and

21  practices for the field training program.

22     Q    But other than that, you've never been

23  involved in developing policies for a police

24  department; is that correct?

25     A    No, I've never done so.

1    Q    Now, you would agree that a judge did issue a

2    warrant in this case for police officers to search the

3    Zorich residence.

4    A    Yes.

5    Q    And a judge is supposed to review a warrant to

6    make sure that it complies with the law and the

7    Constitution, correct?

8    A    To the best of my knowledge, yes.

9    Q    So can officers rely on the validity of a

10   warrant when it's issued by a judge?

11   A    Certainly.

12   Q    And between you and a judge, who would have

13   the greatest experience on the validity and

14   constitutionality of a warrant?

15        MS. MATLOCK:  I'll object to the form of the

16        question and that it exceeds the scope of this

17        expert's expertise.

18        Subject to that, you can answer.

19        THE WITNESS:  I'm not a judge and I don't know

20        the specific judges involved, so I don't know

21        whether any particular judge is more or less

22        qualified.

23   BY MS. GUNN:

24   Q    Well, you haven't been to law school, have

25   you?

1      A      There's judges out there who haven't been to

2  law school, either.

3      Q      There are judges who haven't been to law

4  school?

5      A      There are judges who are elected.

6      Q      Okay.  Do you know, in Missouri, whether you

7  can be a judge without going to law school?

8      A      I don't know.

9      Q      So assuming that the judge that issued the

10  warrant in this case has been to law school and has a

11  law degree and is licensed to practice law in the state

12  of Missouri, would you believe that that person would

13  have more expertise in the lawfulness and the

14  constitutionality of the warrant that was issued in

15  this case than you do?

16          MS. MATLOCK:  Again, I'm going to object to

17      the form of the question as argumentative.

18          Subject to that, you can answer.

19          THE WITNESS:  I would hope so.

20  BY MS. GUNN:

21      Q      What's the population of the city of

22  Jacksonville?

23      A      The city itself is about 850,000.  The metro

24  area is about a million and a half.

25      Q      Do you know what it was in 2014?

Case: 4:17-cv-01522-PLC    Doc. #: 29-2    Filed: 06/11/18    Page: 82 of 151 PageID #: 306

Deposition of James Crosby                                    Angela Zorich vs. St. Louis County, et al

1       A       That's probably a 2012 to 2014 estimate.  It's

2    probably closer to 900,000 now.

3       Q       And when you were with the Jacksonville

4    Sheriff's Department, what was the population?

5       A       When I retired in '99, it was -- the city

6    itself was probably about 600,000 to 700,000 and the

7    surrounding area was probably close to a million.

8       Q       But you only had jurisdiction over the city

9    itself, correct?

10      A       Right.  Duval County at that point was

11   probably 600,000, 650,000 people.

12              I know that my particular area of

13   responsibility had a population at that time in that

14   area alone of about 160,000.

15      Q       Were you ever involved in making decisions of

16   how to execute a warrant, like whether it should be

17   knock and announce or --

18      A       Yes.

19      Q       Give me a circumstance when you had that

20   responsibility.

21      A       As a supervisor and -- there were many times

22   where, with my street crimes task force, we got search

23   warrants and we evaluated the situation to decide what

24   our means of gaining entry was going to be and how we

25   were going to execute it.

1    Q    Is it your opinion that there can never be a

2    no-knock entry for a property maintenance code

3    violation?

4    A    I don't believe that a municipal ordinance

5    violation rises to the level that I would ever approve

6    of or seek any no-knock warrant.

7    Q    Is there ever a situation you can think of

8    when it would be constitutional to do that?

9         THE WITNESS:  I don't know.

10        MS. MATLOCK:  I'm going to object.  That calls

11        for a legal conclusion.

12    BY MS. GUNN:

13    Q    And based on your report, is the only factor

14    to consider in whether a no-knock entry is appropriate

15    is the seriousness of the crime?

16    A    I would say that that has to be a major

17    consideration and also a consideration of the

18    documented likelihood of violent resistance and --

19    Q    Do you --

20    A    I'm sorry.

21    Q    I didn't mean to cut you off.

22        Do you know what the constitutional factors

23    are for officers to consider in determining whether it

24    should be no knock or knock and announce?

25        MS. MATLOCK:  Objection.  That calls for a

Deposition of James Crosby                                      Angela Zorich vs. St. Louis County, et al

```
 1      legal conclusion.
 2          THE WITNESS:  I don't -- I think the officers
 3      are responsible to consider the reasonability of
 4      the methods that they're using, and that to use an
 5      unreasonable amount of force would potentially
 6      violate the constitutional rights of persons,
 7      either property owners or persons involved.
 8  BY MS. GUNN:
 9      Q    Do you know what the constitutional factors
10  are for the officers to consider on whether the amount
11  of force is reasonable or not?
12          MS. MATLOCK:  Again, I'll object that it calls
13      for a legal conclusion.
14          Subject to that, you can answer.
15          THE WITNESS:  I wouldn't be comfortable giving
16      an opinion on that.  There's too many legal factors
17      involved.
18  BY MS. GUNN:
19      Q    And you didn't read any law on the
20  constitutional parameters of knock and announce or no
21  knock, did you?
22      A    No.
23      Q    And you haven't done any research on that,
24  have you?
25      A    No.
```

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

```
 1      Q     And no lawyer advised you about what the law

 2   was.

 3      A     No.

 4      Q     Was there anything about the history of the

 5   residents that you know about that increased the risk

 6   factor for officer safety in entering the Zorich

 7   residence?

 8      A     I'm not aware of anything that I would have

 9   considered making it significantly different.

10      Q     And when I'm reading your opinions, it looks

11   to me like you're saying that there must be exigent

12   circumstances to have a no-knock entry.

13      A     In my experience, exigent circumstances are

14   definitely involved, if not required, for using such a

15   strategy, and that can be either exigency in the course

16   of in the matter of the imminent destruction of

17   evidence or likelihood thereof, or of danger to people

18   in the residence, or particularly the necessity to go

19   in right now.

20      Q     What is your authority for that statement that

21   you just made?

22      A     The exigency -- I'm sorry.  My authority for

23   what?

24      Q     For stating that you need exigent

25   circumstances to have a no-knock entry.
```

Deposition of James Crosby                                    Angela Zorich vs. St. Louis County, et al

 1      A    I believe that that is recognized quite

 2 widely, that exigency is necessary to be in a hurry to

 3 execute a warrant and to -- whether it's a no-knock

 4 warrant in itself, I'm not sure what the legal

 5 requirements for exigency are.

 6           It's my opinion that exigency should be

 7 seriously considered.

 8      Q    And what is your authority for making that

 9 statement?

10      A    My experience over the years and discussion

11 with officers over the years.  I can't cite a written

12 document that's an authority for that.

13      Q    And you can't state where in the Constitution

14 it says that, can you?

15      A    I'm not a constitutional expert.

16           MS. MATLOCK:  Priscilla, sorry, but could we

17      take a short break and deal with the conference

18      call to get Jerry in?

19           MS. GUNN:  Sure.

20           (Brief break.)

21           (Mr. Dobson joined on conference call with Mr.

22      Kolde.)

23           THE WITNESS:  If I could, I'd like to redirect

24      to your last question about the exigency.  I now

25      remember where I first came across that.

1          In getting warrants in the state of Florida,

2     when I was on the police department, in order to

3     get a no-knock warrant that -- especially if it was

4     to be served at night or any day or whatever, part

5     of the requirement was you had to certify that

6     there were exigent circumstances that required the

7     ability to serve this warrant without warning to

8     the people, basically a no-knock warrant, and that

9     we had the ability to do it at night or any day

10    instead of Monday through Friday during daytime.

11         So that was part of -- my first knowledge of

12    that goes back to that was part of what we had to

13    certify to the court to obtain the permission to

14    have a no-knock warrant.

15         So that's my basis for that.

16    BY MS. GUNN:

17    Q     Okay.  But that's Florida law, correct?

18    A     That was Florida law, yes.

19    Q     You don't know if that's constitutional law.

20    A     I don't know.

21    Q     And you don't know if that applies to

22    Missouri, do you?

23    A     I don't know.

24    Q     Now, you said that there was an inspection

25    warrant that was available to the sheriff's department?

1      A    Yes.

2      Q    Now, what were the circumstances?  It had to

3   be during the week, during the day?

4      A    Right.  An inspection warrant in Florida,

5   which is what we would use for a municipal code

6   violation, has to be served during daytime hours,

7   Monday through Friday, holidays excepted, does not

8   authorize the use of forcible entry, and it is to be

9   served on resident -- I'm sorry -- businesses or

10   structures that are not owner occupied, in other words,

11   a rental structure.  A rental residence could be served

12   an inspection warrant.

13           And to serve an inspection warrant, which is

14   the warrants again that are used here for municipal

15   code violations, one must give the property owner or

16   the property occupant 24-hour notice before executing

17   that inspection warrant.

18      Q    So was there a way that you could get into a

19   residence if the owner did not consent?

20      A    If the owner did not consent, then one goes

21   back to court and gets a court order to forcibly enter.

22      Q    Did the inspection warrants require a court

23   order?

24      A    The inspection warrant came before a -- the

25   inspection warrant is issued by a competent magistrate

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

1    and is to be executed as I've described.

2              If the person then refuses entry, one goes

3    back and gets permission, an order from the court, to

4    use forcible means to enter the premises.

5        Q    So forcible means can be used to enter --

6        A    After --

7        Q    -- a residence.

8        A    -- notice and after being refused entry.

9        Q    Okay.  And that's under local law.

10       A    That's under Florida law, yes.

11       Q    Are the opinions that you're giving in this

12   case about the warrant, search warrant -- let me see.

13   You've got, I think, a list of 10 different opinions

14   that you gave in your report, correct?

15       A    Yes.

16       Q    Okay.  And the first several have to do with

17   warrants, right?

18       A    Yes.

19       Q    And those are your opinions based on Florida

20   law?

21       A    Those are my opinions based on my experience

22   as a police officer and my understanding of the law.

23       Q    Florida law, correct?

24       A    Florida law and looking at the documents from

25   the Missouri law.

1     Q     Have you done any research on Missouri law?

2     A     As I said, I have reviewed the Missouri

3  statutes that the County has provided.

4     Q     Okay.

5     A     And have looked at the Missouri Revised

6  Statutes as part of the information that I've consulted

7  since producing this report.

8     Q     Was there anything in Missouri Revised

9  Statutes -- or is there anything that happened in this

10 case that was contrary to Missouri Revised Statute?

11    A     Well, in looking at Missouri Revised Statute

12 Chapter 542.276.1 --

13         MS. MATLOCK:  I'm sorry.  I'm going to insert

14    the objection that it calls for a legal conclusion.

15         Subject to that, you can answer.

16         THE WITNESS:  Sub 3, it says that a search

17    warrant must identify the property, article,

18    material, substance or person which is to be

19    searched for and seized, in sufficient detail and

20    particularity that the officer executing the

21    warrant can readily ascertain that.

22         I don't see that in the -- in the application

23    for the warrant.  There's no specific article,

24    material, substance or person which is to be

25    searched for or seized.

Deposition of James Crosby                                    Angela Zorich vs. St. Louis County, et al

1   BY MS. GUNN:

2        Q    Let me see.   I have a question about your

3   opinion number 6.

4        A    Okay.

5        Q    You state:   The dynamic and forcible service

6   of the warrant without notice or warning did in reality

7   create a real and objective danger to occupants of the

8   home and the dog in the residence.

9             Doesn't that happen anytime there's a no-knock

10  entry or any kind of warrant, there's always an

11  increased danger?  Would you agree with that?

12       A    Yes.  And any kind of a service -- dynamic and

13  forcible service of a warrant does create danger that

14  didn't exist before the officers entered.

15       Q    So that's a given whenever a warrant is

16  executed.

17       A    I would say, yes, it's a given that the

18  officers create a level of hazard.

19       Q    There's also a level of hazard to the officers

20  when they enter a residence.

21       A    Yes.

22       Q    Do you have any information or knowledge about

23  the training that the officers who were involved in

24  this warrant received about executing warrants?

25       A    No.

Deposition of James Crosby                              Angela Zorich vs. St. Louis County, et al

1     Q     So you don't have any opinions about training

2     in this case; is that right?

3     A     No.  Let me rephrase.  I have no opinions

4     about the training regarding the service of warrants or

5     the operation of the SWAT Team.

6     Q     Do you have any opinions about other training

7     or any training that officers received?

8     A     Yes.  I believe that the -- it's my opinion

9     that the best practices standards that were established

10    long before this warrant was served showed that proper

11    training as to dealing with dogs and officer encounters

12    with dogs was established as a best practice and highly

13    recommended bit of training that apparently the St.

14    Louis County Police Department failed to recognize and

15    acknowledge even though nationally recognized, highly

16    respected departments and agencies were expressing that

17    as the best practices.

18    Q     Do you know how widely -- I'm sorry.  Let me

19    go back.

20          So the training that you said they should have

21    had was what?

22    A     Training in safe dog encounters.

23    Q     And how do you know that they didn't have

24    that?

25    A     I've seen no documentation that shows that

Case: 4:17-cv-01522-PLC    Doc. #: 29-2    Filed: 06/11/18    Page: 93 of 151 PageID #: 317

Deposition of James Crosby                                    Angela Zorich vs. St. Louis County, et al

1    they ever did.  And I believe that Officer Zavorka

2    mentioned in his deposition that he'd never been

3    trained on dealing with animals.

4         Q    So "safe dog encounters" means what?

5         A    Means exactly what it says, officer practices

6    and procedures for safely dealing with animals that

7    they come in contact, whether it be on a routine basis

8    or during arrests, during search warrants, in any case.

9         Q    In April 2014, do you know what percentage of

10   police departments, law enforcement agencies, in the

11   country had the type of training on safe dog encounters

12   that you recommended?

13        A    I don't know how deeply the training had

14   penetrated across the country.  I know that, again,

15   Chicago had a massive effort that was supported by the

16   Department of Justice COPS office, and that it was

17   available free of charge to all police departments in

18   the country.

19        Q    But you don't know how many police departments

20   actually had offered that type of training at the time.

21        A    I don't know.

22        Q    You said it's the best practices and it was

23   highly recommended.

24        A    Yes.

25        Q    But you don't know if it was standard practice

Deposition of James Crosby                                    Angela Zorich vs. St. Louis County, et al

1    by any means.  Would you agree with that?

2         A    I don't know how many departments gave it.

3         Q    So you don't know whether it was deliberately

4    indifferent for a department not to offer that training

5    at that time.

6              MS. MATLOCK:  I'll object, that calls for

7         speculation.

8              Subject to that, you can answer.

9              THE WITNESS:  I would say that for a major

10        police department to disregard recommendations by

11        such groups as the Department of Justice and major

12        police departments would be at best ignoring the

13        ability to provide their officers with necessary

14        training that would be best practices.  Nobody

15        should settle for less than best practices.

16   BY MS. GUNN:

17        Q    Do you have a reason to believe that any of

18   the officers entered the house with the deliberate

19   intent to shoot the dog?

20        A    I believe that the officers entered the house

21   with no plan to do anything else.  Officer Zavorka did

22   testify that they had no plan, that they just assumed

23   that their physical presence was somehow going to

24   magically avoid any kind of threat or encounter.

25        Q    My question is:  Do you have a reason to

1   believe that any of the officers entered the house with

2   the deliberate intent to shoot the dog?

3         MS. MATLOCK:  I'll object that it calls for

4      speculation.

5         Subject to that, you can answer.

6         THE WITNESS:  I don't have any grounds to know

7      whether they did or did not intend to shoot the

8      dog.

9         I know that they failed to have any sort of

10     plan to do anything else, despite having, among

11     other things, a catch pole with them.

12  BY MS. GUNN:

13     Q    Did you read the testimony about the number of

14  dog encounters that Officer Zavorka had had prior to

15  this incident?

16     A    Yes.  He said he'd had quite a few.

17     Q    Okay.  And do you doubt that?

18     A    I have no reason to doubt what he said.

19     Q    And you also read that this was the first time

20  he's ever had to shoot at a dog.

21     A    Yes.

22     Q    And you accept that?

23     A    I don't have any reason to doubt it, either.

24     Q    Do you have reason to believe that, based on

25  his prior experience with animals and with dogs that

1   he's encountered, that he had a need for additional

2   training or an additional plan, that he in his own mind

3   had that thought?

4         MS. MATLOCK:  Object to the form of the

5      question and it calls for speculation.

6         THE WITNESS:  I'm not sure what you're asking,

7      so let's try it again.

8   BY MS. GUNN:

9      Q   Okay, I absolutely will try it again.

10        So Officer Zavorka had in the past been

11  successful in achieving safety from dog attacks and dog

12  bites, correct?

13        MS. MATLOCK:  I'll object to that, calls for

14     speculation.

15        Subject to that, you can answer.

16        THE WITNESS:  He stated he had never been

17     bitten and he'd never had to shoot a dog.

18  BY MS. GUNN:

19     Q   Do you know whether he'd ever felt that he'd

20  been threatened by any dogs that he'd encountered in

21  the past?

22        MS. MATLOCK:  Objection, that calls for

23     speculation.

24        THE WITNESS:  I did not see any testimony to

25     whether he'd ever felt threatened before.

Case: 4:17-cv-01522-PLC   Doc. #: 29-2   Filed: 06/11/18   Page: 97 of 151 PageID #: 321

Deposition of James Crosby                                    Angela Zorich vs. St. Louis County, et al

1   BY MS. GUNN:

2      Q     So he had had success in avoiding negative

3   encounters with dogs in the past, correct?

4           MS. MATLOCK:  I'll object that it

5      mischaracterizes this witness' testimony and other

6      evidence and calls for speculation.

7           Subject to that, you can answer.

8           THE WITNESS:  I don't know what techniques he

9      had used before, and I don't know whether he'd felt

10     threatened before.

11          I know that he'd never -- he stated he'd never

12     shot a dog before.  I don't know what methods he

13     may have used that he failed to use this time.

14  BY MS. GUNN:

15     Q     Do you know whether he felt that there was --

16  that he needed to have a different plan for addressing

17  aggressive dogs before he entered that house?

18          MS. MATLOCK:  Objection, calls for

19     speculation.

20          Subject to that --

21          THE WITNESS:  Based on his testimony that he

22     assumed that simply his presence was somehow going

23     to magically protect him, apparently he didn't have

24     any other plans.

25  BY MS. GUNN:

Deposition of James Crosby                                    Angela Zorich vs. St. Louis County, et al

1     Q    My question is:  Do you have a reason to

2   believe that he had reason to believe that he needed

3   other plans?

4     A    I don't know what was in his mind.

5     Q    And you read his testimony about how the dog

6   charged at him?

7     A    I read that he testified that the dog charged

8   at him, yes.

9     Q    Do you have reason to believe that he did not

10  generally believe that he was in danger of being

11  injured from the dog charging at him?

12    A    I cannot testify to Officer Zavorka's beliefs

13  or his state of mind.

14    Q    Did you see any photographs showing where the

15  final resting place of the dog was in the house?

16    A    I saw photographs in the house, and the dog

17  was on the floor.  It wasn't real clear as to the

18  physical dimensions or locations of things.

19         In fact, the police department apparently was

20  deficient in actually producing a crime scene diagram

21  or documentation of the physical layout of where the

22  shootings happened.  That's something that my

23  department did every time we shot.

24         MS. MATLOCK:  Mr. Crosby, I'll just remind you

25    to answer the question that's asked.

Deposition of James Crosby                                    Angela Zorich vs. St. Louis County, et al

1    BY MS. GUNN:

2        Q    Did you see any photographs showing -- that

3    you could tell where the final resting place of the dog

4    was?

5        A    I could see it was inside the house.

6        Q    Could you tell how far from the door it was?

7        A    Not clearly, no.

8        Q    Could you ascertain or determine where the

9    final resting place was in relation to the door?

10       A    It was inside the door.  I don't recall at

11   this point exactly how far it appeared to be.  And,

12   again, there's no -- I've seen no evidence of

13   measurements taken to verify --

14       Q    Did you make an attempt to figure out how

15   close to the door the final resting place was?

16       A    No, I did not.  The final resting place may or

17   may not have been where the dog was shot.

18       Q    And if the resting place was at a different

19   place from where the dog was shot, what does that tell

20   you?

21       A    Could tell me several things, including that,

22   after the dog was shot, it was in pain and trying to

23   escape the residence.

24       Q    Are there other possibilities it could be

25   telling you?

1       A       It could have been moved by somebody.

2       Q       Anything else?

3       A       Any number of things.  It could have moved

4    there under its own power before or after being shot.

5       Q       Do you have an opinion about whether the

6    members of the -- we call it the TAC Team in St. Louis

7    County.  You understand what the Tac is?

8       A       Yes.

9       Q       Do you have an opinion about -- or let me

10   start again.

11              I think there's something that you say that

12   the TAC Team didn't follow St. Louis County policy?

13              MS. MATLOCK:  Object to the form of the

14       question.

15   BY MS. GUNN:

16       Q       Look at paragraph 7 of your report.

17       A       The policy that I was provided is that there

18   should have been adequate surveillance beforehand, and

19   there doesn't seem to have been.

20       Q       What policy?

21       A       Policy -- okay.  That was put in afterwards.

22   The policy 94-34 says that there should be a drive-by

23   and target reconnaissance, including the presence of

24   animals.

25              That was removed after this shooting.

1    Q    What do you mean?

2    A    The June 1st policy revision of that shows

3    that the provision to check for animals present was

4    deleted from the policy.

5          But at that time, the policy said that there

6    should have been target reconnaissance looking for the

7    presence and location of animals, and there's no

8    indication that any such notification or surveillance

9    was done other than simply taking Officer Rinck's word

10   for it.

11   Q    Well, what should have been done?

12   A    What my experience --

13   Q    According to the policy?

14   A    What should have been done is that they should

15   have done a drive-by, paying particular attention to

16   approaches, descriptions, and if you go down to (f),

17   animals present.

18   Q    Do you know whether that was done or not?

19   A    There is no indication, other than Officer

20   Rinck's statements, that there was a surveillance by

21   the TAC Team for animals present.

22   Q    So do you know whether the TAC Team drove by

23   and did surveillance of the residence before they

24   entered?

25   A    There is no documentation that they surveilled

1  for animals present.

2      Q     Do you know whether there's documentation that

3  they engaged in surveillance of the residence before

4  they entered?

5      A     I don't have any report that shows that they

6  did.

7      Q     Okay.  Did you read Officer Zavorka's

8  deposition?

9      A     Officer Zavorka's deposition was that -- yes,

10 I did read the deposition.

11     Q     And what does he --

12     A     And he states that, on page 51:  So you knew

13 there was a dog inside.

14           No, sir.

15           What did you know about the presence of a dog?

16           We knew there was a dog somewhere on the

17 premises.

18           So they were aware that the dog was present,

19 but did not make a plan for dealing with that dog.

20     Q     Well, that's different than surveillance.

21           MS. MATLOCK:  Object to the form of the

22           question as argumentative.  Is there a question?

23 BY MS. GUNN:

24     Q     I mean, you're saying that they violated the

25 policy because they didn't engage in surveillance to

1   check for the presence of dogs.

2          Well, do you know whether they did

3   surveillance to check for the presence of dogs?

4      A    He does not -- I do not recall him actually

5   saying that they did surveillance for that.  They were

6   operating off of Officer Rinck's statements that there

7   were dogs there.

8      Q    Do you know whether they engaged in any

9   surveillance of the property beforehand?

10     A    I do not recall in the deposition whether he

11  said they specifically did or not themselves.

12     Q    If the evidence is that the officers drove by

13  the house, looked at it carefully, did not see any

14  animals in their view that they're allowed to -- in

15  areas that they were permitted to step before they

16  executed the warrant, did they comply with the policy?

17         MS. MATLOCK:  I'm going to object that it

18      presents an improper hypothetical, is vague and

19      confusing.

20         But subject to that, if you understand, you

21      can answer.

22         THE WITNESS:  I still think that they were

23      deficient in trying to ascertain the location of

24      the dog or dogs present and, as such, I would find

25      that they failed to meet that requirement.

```
 1   BY MS. GUNN:

 2        Q     The policy?

 3        A     The policy.

 4        Q     Well, what else were they supposed to do?

 5        A     How about sitting back for a while and

 6   watching?  That's normally what one does when one

 7   serves a search warrant.  One puts somebody in place to

 8   watch and see who's coming and going, instead of

 9   getting in a hurry to go crashing in.

10        Q     Well, clearly they were aware that there was a

11   dog --

12        A     Yes, and failed --

13        Q     -- before they --

14        A     -- and failed to provide for that.

15        Q     So is it the officers' fault who didn't

16   provide for a way to deal with the dog?

17        A     I would say that the TAC Team should have

18   provided -- based on the information that there was a

19   dog present, they should have provided a plan and

20   established a means of dealing with that dog,

21   especially since they had, according to Officer

22   Zavorka, tools such as OC spray, tasers, batons, and

23   even a catch pole on the van that was with them, yet

24   they failed to avail themselves of those.

25        Q     Are tasers effective against dogs?
```

```
 1      A    Yes.

 2      Q    I mean, but also there's a risk associated

 3  with using them, too, because you have to get both

 4  prongs --

 5      A    Just like with a person.  But, yes, they're

 6  highly effective.

 7      Q    A dog is a smaller target, isn't it?

 8      A    That's correct.  And they're highly effective.

 9      Q    What are you supposed to do with the catch

10  pole if the dog is charging at you?

11      A    You do what tens of thousands of animal

12  control officers do every day, you grab it by the neck

13  and secure it.

14      Q    When it's charging at you?

15      A    Yes.  Or you use the end of it as a means of

16  distracting the dog and keeping it at a distance while

17  you then loop it over.

18           Again, tens of thousands of animal control

19  officers do that every day without firearms.

20      Q    Okay, but you don't know that police officers

21  do that ten thousand --

22      A    Police officers do it also.

23      Q    Do you know whether there were any animal

24  control people at the scene?

25      A    Eventually they were called in to the scene.
```

1    I don't believe they were there during the entry.

2        Q    And what do you base that on?

3        A    I know that animal control was directed to

4    pick up the dog that was there.

5        Q    And what do you base that on?

6        A    The statement that animal control recovered

7    the dog.  In fact, there's an animal control officer

8    who was -- somewhere here was described by name as

9    having picked up the dog.

10        Let's see.  It may be in the police report.

11    (Examining document.)  Trying to see where -- St. Louis

12    County Animal Control, according to the report,

13    14-23211, submitted by -- let's see what the signature

14    -- apparently it's Officer Rinck.  Trying to see where

15    on this report it issues as to who actually wrote this

16    report.  It says entered by Pfanstiel.

17        COURT REPORTER:  Entered by who?

18        THE WITNESS:  P-f-a-n-s-t-i-e-l, who if I

19        recall correctly, was the sergeant.  And it says

20        Reporting Officer:  Rinck.

21        So it's not really clear to me exactly who

22        actually wrote this report.  It says the reporting

23        party is Officer Rinck, and there's no signature on

24        the report.

25        But, in any case, the report states, page 11

1       of 13, St. Louis animal county -- I'm sorry -- St.

2       Louis County Animal Control was notified, at which

3       time Animal Control Officer Zambruski responded and

4       removed two dogs from the exterior of the

5       residence.

6           So that tells me that, yes, animal control was

7       called, but they had to be summoned to the scene

8       after the dogs were shot.

9   BY MS. GUNN:

10      Q    Do you have an opinion about what Officer

11      Fumagalli's role was in this situation?

12      A    Which one was he?

13      Q    He's a named Defendant.

14      A    Okay, Fumagalli.  Were inside the residence

15  when the shots were fired.  I'm referring to the report

16  here.

17          I don't have anything from Fumagalli or any

18  knowledge of what Fumagalli's role was other than the

19  fact that he was present.

20      Q    So you don't have any opinions directed to his

21  behavior specifically --

22      A    No.

23      Q    -- is that correct?

24      A    That's correct.

25      Q    And how about Pfanstiel, do you have any

Deposition of James Crosby                                    Angela Zorich vs. St. Louis County, et al

```
 1   opinions about his behavior specifically?

 2       A    Pfanstiel was the sergeant in charge of the

 3   TAC Team, if I understand correctly; is that right?

 4            MS. MATLOCK:  Just answer the questions that

 5       she -- if you can.  If you don't know, say --

 6            THE WITNESS:  I don't know which one Pfanstiel

 7       was.

 8   BY MS. GUNN:

 9       Q    So do you have any opinions directed him to

10   specifically?

11       A    Without knowing which officer he is, no.

12       Q    And how about Officer Zavorka?

13       A    Officer Zavorka, I believe, misinterpreted and

14   over -- misinterpreted the dog's presence and

15   overreacted to an animal that may or may not have been

16   a valid threat, and that Officer Zavorka was deficient

17   in the fact that he did not even attempt to use

18   anything other than deadly force, including simply

19   yelling no, sit, or using his vocal presence to attempt

20   to diffuse or control the situation.

21       Q    Do you have an opinion about whether that was

22   deliberate indifference on his part?

23       A    I don't know whether it was deliberate or not.

24       Q    And how about Officer Rinck?

25       A    I have not reviewed Officer Rinck's deposition
```

1    or testimony.  All I have is the allegations of others,

2    so I have no opinion one way or the other at this time

3    about Officer Rinck.

4         Q    Okay.  And how about St. Louis County?

5         A    I believe St. Louis County, as far as their

6    police department, should have been aware of the best

7    practices that were available and should have availed

8    themselves of.

9         Q    And that's your opinion --

10        A    Yes.

11        Q    -- for liability against St. Louis County; is

12   that correct?

13        A    My opinion is that St. Louis County should

14   have been actively pursuing best practices.

15             MS. GUNN:  Okay.  Let me take a minute here

16        and review my notes.  I'll have some more

17        questions, but I just need to --

18             MS. MATLOCK:  Want to go off the record for a

19        break?

20             MS. GUNN:  Yes, let's do that.

21             (Brief break.)

22   BY MS. GUNN:

23        Q    So, Mr. Crosby, you gave me something we

24   entered.  It's an article that he's written but it's

25   not yet published, and it's called Changing the

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

1  Narrative - Improving Law Enforcement and Dog

2  Encounters to Reduce Lethal Incidents and Improve

3  Community Relations with Pet Owners, correct?

4      A    Correct.

5      Q    And you told me that you've written this, but

6  it's not yet been published and disseminated; is that

7  correct?

8      A    Correct.  It was submitted to the Department

9  of Justice.  They were originally going to publish it.

10 Due to changes within the DOJ, they are not publishing

11 it, but it will be published in an upcoming version or

12 upcoming issue of the National Sheriffs' Magazine.

13         MS. GUNN:  Okay.  And we will mark that

14     Exhibit E, Crosby Exhibit E.

15         (Defendants' Exhibit E was marked for

16     identification.)

17 BY MS. GUNN:

18     Q    And then you've also given me another article

19 from the National Institute of Justice, Research in

20 Brief, and it's called Evaluation of Pepper Spray, and

21 there's also a sticker on this; is that correct?

22     A    Correct.

23     Q    And what's your purpose in giving this to me?

24     A    That is documentation that, as far back as

25 1997, the National Institute of Justice and others

```
 1   recognize that oleoresin capsicum spray, or pepper

 2   spray, is nearly 100-percent effective even on charging

 3   and aggressive dogs, and that it is a safe and

 4   effective means of self-defense for police officers.

 5            (Discussion off the record.)

 6   BY MS. GUNN:

 7        Q    So Crosby Exhibit E is the unpublished article

 8   or the article that you're planning on publishing in

 9   the future.

10        A    Correct.

11        Q    And then Exhibit F is the National Institute

12   of Justice article that you gave me, correct?

13        A    Correct.

14            (Defendants' Exhibit F was marked for

15        identification.)

16   BY MS. GUNN:

17        Q    Then I also want to mark your CV, which would

18   be Exhibit G.

19            MS. MATLOCK:  And would that be his new CV, or

20        the one that you already have?

21            THE WITNESS:  That's the latest one that I was

22        asked to bring.

23            (Defendants' Exhibit G was marked for

24        identification.)

25   BY MS. GUNN:
```

Deposition of James Crosby                                    Angela Zorich vs. St. Louis County, et al

```
1        Q    So Exhibit Number G is an up-to-date CV of

2   yours; is that correct?

3        A    Correct.

4             MS. GUNN:  And I'm going to mark H as the depo

5        notice.

6             (Defendants' Exhibit H was marked for

7        identification.)

8   BY MS. GUNN:

9        Q    Exhibit Number H is a copy of the Notice of

10  Deposition that you received with a list of documents

11  that you are to produce today; is that correct?

12       A    Yes.

13       Q    I want to go over this list with you.  Did you

14  bring with you all materials that you relied on to form

15  your opinions?

16       A    Yes.

17       Q    And those materials are?

18       A    The materials that we've entered as exhibits

19  and the other materials that were detailed in my report

20  under Materials Reviewed.

21            In addition to those materials specifically

22  listed, there were the policies and statutes that the

23  County provided recently to counsel.

24       Q    Okay.  And can you list those?

25       A    Yeah.  There were 16 color digital
```

1   photographs --

2       Q    Oh, no.  I mean the ones that were just

3   recently provided.

4       A    Oh, okay.  That would have the Missouri

5   Revised Statutes and the two versions of Tactical

6   Operations Unit Procedure, one that's dated June 1st,

7   2014, and the one that was in effect at the time of

8   this incident dated March 1st, 1994.

9       Q    And is there a number on them, like a general

10  order or --

11      A    The old one is procedure 94-34, and the new

12  apparently rewrite of that is labeled as 14-34.

13      Q    All right.  And then the third thing I asked

14  for is all correspondence with counsel, including

15  email, and you didn't bring that, but Mr. Kolde is

16  going to get that to me, correct?

17      A    Correct.

18      Q    And then number 4 is all documents evidencing

19  your fee schedule, and you're going to get that to me,

20  right?

21      A    Right.  You've got my current one, but I've

22  got to get you the copy -- and I believe that Mr. Kolde

23  may have -- in fact, I'm sure he has in his files the

24  one that was originally sent to him.  So that should be

25  easy to get a copy of.

1      Q      All right.   Then we have all ledgers and other

2    records of time that you spent working on the lawsuit.

3      A      I don't keep records and ledgers of time.

4      Q      A list of income earned by you during the

5    past four years for your consulting and expert witness

6    services?

7      A      I can give you a general figure.   I'm not

8    going to turn over my tax returns.

9      Q      Do you have any other records other than your

10   tax returns?

11     A      No, W-2s and tax returns.   And with social

12   security numbers and so forth, both mine and other

13   people's, I don't like to release those.

14     Q      Well, you can redact your social security

15   numbers.

16     A      I mean, I --

17     Q      You can redact personal identifying

18   information.

19     A      Okay.   I didn't know that I could do that.

20     Q      That's fine.

21     A      Okay.   Then I'll go through that and -- I'll

22   be happy to go through that and send it through Mr.

23   Kolde's office to you.

24     Q      Okay.

25     A      My concern with that, again, is not that -- is

1    simply the employer ID numbers and --

2         Q    I understand.  I'm not interested in that.

3         A    No problem.

4         Q    Okay.  And then do you have a ballpark for the

5    income that you've earned for consulting as an expert

6    witness in the last four years?

7         A    Expert witness regarding police cases?

8         Q    Yes.

9         A    Probably 10 percent, maybe 12 percent of my

10   total income.

11        Q    And what is that?

12        A    Last year, our household total income was, I

13   think, $184,000.

14        Q    Then number 7, we asked for if you published

15   any articles that have relevance, and you don't have

16   any published articles, but you have the one that you

17   plan to publish; is that correct?

18        A    Correct, and I brought that just to make sure

19   you had that.

20        Q    All right.  And number 8, if you prepared

21   preliminary opinions, I asked for that, and the only

22   thing that you've -- the only opinions that you've

23   given are this July 8, 2016 report; is that correct?

24        A    That's correct.

25        Q    I asked for all handwritten and computer notes

1   created by you in connection with your work in this

2   lawsuit.

3       A    I really don't keep that much as far as notes.

4   You looked through the reports, and I'll make -- as you

5   see, I put flags and stuff on things, but I don't keep

6   an extra set of notes.

7       Q    Okay.  And then we asked for any legal

8   literature or law citations or case law of the sort

9   that you reviewed in this case.

10      A    And the things I reviewed are in the list of

11   references and so forth in the report.

12      Q    All right.

13      A    And the other documents that I provided and so

14   forth.

15      Q    I wanted to ask you about these Other

16   Documents and Publications Consulted During This Case.

17   So you have 12 different sources?

18      A    Yes.

19      Q    Where do we get these or how do I --

20      A    They're all available online.

21      Q    All of them?

22      A    Yes, I believe so.  The only one I'm not sure

23   of -- that's online, that's online, that's online.  I

24   gave you the copy of the Problem of Dog-Related

25   Incidents and Encounters.  That's the document there.

 1   I gave you a copy of -- I gave you a copy of the

 2   Los Angeles Police Department directive regarding dog

 3   encounters?

 4        Q    Yes.

 5        A    The only one that I don't have to give you,

 6   and I don't know if it's online, is number 6, which is

 7   a book that was published back in 2002, called Fatal

 8   Dog Attacks:  The Stories Behind the Statistics.

 9        Q    Is there anything about police in there?

10        A    That has to do more with the identification of

11   dogs as being particularly or uniquely aggressive or

12   dangerous based on assumptions regarding breed or

13   appearance.  So it doesn't directly affect -- or it

14   doesn't directly address the question of police officer

15   interactions.

16             I list that because that does, along with a

17   lot of other stuff, but that does inform my opinions

18   towards whether one can make behavioral assessments

19   based on physical attributes.

20        Q    Would you agree that there are some breeds

21   that are more aggressive than others?

22        A    The only breed that's innately aggressive has

23   two legs and walks around, and we're talking here.

24             As far as dogs, no, there is no scientific

25   evidence that any breed is more or less aggressive than

1  any other.

2          Frankly, I've got Miniature Dachshunds.  And

3  if Dachshunds were four feet tall, we'd be not worried

4  about sharks.

5     Q    I do, too.

6          So are there certain breeds of dogs that are

7  involved in dog bite cases and dog fatality cases with

8  humans?

9     A    Based on the reliable evidence I've seen, dogs

10  involved -- most dogs involved in bites include

11  Labradors, Dachshunds, a couple of the small breeds.

12  People get -- Chihuahuas -- people get bitten by those

13  way more than other dogs, but then there's an awful lot

14  more of them.

15     Q    And what about fatalities?

16     A    Fatalities have occurred from Pomeranians to

17  Great Danes, literally.  The identification of breed

18  and fatalities, even according to the research done by

19  the Centers for Disease Control, is questionable,

20  because people make assumptions.  And the knowledge --

21  the documentation really just isn't there.  I wish it

22  was.

23     Q    So you want to just read through this list

24  from the Exhibit H, starting at maybe 9, and just make

25  sure there's nothing else that --

1    A    I looked through it.  I don't believe -- so no

2  notes.  I got the citations.

3         We talked about the deposition and trial

4  testimony.

5         You've got the publication.

6         I have a blog that's online that you can look

7  up if you just Google Jim Crosby dog blog.  That is

8  easy to get.

9         I don't place advertisements on the Internet.

10        I don't belong to an expert witness service,

11  nor do I take referrals from witness services.

12        The different versions of my curriculum vitae.

13  Whenever a different case or whatever comes up, I'm

14  updating it, so the one you've got is actually the

15  current one with all the other ones included in it.

16    Q    That's fine.

17    A    You've got copies of all the files I've got,

18  and you've got copies of all the material provided by

19  -- under discovery, so there's nothing else.  There's

20  nothing missing.

21    Q    Now, I think you've testified that it is a

22  common mistake for police officers to misread the

23  behavior of dogs without training; is that what you're

24  saying?

25    A    I'm not sure it's a common mistake.  It's a

1  mistake that I see, and sometimes officers do mistake

2  nonaggressive behavior for dangerous behavior.

3      Q    And charging dogs is one of the behaviors that

4  officers mistake?

5      A    One of the points that's raised by the

6  Department of Justice publication that we talked about

7  is that poorly trained officers incorrectly interpret

8  an approaching dog as a danger.

9          MS. GUNN:  I think that's all I have.  Yep,

10         that's all I have.

11         MS. MATLOCK:  Do you mind if we take a quick

12         break?  I may have a couple of questions for you.

13         (Brief break.)

14         MS. MATLOCK:  I do have a few questions for

15         you.

16         THE WITNESS:  Sure.

17                    CROSS-EXAMINATION

18  BY MS. MATLOCK:

19     Q    Based on your review of the search warrant and

20  the testimony and the documents that you have reviewed

21  in this case, do you have an idea of how much time

22  passed between the issuance of the search warrant and

23  the execution of it?

24     A    My understanding is that it was perhaps two

25  hours or so.

1      Q      And in your experience as a law enforcement

2  officer, do you find that to be unusual?

3             MS. GUNN:  I want to object to the question.

4      It's leading and also it's outside the scope of his

5      expertise.

6             THE WITNESS:  In my experience, it would have

7      been -- and including in warrants that I've served

8      on animal control cases, it would be unusual to

9      execute a search warrant, especially for a non-

10     in-progress crime, to be issued and served within

11     just a couple of hours.  That's a very short time

12     period.

13  BY MS. MATLOCK:

14     Q      In your experience, when you were an officer

15  executing a search warrant and supervising the

16  execution of search warrants, was there a specific time

17  frame between the issuance and execution of search

18  warrants, that you can recall?

19     A      In the state of Florida, from the issuance of

20  a search warrant to execution, it has to be within a

21  10-day period.  I believe, looking through Missouri

22  law, you also have a period of 10 days within which the

23  search warrant must be executed.

24     Q      Did you see -- we've talked about Officer

25  Zavorka's testimony.  Did you see anything in his

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

1   testimony about a 24-hour period, that you can recall?

2       A    I noticed, and I think it was in Officer

3   Zavorka's testimony, but I do recall that there was a

4   -- there's a policy within the St. Louis County TAC

5   Team that they ask for 24-hours' notice for the service

6   of a search warrant.  And right now I cannot recall

7   exactly where I saw that, but I recall specifically

8   seeing that somewhere, that there was a -- that their

9   policy is 24 hours.

10      Q    And in your experience in law enforcement as a

11  law enforcement officer, between the time the search

12  warrant is issued and it's served, would the police

13  department or law enforcement engage in some activity

14  to prepare for the execution of the search warrant?

15      A    Oh, yes.

16      Q    And what would that activity consist of?

17      A    It would consist of making sure that your Team

18  was gathered together, you had all tools you needed.

19  It would include -- in my own practice, it included

20  actually putting somebody to watch the target to see

21  who was coming and going to make sure that, for

22  instance, you weren't going in with a handful of people

23  and suddenly a guy with a busload of guns and bad guys

24  showed up that you weren't expecting.  So there would

25  be a period of time we would watch the target.

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

1          In drug issues, we wanted to watch and see if

2     the bad guy we were looking for got in his car and

3     drove away.

4          So there was always a matter of surveillance

5     for a period of time before going in.

6          And taking the time to do as much checking on

7     the layout and details of the structure or residence or

8     property to be searched.

9     Q    And do you know the purpose of taking the time

10    to examine the layout of the property?

11    A    Several.  To make sure there's nowhere for the

12    bad guys to run away, to make sure that you've covered

13    all the possible safety issues to the officers, to make

14    sure that you're not unduly causing a hazard.

15         For instance, my experience is we hated

16    serving search warrants when there were children

17    present, so we would often wait for the kid to go to

18    school and then serve the search warrant, especially if

19    we had any belief that there was going to be

20    resistance.  We didn't want to get a child used as a

21    hostage or caught in a crossfire.

22         We also, if there was a -- for instance, if we

23    were going on a weapons search or a highly violent

24    person, we would very often wait until the person drove

25    from the property, secured them off the property, and

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

1    then go in and serve the search warrant.

2             I participated in one of those as recently as

3    when I was out running animal control in Dade County.

4    We had a cruelty case where we were entering the

5    property.  We knew the person was mentally unstable and

6    was likely to be heavily armed.  And so, working with

7    the sheriff's office, we stationed detectives down the

8    street, and when he left to go to Walmart he was taken

9    down off property.  And then we searched the property

10   knowing that our primary bad guy was gone.

11   Q    In your experience as a law enforcement

12   officer, when you were serving a search warrant in a

13   residence where there were dogs present or you

14   suspected there were, how much time would you typically

15   allow to plan before going and executing the search

16   warrant between the issuance and the search itself?

17   A    I can't say that there was any particular time

18   that was dependent on animals.  I cannot remember a

19   search warrant that we served that we got it at, for

20   instance, 10:00 o'clock on Monday and were serving it

21   an hour or two later.  It was always a matter of a

22   couple of days later so that we could get our resources

23   together.

24   Q    Do you have any recollection as to how long it

25   would take to plan for animals in the home?

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

1      A    To be honest, back when I was a police

2   officer, there was very little recognition of the

3   importance of planning for that specifically.  But then

4   that was -- I was serving search warrants in the '80s,

5   so that was substantially before this incident

6   occurred.

7      Q    Do you have an opinion as to how long it would

8   reasonably take to prepare and plan for dogs in the

9   home?

10       MS. GUNN:  I'm going to object.  It's a vague

11       question, calls for speculation.

12       THE WITNESS:  I would say that it would be

13       whatever time that would be needed to contact

14       animal services and get somebody from animal

15       services present and available to, if nothing else,

16       simply take possession of the dogs at the

17       conclusion, however it went; enough time to make

18       sure that your officers were aware of the resources

19       they had, like catch poles; to make sure your

20       officers were aware of what to do in case a dog

21       popped out from some place, such as the deployment

22       of OC or pepper spray, which is extremely

23       effective; to make sure your officers understood

24       that if they decided to go to a conducted

25       electrical weapon, a taser, that they understood

Case: 4:17-cv-01522-PLC    Doc. #: 29-2    Filed: 06/11/18    Page: 126 of 151 PageID #: 350

Deposition of James Crosby                                          Angela Zorich vs. St. Louis County, et al

1    clearly that this was a horizontal target, not a

2    vertical target.

3         So that would be part of the briefing.  Part

4    of that would depend on how long it took animal

5    services to be part of it.

6         I have been part of such briefings, and have

7    participated as an animal resource here in Florida

8    on a couple of raids on dog-fighting places, in

9    Georgia on a raid on a dog-fighting location where

10   there were absolutely animals, and our conferences

11   regarding the animals themselves and how to address

12   them and how to keep the officers safe.

13        Those are probably 45 minutes or an hour by

14   themselves, and that was me briefing a SWAT Team --

15   in two cases a SWAT Team, and in the other case

16   briefing and organizing a crew of animal control

17   officers and deputies to make safe entry to the

18   property, to make sure that they kept distance from

19   the animals, to know what they were supposed to do

20   if one of these fighting animals -- because these

21   were for dog-fighting cases -- one of these animals

22   broke lose.  If, as a dog-fighting ring, if they

23   had loose dogs that were intended to be guard dogs.

24   We went through these discussions.

25        MS. MATLOCK:  I don't have any further

Deposition of James Crosby                                    Angela Zorich vs. St. Louis County, et al

1       questions for you.

2            MS. GUNN:  I don't have any follow-up.

3            MS. MATLOCK:  We'll read.

4            COURT REPORTER:  Are you ordering this

5       transcript?

6            MS. GUNN:  Yes.  And I need an e-Tran.  And I

7       need the exhibits.

8            COURT REPORTER:  And you want --

9            MS. MATLOCK:  I think we need everything, hard

10      copy and e-Tran.  At least a hard copy condensed.

11           (Witness excused.)

12           (At 12:20 p.m., the deposition was concluded.)

13                           -  -  -

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OATH

2    STATE OF FLORIDA   )

3    COUNTY OF DUVAL    )

4            I, Cindy Danese, do hereby certify that JAMES

5    CROSBY personally appeared before me and was duly

6    sworn.

7            WITNESS my hand and official seal this 30th

8    day of March 2018.

9

10

11

12                              _____

13                              Notary Public
                                State of Florida at Large.

14

15

16

17

18

19

20

21

22

23

24

25

Case: 4:17-cv-01522-PLC    Doc. #: 29-2    Filed: 06/11/18    Page: 129 of 151 PageID #: 353

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

1                C E R T I F I C A T E

2    STATE OF FLORIDA    )

3    COUNTY OF DUVAL     )

4            I, CINDY DANESE, Notary Public, State of

5    Florida at Large, certify that I was authorized to and

6    did stenographically report the deposition of JAMES

7    CROSBY; that a review of the transcript was requested;

8    and that the transcript is a true and complete record

9    of my stenographic notes.

10           I further certify that I am not a relative,

11   employee, attorney or counsel of any of the parties,

12   nor am I a relative or employee of any of the parties'

13   attorney or counsel connected with the action, nor am I

14   financially interested in the action.

15           Dated this 9th day of April 2018.

16

17

18                              _____

19                              CINDY DANESE, Notary Public
                                State of Florida at Large.

20

21

22

23

24

25

Case: 4:17-cv-01522-PLC    Doc. #: 29-2    Filed: 06/11/18    Page: 130 of 151 PageID #: 354

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

1    360 Litigation Services

2    Friday, April 13, 2018

3    Nicole A. Matlock
4    Dobson Goldberg Berns & Rich, LLP
5    5017 Washington Place3rd Floor
6    Saint Louis, MO, 63108

7    Re: Deposition of James Crosby
     Date:Friday, March 30, 2018
8    Case:Angela Zorich vs. St. Louis County, et al.

9    Nicole A. Matlock


10    Your witness did not waive the right to read and sign
      his/her deposition in the above referenced matter.
11    Enclosed is the copy of the deposition you ordered,
      together with errata sheets and additional signature
12    page.  Please instruct your witness to read the
      transcript, list any corrections (including page and
13    line number) on the errata sheets, sign and date the
      errata sheets and signature page.
14    Within 30 days, please return the errata sheets and
15    signature page to our office for further processing.

16    Your prompt cooperation will be appreciated.

17    Sincerely,

18
19    360 Litigation Services
20    Production Department
21    10097 Manchester Road, Suite 102
22    St. Louis, MO  63122
23    (314) 394-2206(main)
24    (314) 394-2207(fax)
25    office@360litigationservices.com

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

1    Page Line Should Read:

2    Reason for change:

3

4    Page Line Should Read:

5    Reason for change:

6

7    Page Line Should Read:

8    Reason for change:

9

10    Page Line Should Read:

11    Reason for change:

12

13    Page Line Should Read:

14    Reason for change:

15

16    Page Line Should Read:

17    Reason for change:

18

19    Page Line Should Read:

20    Reason for change:

21

22    Page Line Should Read:

23    Reason for change:

24

25

Deposition of James Crosby                                          Angela Zorich vs. St. Louis County, et al

1    Page Line Should Read:

2    Reason for change:

3

4    Page Line Should Read:

5    Reason for change:

6

7    Page Line Should Read:

8    Reason for change:

9

10    Page Line Should Read:

11    Reason for change:

12

13    Page Line Should Read:

14    Reason for change:

15

16    Page Line Should Read:

17    Reason for change:

18

19    Page Line Should Read:

20    Reason for change:

21

22    Page Line Should Read:

23    Reason for change:

24

25

Deposition of James Crosby                                    Angela Zorich vs. St. Louis County, et al

1    Comes now the witness, James Crosby,

2    and having read the foregoing transcript

3    of the deposition taken on 3/30/2018,

4    acknowledges by signature hereto, that together

5    with any attached errata or Amendment to Deposition Pages,

6    constitutes a true and accurate transcript of the testimony

7    given on the date hereinabove mentioned.

8

9    _____

10   James Crosby

11

12   Subscribed and sworn to me before this

13   _____ day of _____,20____.

14   My Commission expires

15

16

17   _____

18   Notary Public

19

20

21

22

23

24

25

Case: 4:17-cv-01522-PLC    Doc. #: 29-2    Filed: 06/11/18    Page: 134 of 151 PageID #: 358

Deposition of James Crosby                                                    Angela Zorich vs. St. Louis County, et al

```
              133
 1    COURT MEMO


 3

 4

 5    Angela Zorich vs. St. Louis County, et al.

 6

 7

 8    CERTIFICATE OF OFFICER AND

 9    STATEMENT OF DEPOSITION CHARGES

10

11    DEPOSITION OF James Crosby

12

13    3/30/2018

14    Name and address of person or firm having custody of

15    the original transcript:

16    Priscilla Gunn

17    St. Louis County Counselor's Office

18    41 S. Central, 9th flr

19    St. Louis, MO 63105

20

21

22

23

24

25
```

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

```
1    ORIGINAL TRANSCRIPT TAXED IN FAVOR OF:

2    Priscilla Gunn

3    St. Louis County Counselor's Office

4    41 S. Central, 9th flr

5    St. Louis, MO 63105

6    Total:

7    1 ONE COPY - TAXED IN FAVOR OF:

8    Nicole A. Matlock

9    Dobson Goldberg Berns & Rich, LLP

10   5017 Washington Place, 3rd Floor

11   Saint Louis, MO 63108

12   Total:

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case: 4:17-cv-01522-PLC    Doc. #: 29-2    Filed: 06/11/18    Page: 136 of 151 PageID #: 360

Deposition of James Crosby                                          Angela Zorich vs. St. Louis County, et al

1     Upon delivery of transcripts, the above

2     charges had not been paid.  It is anticipated

3     that all charges will be paid in the normal course

4     of business.

5     360 Litigation Services

6     10097 Manchester Road, Suite 102

7     St. Louis, Missouri 63122

8     IN WITNESS WHEREOF, I have hereunto set

9     STATEMENT OF DEPOSITION CHARGES

10     my hand and seal on this _____ day of _____

11     Commission expires

12     _____

13     Notary Public

14

15

16

17

18

19

20

21

22

23

24

25

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

## WORD INDEX

**< >**
132:9
132:13, 17
135:12
**133** 2:1
**5017** 134:10
**Commission**
135:11
**Date:Friday**
129:1
errata 129:1
his 129:1
**James** 132:10
**My** 132:14
135:10
**Notary**
132:18
135:13
**Page Line**
**Should**
130:10, 13, 16,
19, 22 131:10,
13, 16, 19, 22
**Reason**
130:11, 14, 17,
20, 23 131:11,
14, 17, 20, 23
**Saint** 134:11
**Subscribed**
132:12
together
129:1
**Total** 134:12
transcript
129:1
**1** 134:7
**10097** 135:6
**360** 135:5
**41** 134:4
acknowledges
132:4
and 132:2
charges 135:2
**Comes** 132:1
constitutes
132:6

**Dobson** 134:9
given 132:7
**IN** 135:8
**Nicole** 134:8
of 132:3
135:4
**ORIGINAL**
134:1
**Page Line**
**Should** 130:1,
4, 7 131:1, 4,
7
**Priscilla**
134:2
**Reason**
130:2, 5, 8
131:2, 5, 8
**St** 134:3, 5
135:7

**STATEMENT**
135:9
that 135:3
**Total** 134:6
**Upon** 135:1
with 132:5

**< $ >**
**$1,000** 11:1
**$125,000** 49:1
**$184,000**
114:1
**$200** 11:1
**$262,500** 49:1
**$3,000** 11:1,
1 12:1
**$50** 45:1
**$600** 11:1

**< , >**
,20 132:13

**< 1 >**
**1 360** 129:1
**1 COURT**
2:1
**10 Your** 129:1
**10:00** 123:1
**100-percent**
110:1

**102** 129:1
135:6
**10-29** 7:1
**108** 8:1
**109** 3:1
**10-day** 120:1
**11**
**DEPOSITION**
2:1
**11 Enclosed**
129:1
**110** 3:1, 1
**112** 3:1
**12 page** 129:1
**12:20** 1:1
126:1
**120** 3:1
**13 3** 2:1
**13 line** 129:1
**14 Name** 2:1
**14 Within**
129:1
**14-23211**
105:1
**14-34** 112:1
**15 signature**
129:1
**15 the** 2:1
**16 Priscilla**
2:1
**16 Your** 129:1
**160,000** 81:1
**17 Sincerely**
129:1
**17 St** 2:1
**18 41** 2:1
**19 360** 129:1
**19 St** 2:1
**1967** 18:1, 1
**1977** 34:1
**1978** 34:1
**1980s** 45:1
**1987** 35:1
**1994** 112:1
**1997** 109:1
**1999** 18:1
**1st** 100:1
112:1, 1

**< 2 >**
**2 Friday**
129:1
**20 Production**
129:1
**2002** 116:1
**2005** 22:1, 1
**2006** 23:1
**2007** 23:1
24:1 32:1
**2007-2009**
29:1
**2008** 24:1, 1
32:1
**2009** 31:1
32:1
**2011** 27:1, 1
28:1, 1 31:1
32:1 33:1
46:1
**2012** 25:1
32:1 81:1
**2014** 22:1, 1
23:1 32:1, 1
57:1 61:1
68:1 71:1
73:1 74:1
80:1 81:1
92:1 112:1
**2015** 49:1
**2016** 6:1
11:1 17:1
31:1 50:1
69:1 114:1
**2017** 53:1
70:1, 1, 1
**2018** 1:1
127:1 128:1
129:1, 1
132:3 2:1
**21 10097**
129:1
**22 St** 129:1
**23** 129:1
**24** 129:1
**24-hour** 87:1
121:1
**24-hours**
121:1

**25**
office@360liti
gationservices.
com 129:1
**25-percent**
14:1
**27** 3:1
**29** 22:1 23:1
32:1 56:1
57:1 61:1
68:1 71:1

**< 3 >**
**3 Nicole** 129:1
**30** 1:1 129:1,
1 132:3 2:1
**30th** 127:1
**314** 2:1, 1
129:1, 1
**32** 3:1
**32202** 1:1
**394-2206**
129:1
**394-2207**
129:1
**3rd** 2:1
134:10

**< 4 >**
**4 Dobson**
129:1
**4:17-cv-1522P**
**LC** 1:1
**41** 2:1
**45** 125:1

**< 5 >**
**5 5017** 129:1
**5 Angela** 2:1
**5017** 2:1
**51** 101:1
**542.276.1**
89:1
**55** 9:1
**56** 9:1

**< 6 >**
**6 Saint** 129:1
**600,000** 81:1, 1

*1*
**615-7042** 2:1
**621-8363** 2:1
**63105** 2:1
2:1 134:5
**63108** 2:1
129:1 134:11
**63122** 129:1
135:7
**650,000** 81:1

**< 7 >**
**7 Re:**
**Deposition**
129:1
**700,000** 81:1

**< 8 >**
**8 Case:Angela**
129:1
**8**
**CERTIFICAT**
**E** 2:1
**80s** 124:1
**850,000** 80:1
**87** 35:1, 1

**< 9 >**
**9 Nicole** 129:1
**9**
**STATEMENT**
2:1
**9:00** 1:1
**900,000** 81:1
**90s** 73:1
**93** 35:1 36:1
**94-34** 99:1
112:1
**99** 81:1
**9th** 128:1
2:1 134:4

**< A >**
**a.m** 1:1
abated 63:1
abducted
16:1
ability 86:1,
1 93:1

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

able 23:1
25:1 44:1
absence 63:1,
1
absolutely
32:1 63:1
70:1 95:1
125:1
Abuse 17:1
academy 34:1
accept 58:1,
1 59:1 94:1
accepted 13:1
accepting
58:1
access 25:1
58:1

accompanying
39:1
accord 69:1
account 71:1
77:1
accreditation
73:1
accredited
73:1, 1
accrediting
73:1, 1
accurate
14:1 60:1
67:1 132:6
accusation
60:1
accusations
60:1, 1, 1
61:1 62:1
accused 60:1
achieving
95:1
acknowledge
91:1
ACPS 39:1
action 128:1,
1
actively 55:1
108:1
activities 34:1
activity 40:1
121:1, 1

actual 5:1
22:1 48:1
72:1
Adam 47:1
Adams 50:1,
1, 1
add 51:1
added 33:1
addition
111:1
additional
95:1, 1 129:1
additions 7:1
address 13:1
38:1 116:1
125:1 2:1
addressing
96:1
adequate
99:1

administrative
42:1

administrators
71:1
advertise
12:1, 1
advertisement
s 118:1
advice 55:1, 1
advised 9:1
84:1
Advocates
24:1
affect 116:1
age 68:1, 1
agencies 20:1
22:1, 1, 1, 1
23:1, 1, 1, 1
29:1 30:1
32:1 33:1, 1
34:1, 1, 1
71:1, 1 73:1
91:1 92:1
agency 18:1
72:1
aggravated
75:1

aggression
4:1 12:1
13:1 17:1
30:1, 1 33:1
aggressive
13:1 16:1, 1
20:1 22:1, 1
26:1 45:1
71:1 96:1
110:1 116:1,
1, 1, 1
agree 12:1
16:1, 1, 1
33:1, 1 37:1
46:1, 1 77:1,
1 79:1 90:1
93:1 116:1
agreed 11:1
ahead 14:1
26:1 60:1
66:1
al 1:1 129:1
2:1
Alberta 24:1
aliens 16:1
allegations
61:1 108:1
alleged 15:1
36:1 45:1
56:1 62:1
allow 77:1
123:1
allowed 102:1
allows 69:1
Almendarez
53:1
A-l-m-e-n-d-a-
r-e-z 53:1
alternative
65:1
Amendment
132:5
American
13:1
amount 83:1,
1
Amy 30:1
Anderson 1:1

ANGELA
1:1 4:1
57:1 68:1
Angeles 29:1
30:1 31:1, 1,
1, 1 116:1
animal 13:1,
1 17:1, 1, 1, 1
20:1 21:1, 1
22:1, 1 23:1,
1, 1 24:1, 1, 1
25:1 38:1, 1,
1 39:1, 1, 1, 1
40:1 43:1, 1,
1, 1, 1, 1, 1
44:1 45:1
49:1 69:1, 1,
1 77:1 104:1,
1, 1 105:1, 1,
1, 1 106:1, 1,
1, 1 107:1
120:1 123:1
124:1, 1
125:1, 1, 1
animals 39:1,
1 43:1, 1
44:1 70:1, 1,
1 92:1, 1
94:1 99:1
100:1, 1, 1, 1
101:1 102:1
123:1, 1
125:1, 1, 1, 1,
1
announce
81:1 82:1
83:1
answer 8:1
15:1 34:1
54:1, 1, 1
62:1 64:1
65:1 67:1
71:1 74:1
76:1 77:1
79:1 80:1
83:1 89:1
93:1 94:1
95:1 96:1
97:1 102:1
107:1

answered
14:1
anticipated
135:2
anybody
37:1 45:1
58:1
anybody's
58:1
anyplace 12:1
Anytime
43:1, 1 90:1
apart 21:1
apparently
6:1 7:1
61:1, 1 68:1
91:1 96:1
97:1 105:1
112:1
APPEARANC
E 2:1 116:1
appeared
98:1 127:1
appliance
65:1
appliances
64:1 65:1
application
89:1
applied 69:1
applies 86:1
apply 69:1, 1,
1
applying
69:1 71:1
73:1
appreciated
129:1
apprehension
37:1
approaches
100:1
approaching
119:1
appropriate
82:1
appropriatene
ss 62:1
approval

17:1 45:1
approve 82:1
approved
46:1
approving
46:1
April 22:1, 1
23:1 32:1
56:1 57:1
61:1 68:1
71:1 92:1
128:1 129:1
area 23:1
24:1, 1 29:1,
1, 1, 1 32:1
35:1, 1 36:1
49:1 52:1
64:1 80:1
81:1, 1, 1
areas 35:1, 1
40:1 102:1

argumentative
80:1 101:1
armed 76:1
123:1
arrest 45:1
59:1, 1 60:1
75:1
arrested 60:1,
1
arrests 92:1
Article 3:1, 1,
1 27:1 89:1,
1 108:1
109:1 110:1,
1, 1
articles
114:1, 1
ascertain
89:1 98:1
102:1
asked 8:1
15:1 41:1
57:1 62:1
97:1 110:1
112:1 114:1,
1, 1 115:1
asking 6:1
8:1 21:1

Deposition of James Crosby

Case: 4:17-cv-01522-PLC    Doc. #: 29-2    Filed: 06/11/18    Page: 139 of 151 PageID #: 363

Angela Zorich vs. St. Louis County, et al

54:1  57:1
64:1  95:1
**ASPCA** 26:1
**assault** 60:1
75:1, 1, 1
76:1, 1
**assaultive**
75:1
**assess** 25:1
**assessing**
21:1
**assessment**
21:1  25:1
**assessments**
116:1
**assigned**
37:1, 1  43:1
73:1
**Assistant** 2:1
**associated**
17:1  34:1
35:1  37:1
64:1  104:1
**Association**
17:1  19:1
22:1  24:1, 1
70:1, 1, 1
71:1, 1, 1, 1, 1
73:1
**assume** 11:1
49:1
**assumed**
93:1  96:1
**assuming** 8:1
80:1
**assumptions**
116:1  117:1
**assure** 39:1
**Atlanta** 26:1
30:1, 1  32:1
**attached** 7:1
132:5
**attack** 78:1, 1
**attacked**
77:1  78:1
**attacks** 20:1,
1, 1, 1, 1  21:1,
1  24:1  25:1
95:1  116:1

**attempt** 64:1
98:1  107:1, 1
**attempted**
58:1
**attempting**
51:1
**attend** 23:1
**attendance**
23:1
**attended**
22:1, 1  23:1,
1, 1  24:1, 1, 1,
1  25:1
**attendees**
23:1  25:1
70:1
**attention**
100:1
**attorney** 4:1,
1  11:1  47:1
48:1  128:1, 1
**attorneys** 9:1
10:1  22:1
48:1  49:1
55:1, 1, 1
**Attorney's**
44:1  47:1
49:1
**attributes**
116:1
**Australia**
20:1
**authoritative**
27:1
**authority**
41:1  84:1, 1
85:1, 1
**authorize**
41:1  87:1
**authorized**
41:1, 1  128:1
**automatic** 6:1
**avail** 103:1
**available** 8:1
29:1  86:1
92:1  108:1
115:1  124:1
**availed** 108:1
**avoid** 63:1

93:1
**avoiding** 96:1
**award** 49:1
**aware** 31:1
32:1  33:1
34:1  40:1
45:1  61:1
73:1  84:1
101:1  103:1
108:1  124:1,
1
**awful** 117:1

**< B >**
**back** 9:1
15:1  26:1, 1
27:1  31:1
32:1  43:1
45:1  68:1
69:1  86:1
87:1  88:1
91:1  103:1
109:1  116:1
124:1
**backed** 17:1
46:1
**backyard**
65:1
**bad** 36:1
121:1  122:1,
1  123:1
**ballpark**
114:1
**Bar** 22:1
**barked** 78:1
**base** 11:1
105:1, 1
**based** 16:1
29:1  74:1
76:1, 1  82:1
88:1, 1  94:1
96:1  103:1
116:1, 1
117:1  119:1
**basic** 10:1
**basing** 33:1, 1
**basis** 86:1
92:1
**Bathurst** 26:1

**batons** 103:1
**batteries** 76:1
**battering**
67:1, 1, 1, 1
**battery** 75:1
76:1, 1  77:1
**beach** 19:1
52:1
**bearing** 60:1
**Beck** 51:1
**began** 32:1
**Behalf** 1:1
**behavior**
13:1, 1, 1, 1
15:1  17:1
20:1, 1  21:1
22:1  26:1
30:1  32:1
45:1  75:1, 1,
1  106:1
107:1  118:1
119:1, 1
**behavioral**
20:1  116:1
**behaviors**
22:1  119:1
**belief** 122:1
**beliefs** 97:1
**believe** 8:1, 1
29:1, 1, 1
30:1  32:1
46:1  48:1
51:1  52:1
60:1  62:1, 1,
1  67:1, 1, 1, 1,
1  68:1, 1
80:1  82:1
85:1  91:1
92:1  93:1, 1
94:1, 1  97:1,
1, 1, 1  105:1
107:1  108:1
112:1  115:1
118:1  120:1
**believes** 62:1
**belong** 118:1
**Berns** 129:1
134:9
**best** 15:1
32:1  33:1, 1,

1  41:1  42:1
79:1  91:1, 1,
1  92:1  93:1,
1, 1  108:1, 1
**bin** 65:1
**bit** 13:1  91:1
**bite** 25:1
48:1  117:1
**bites** 95:1
117:1
**bitten** 78:1, 1
95:1  117:1
**blend** 72:1
**blessed** 44:1
**blocking**
64:1  66:1
**blocky** 14:1
**blog** 12:1
118:1, 1
**board** 36:1
44:1, 1, 1
**body** 21:1, 1
22:1  25:1, 1
30:1
**Bonnie** 53:1
**book** 116:1
**boy** 68:1
**boys** 68:1
**Bradley** 51:1
**Branson**
49:1  51:1
**break** 11:1
40:1, 1  67:1
85:1, 1  108:1,
1  119:1, 1
**bred** 14:1
**breed** 13:1, 1,
1  14:1, 1,
15:1, 1  16:1,
1  116:1, 1, 1
117:1
**breeds** 13:1
14:1, 1  15:1,
1  116:1
117:1, 1
**Bridget** 8:1
**Brief** 40:1
85:1  108:1
109:1  119:1

**briefing**
125:1, 1, 1
**briefings**
125:1
**bring** 110:1
111:1  112:1
**bringing** 26:1
**broke** 125:1
**brought**
114:1
**Bryan** 52:1
**Building**
40:1  66:1, 1
**bull** 13:1, 1,
1  48:1
**bull,** 14:1
**bulls** 13:1
14:1, 1, 1
15:1, 1, 1
16:1, 1
**bunch** 65:1
72:1
**bursts** 6:1
**bush** 61:1
**business**
42:1  48:1
135:4
**businesses**
38:1  40:1
87:1
**busload**
121:1
**Bylaw** 24:1
**bypass** 64:1

**< C >**
**CALEA** 72:1,
1, 1, 1, 1  73:1
**Calgary** 24:1,
1
**California**
28:1  29:1, 1
30:1  31:1
48:1, 1  52:1,
1, 1, 1  53:1, 1
**call** 16:1
37:1  43:1
50:1  51:1
60:1  61:1
85:1, 1  99:1

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

called 19:1
27:1, 1  31:1
38:1  104:1
106:1  108:1
109:1  116:1
calls  4:1
14:1, 1  16:1
26:1  63:1
66:1  75:1
82:1, 1  83:1
89:1  93:1
94:1  95:1, 1,
1  96:1, 1,
124:1
campuses
34:1
Canada  20:1
24:1
canine  13:1
24:1  25:1
28:1, 1  29:1,
1  47:1, 1
56:1  71:1
canineaggressi
on@gmail.co
m  13:1
cape  75:1
capsicum
110:1
car  122:1
Care  17:1, 1,
1  38:1  69:1
career  34:1
38:1  44:1
45:1
carefully
102:1
case  4:1, 1
5:1, 1  7:1
9:1  11:1
46:1, 1  47:1,
1, 1, 1, 1  48:1,
1, 1  49:1, 1, 1,
1, 1, 1  50:1, 1,
1, 1, 1, 1
51:1, 1, 1, 1
52:1, 1, 1
53:1, 1, 1, 1
54:1  55:1
56:1, 1, 1

62:1  67:1
76:1  79:1
80:1, 1  88:1
89:1  91:1
92:1  105:1
115:1, 1, 1
118:1  119:1
123:1  124:1
125:1
cases  22:1
35:1  46:1
47:1  48:1
49:1  50:1
51:1  52:1
54:1, 1, 1, 1
55:1, 1, 1, 1, 1,
1  56:1, 1
74:1, 1, 1
114:1  117:1,
1  120:1
125:1, 1
catch  94:1
103:1  104:1
124:1
caught  122:1
cause  62:1
63:1  65:1
76:1
caused  12:1
causing  122:1
cautious  75:1
Centers
117:1
Central  2:1
46:1  48:1, 1
53:1, 1  2:1
134:4
certain  117:1
Certainly
26:1, 1  59:1
66:1  77:1
79:1
CERTIFICAT
E  127:1
certified  13:1
certify  54:1
86:1, 1  127:1
128:1, 1
chance  63:1,
1, 1

change  130:2,
5, 8, 11, 14, 17,
20, 23  131:2,
5, 8, 11, 14, 17,
20, 23
changes
109:1
Changing
108:1
Chapter  89:1

characteristics
14:1
charge  35:1,
1  36:1, 1
92:1  107:1
charged  11:1
12:1  97:1, 1
charges  60:1,
1  2:1  135:3,
9
charging
97:1  104:1, 1
110:1  119:1
check  45:1
100:1  102:1,
1
checking
122:1
Chicago  26:1
27:1, 1  92:1
chief  17:1, 1
18:1  38:1
46:1
Chiefs  70:1
71:1
Chihuahuas
117:1
child  66:1
68:1, 1, 1, 1, 1
122:1
children
66:1  68:1, 1,
1, 1, 1  122:1
Cindy  1:1
127:1  128:1,
1
circumstance
44:1  81:1

circumstances
37:1  52:1
76:1  77:1
84:1, 1, 1
86:1  87:1
citations
115:1  118:1
cite  85:1
cited  70:1
cities  19:1
citizen  36:1
City  17:1, 1
18:1, 1, 1, 1, 1,
1  19:1, 1
24:1, 1, 1, 1
34:1  45:1
46:1  47:1, 1,
1  48:1, 1
49:1, 1, 1
53:1  80:1, 1
81:1, 1
claim  15:1
16:1  48:1
claiming  63:1
Claims  15:1
Clayton  2:1
clear  97:1
105:1
clearly  98:1
103:1  125:1
close  26:1
81:1  98:1
closed  55:1
closer  81:1
closure  8:1
Coast  29:1
code  38:1, 1,
1, 1  39:1
41:1, 1, 1, 1, 1
42:1, 1, 1
62:1, 1, 1
63:1, 1, 1
66:1  69:1
82:1  87:1, 1
codes  40:1, 1,
1, 1  66:1, 1, 1,
1  69:1
codification
33:1
color  111:1

Colorado
23:1  29:1
30:1, 1  49:1,
1  50:1
Colorado's
30:1
come  30:1
92:1
comes  118:1
comfortable
83:1
coming
103:1  121:1
command
35:1  36:1, 1,
1  37:1  38:1
46:1
commander
36:1
Commerce
49:1
Commission
17:1  28:1
132:14
common
61:1  118:1, 1
communities
19:1
Community
27:1  28:1
63:1  109:1
company
25:1
competent
87:1
complaint
61:1
complaints
36:1, 1  39:1,
1  61:1, 1
complete  8:1
33:1  128:1
completed
17:1  19:1, 1,
1
completion
17:1
complied
73:1

complies  79:1
comply  102:1
compound
71:1  76:1
computer
114:1
concept  6:1
concern  65:1
113:1
concerned
66:1
concerns
64:1  70:1
concluded
126:1
conclusion
82:1  83:1, 1
89:1  124:1
condensed
126:1
conditions
39:1  42:1
conduct  40:1
conducted
124:1
Conference
24:1  85:1, 1
conferences
125:1
confident
32:1  33:1

confidentiality
55:1
confused  40:1
confusing
33:1  41:1
59:1  60:1
102:1
connected
62:1  64:1, 1
128:1
connection
7:1  21:1
57:1  115:1
consent  87:1,
1
consider
13:1  14:1
66:1, 1, 1

Case: 4:17-cv-01522-PLC    Doc. #: 29-2    Filed: 06/11/18    Page: 141 of 151 PageID #: 365

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

74:*1*  75:*1*
76:*1, 1, 1*
82:*1, 1*  83:*1, 1*

**Consideration**
60:*1*  82:*1, 1*

**considered**
60:*1*  74:*1*
75:*1*  77:*1*
84:*1*  85:*1*

**considering**
77:*1*

**consist**  121:*1, 1*

**consolidated**
18:*1, 1*

**Constitution**
79:*1*  85:*1*

**constitutional**
82:*1, 1*  83:*1, 1, 1*  85:*1*
86:*1*

**constitutionali ty**  79:*1*  80:*1*

**consultant**
13:*1*  17:*1, 1*

**consulted**
69:*1*  89:*1*
115:*1*

**consulting**
17:*1*  113:*1*
114:*1*

**contact**  92:*1*
124:*1*

**contacted**
4:*1*  5:*1*

**contempt**
56:*1*

**contentious**
61:*1*

**Continuing**
22:*1*

**contract**  17:*1, 1*

**contrary**  89:*1*

**control**  20:*1*
21:*1, 1*  22:*1, 1*  23:*1, 1*
24:*1, 1*  25:*1*
38:*1, 1*  39:*1,*

*1, 1*  40:*1*
43:*1, 1, 1, 1, 1*
49:*1, 1*  69:*1, 1*  104:*1, 1, 1*
105:*1, 1, 1, 1*
106:*1, 1, 1*
107:*1*  117:*1*
120:*1*  123:*1*
125:*1*

**controlled**
49:*1*

**convention**
19:*1*

**conversations**
5:*1*

**cooperation**
129:*1*

**cooperative**
38:*1*  61:*1, 1*

**copies**  9:*1*
28:*1*  57:*1*
118:*1, 1*

**COPS**  92:*1*

**copy**  6:*1, 1*
7:*1*  11:*1*
12:*1*  14:*1*
27:*1*  28:*1*
46:*1*  111:*1*
112:*1, 1*
115:*1*  116:*1, 1*  126:*1, 1*
129:*1*  134:*7*

**corrections**
129:*1*

**correctly**
46:*1*  72:*1*
105:*1*  107:*1*
135:*3*

**correlation**
16:*1*  17:*1*

**correspondenc e**  9:*1, 1*  10:*1*
112:*1*

**counsel**
111:*1*  112:*1*
128:*1, 1*

**Counselor**
2:*1*

**Counselor's**
2:*1*  134:*3*

**counsels**  54:*1*

**counterpart**
26:*1*

**countries**
24:*1*

**country**  29:*1*
33:*1, 1*  71:*1*
92:*1, 1, 1*

**COUNTY**
1:*1*  2:*1*  4:*1, 1*  5:*1, 1*  7:*1, 1, 1, 1*  18:*1, 1, 1, 1, 1*  19:*1, 1*
28:*1*  34:*1*
47:*1*  50:*1, 1, 1, 1*  51:*1*
52:*1*  53:*1*
56:*1*  61:*1*
62:*1*  63:*1*
70:*1*  71:*1*
73:*1*  81:*1*
89:*1*  91:*1*
99:*1, 1*  105:*1*
106:*1, 1*
108:*1, 1, 1, 1*
111:*1*  121:*1*
123:*1*  127:*1*
128:*1*  129:*1*
2:*1, 1*  134:*3*

**couple**  6:*1*
7:*1*  26:*1*
45:*1*  57:*1*
58:*1*  60:*1*
73:*1*  117:*1*
119:*1*  120:*1*
123:*1*  125:*1*

**course**  5:*1*
21:*1*  28:*1, 1*
30:*1*  84:*1*
135:*3*

**COURT**  1:*1*
8:*1*  9:*1*
11:*1*  13:*1*
46:*1*  47:*1, 1*
48:*1*  49:*1, 1*
50:*1*  53:*1*
55:*1, 1, 1*
86:*1*  87:*1, 1, 1*  88:*1*  105:*1*
126:*1, 1*

**covered**
122:*1*

**Covington**
23:*1*

**crashing**
103:*1*

**create**  90:*1, 1, 1*

**created**  115:*1*

**creates**  63:*1*
77:*1*

**crew**  125:*1*

**crime**  36:*1*
42:*1*  82:*1*
97:*1*  120:*1*

**crimes**  35:*1, 1, 1, 1, 1*
38:*1*  81:*1*

**criminal**
40:*1*  59:*1*
74:*1*

**Criscuolo**
46:*1*  51:*1*

**critical**  36:*1*

**critically**  45:*1*

**CROSBY**
1:*1*  3:*1*  4:*1, 1*  6:*1, 1*  8:*1*
11:*1, 1*  15:*1*
27:*1, 1*  31:*1*
57:*1, 1*  64:*1*
78:*1*  97:*1*
108:*1*  109:*1*
110:*1*  118:*1*
127:*1*  128:*1*
129:*1*  132:*1, 10*  2:*1*

**Crosby's**  66:*1*

**Cross-Examin ation**  3:*1*
119:*1*

**crossfire**
122:*1*

**cruelty**  22:*1*
123:*1*

**current**  11:*1*
17:*1*  112:*1*
118:*1*

**currently**
17:*1*  18:*1*
54:*1*

**curriculum**
17:*1, 1*  19:*1, 1*  21:*1, 1, 1*
118:*1*

**curriculums**
19:*1*  20:*1*

**custody**  2:*1*

**cut**  82:*1*

**CV**  3:*1*
110:*1, 1*
111:*1*

**Cynthia**  26:*1*


**< D >**

**D.C.**  26:*1*
29:*1*

**Dachshunds**
117:*1, 1, 1*

**Dade**  123:*1*

**Dallas**  24:*1, 1*

**damages**  47:*1*

**Dan**  4:*1*
57:*1*

**Danes**  117:*1*

**Danese**  1:*1*
127:*1*  128:*1, 1*

**danger**  63:*1, 1*  77:*1, 1, 1*
78:*1*  84:*1*
90:*1, 1, 1*
97:*1*  119:*1*

**dangerous**
12:*1, 1, 1*
20:*1*  21:*1, 1*
23:*1*  24:*1*
37:*1*  63:*1, 1*
65:*1*  74:*1*
76:*1*  116:*1*
119:*1*

**DANIEL**  2:*1*

**DART**  38:*1, 1*  39:*1, 1, 1*
40:*1, 1*  41:*1*
43:*1, 1, 1*

**DATE**  1:*1*
12:*1*  23:*1*

59:*1*  69:*1*
129:*1*  132:*7*

**dated**  6:*1*
112:*1, 1*
128:*1*

**dates**  25:*1*
32:*1*

**day**  11:*1*
42:*1, 1*  65:*1*
86:*1, 1*  87:*1*
104:*1, 1*
127:*1*  128:*1*
132:*13*
135:*10*

**daylight**  42:*1*

**days**  120:*1*
123:*1*  129:*1*

**daytime**  86:*1*
87:*1*

**day-to-day**
36:*1*

**deadly**  36:*1*
44:*1*  77:*1*
107:*1*

**deal**  85:*1*
103:*1*

**dealing**  20:*1*
22:*1*  35:*1*
58:*1*  70:*1, 1*
91:*1*  92:*1, 1*
101:*1*  103:*1*

**deaths**  12:*1*

**decide**  81:*1*

**decided**  44:*1*
124:*1*

**decisions**
81:*1*

**deck**  63:*1*
66:*1, 1, 1*

**dedicated**
38:*1*

**deeply**  92:*1*

**Defendant**
106:*1*

**Defendants**
1:*1, 1*  2:*1*
3:*1*  6:*1*
11:*1*  27:*1*
32:*1*  47:*1*

Case: 4:17-cv-01522-PLC   Doc. #: 29-2   Filed: 06/11/18   Page: 142 of 151 PageID #: 366

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

109:*1*  110:*1,*
*1*  111:*1*
**deficient**
97:*1*  102:*1*
107:*1*
**define**  78:*1, 1*
**definitely**
84:*1*
**degree**  80:*1*
**deleted**  100:*1*
**deliberate**
93:*1*  94:*1*
107:*1, 1*
**deliberately**
93:*1*
**delivery**
135:*1*
**Denver**  23:*1,*
*1*  49:*1*  50:*1,*
*1*
**department**
5:*1, 1*  7:*1, 1,*
*1, 1*  17:*1*
18:*1*  19:*1*
23:*1*  27:*1, 1*
28:*1, 1*  30:*1,*
*1, 1*  31:*1*
32:*1*  34:*1, 1*
36:*1*  37:*1*
38:*1*  39:*1*
41:*1, 1*  43:*1*
44:*1*  47:*1*
50:*1*  51:*1*
52:*1*  53:*1*
56:*1, 1, 1, 1*
71:*1*  73:*1, 1*
78:*1, 1*  81:*1*
86:*1, 1*  91:*1*
92:*1*  93:*1, 1,*
*1*  97:*1, 1*
108:*1*  109:*1*
116:*1*  119:*1*
121:*1*  129:*1*
**departments**
23:*1, 1*  32:*1,*
*1, 1, 1*  34:*1, 1,*
*1*  47:*1*  61:*1*
70:*1, 1*  71:*1*
78:*1*  91:*1*

92:*1, 1, 1*
93:*1, 1*
**depend**  125:*1*
**dependent**
123:*1*
**depending**
42:*1*
**deployment**
36:*1*  44:*1*
56:*1*  124:*1*
**depo**  51:*1*
53:*1*  111:*1*
**depos**  51:*1, 1*

**DEPOSITION**
1:*1*  3:*1*  7:*1,*
*1*  8:*1, 1, 1*
9:*1, 1, 1*  10:*1,*
*1*  11:*1*  51:*1*
52:*1, 1, 1*
58:*1*  59:*1, 1,*
*1*  67:*1*  92:*1*
101:*1, 1, 1*
102:*1*  107:*1*
111:*1*  118:*1*
126:*1*  128:*1*
129:*1, 1*
132:*3, 5*   2:*1*
135:*9*
**depositions**
8:*1*  52:*1*
53:*1, 1*
**deputies**
125:*1*
**described**
88:*1*  105:*1*
**DESCRIPTIO**
**N**  3:*1*
**descriptions**
100:*1*
**designed**  65:*1*
**despite**  94:*1*
**destruction**
84:*1*
**detail**  89:*1*
**detailed**
111:*1*
**details**  122:*1*
**detectives**
123:*1*

**determine**
98:*1*
**determining**
14:*1*  77:*1, 1*
82:*1*
**develop**  19:*1*
**developed**
19:*1*  20:*1*
21:*1, 1, 1*
28:*1*  30:*1*
**developing**
69:*1*  70:*1*
78:*1, 1, 1, 1*
**diagram**  97:*1*
**Diego**  28:*1*
**difference**
42:*1, 1*  43:*1*
**different**
34:*1*  35:*1*
54:*1, 1*  84:*1*
88:*1*  96:*1*
98:*1*  101:*1*
115:*1*  118:*1,*
*1*
**difficult**  22:*1*
**diffuse**  107:*1*
**digital**  111:*1*
**dimensions**
97:*1*
**Direct**  3:*1*
4:*1*  64:*1*
**directed**  29:*1*
55:*1, 1*  76:*1*
105:*1*  106:*1*
107:*1*
**directions**
28:*1*  54:*1*
**Directive**  3:*1*
31:*1, 1, 1*
116:*1*
**directly**  40:*1*
116:*1, 1*
**director**  26:*1,*
*1*
**disagree**  74:*1*
75:*1*
**discharge**
44:*1*

**discharged**
6:*1*  44:*1*
47:*1*
**discipline**
46:*1*
**disciplined**
45:*1*
**disclose**  55:*1*
**disclosing**
54:*1*
**disconnected**
63:*1*
**discoverable**
10:*1*
**discovery**
118:*1*
**discretion**
76:*1*  77:*1, 1*
**discretionary**
76:*1*
**discuss**  55:*1,*
*1, 1*  56:*1, 1*
**discussed**
10:*1*  11:*1*
70:*1, 1*
**discussion**
85:*1*  110:*1*
**discussions**
70:*1*  125:*1*
**Disease**  117:*1*
**dismissed**
48:*1*  53:*1*
**disorderly**
45:*1*
**displaying**
76:*1*
**disposed**  54:*1*
**disputes**  35:*1*
61:*1*
**disregard**
93:*1*
**disseminated**
29:*1*  109:*1*
**dissemination**
32:*1*
**distance**
104:*1*  125:*1*
**distracting**
104:*1*

**distributed**
27:*1*  28:*1*
**DISTRICT**
1:*1, 1*  46:*1, 1*
48:*1, 1*  49:*1,*
*1*  50:*1, 1*
51:*1*  52:*1, 1,*
*1*  53:*1, 1*
**districts**  13:*1*
**DIVISION**
1:*1*  35:*1*
**divisions**  35:*1*
**DNA**  15:*1*
**DOBSON**
2:*1*  5:*1*  85:*1*
**document**
12:*1*  27:*1, 1,*
*1*  31:*1, 1*
56:*1*  67:*1, 1*
85:*1*  105:*1*
115:*1*
**documentatio**
**n**  91:*1*  97:*1*
100:*1*  101:*1*
109:*1*  117:*1*
**documented**
82:*1*
**documents**
7:*1, 1*  8:*1, 1*
61:*1*  88:*1*
111:*1*  112:*1*
115:*1, 1*
119:*1*

**dog**  5:*1*  6:*1,*
*1, 1*  9:*1*  12:*1*
13:*1, 1, 1*
17:*1*  19:*1, 1*
20:*1, 1, 1, 1,*
*1, 1, 1, 1, 1*
21:*1, 1, 1, 1, 1,*
*1, 1*  22:*1, 1,*
*1*  23:*1*  24:*1,*
*1*  25:*1, 1, 1*
26:*1*  27:*1*
28:*1*  30:*1, 1*
31:*1*  32:*1, 1*
33:*1, 1*  44:*1*
45:*1, 1, 1, 1*
47:*1, 1, 1*
48:*1, 1, 1, 1*

49:*1, 1*  50:*1,*
*1*  51:*1, 1*
52:*1*  53:*1, 1*
56:*1*  58:*1, 1,*
*1, 1*  59:*1*
90:*1*  91:*1*
92:*1, 1*  93:*1*
94:*1, 1, 1, 1*
95:*1, 1, 1*
96:*1*  97:*1, 1,*
*1, 1, 1*  98:*1, 1,*
*1, 1*  101:*1, 1,*
*1, 1, 1*  102:*1*
103:*1, 1, 1, 1*
104:*1, 1, 1*
105:*1, 1, 1*
109:*1*  116:*1,*
*1*  117:*1, 1*
118:*1*  119:*1*
124:*1*
**dog-fighting**
125:*1, 1, 1, 1*
**dog-related**
17:*1*  27:*1*
33:*1*  115:*1*
**dogs**  4:*1*
12:*1, 1, 1*
13:*1, 1, 1*
14:*1, 1*  15:*1,*
*1*  16:*1, 1*
20:*1, 1*  21:*1,*
*1, 1*  22:*1*
24:*1*  28:*1*
29:*1*  45:*1, 1,*
*1*  46:*1*  71:*1,*
*1*  91:*1, 1*
94:*1*  95:*1*
96:*1, 1*  102:*1,*
*1, 1, 1*  103:*1*
106:*1, 1*
110:*1*  116:*1,*
*1*  117:*1, 1, 1,*
*1*  118:*1*
119:*1*  123:*1*
124:*1, 1*
125:*1, 1*
**dog's**  46:*1*
107:*1*

Case: 4:17-cv-01522-PLC     Doc. #: 29-2     Filed: 06/11/18     Page: 143 of 151 PageID #: 367

Deposition of James Crosby                                    Angela Zorich vs. St. Louis County, et al

doing 4:1
29:1 36:1
37:1, 1
DOJ 109:1
door 58:1, 1
62:1, 1, 1
66:1, 1 67:1,
1, 1 98:1, 1, 1,
1
double-checke
d 46:1
doubt 94:1, 1,
1
downtown
35:1
Dr 26:1, 1
29:1
drinking 61:1
drive-by
99:1 100:1
drove 100:1
102:1 122:1,
1
drug 35:1
39:1 122:1
drugs 37:1
74:1
drunk 45:1
due 54:1
74:1 109:1
duly 4:1
127:1
duties 37:1
44:1 72:1
75:1
duty 73:1
Duval 18:1,
1 81:1 127:1
128:1
dynamic 5:1
67:1 90:1, 1

< E >
earliest 22:1
33:1
early 45:1
earned 113:1
114:1
easier 11:1
East 29:1

EASTERN
1:1, 1 46:1, 1,
1
easy 67:1
112:1 118:1
Education
22:1
educational
24:1
effect 112:1
effective 17:1
103:1 104:1,
1 110:1, 1
124:1
effort 38:1
92:1
either 29:1
36:1 70:1
71:1 80:1
83:1 84:1
94:1
elected 80:1
electric 65:1,
1
electrical
64:1 124:1
electricity
65:1
email 13:1
112:1
emails 9:1, 1,
1 10:1 57:1
employee
128:1, 1
employer
114:1
encompasses
13:1
Encounter
19:1 44:1
60:1 93:1
encountered
95:1, 1
encountering
76:1
encounters
17:1 19:1
20:1, 1, 1
27:1, 1 28:1,
1 29:1, 1

31:1 32:1
33:1 61:1, 1
71:1 91:1, 1
92:1, 1 94:1
96:1 109:1
115:1 116:1
enforce 38:1
Enforcement
17:1 18:1
19:1, 1 20:1
21:1, 1, 1
22:1, 1, 1, 1, 1,
1, 1 23:1, 1, 1,
1 24:1, 1
25:1, 1, 1
30:1, 1 32:1
33:1, 1, 1
34:1, 1 38:1,
1 39:1 41:1
66:1 71:1, 1
72:1, 1 92:1
109:1 120:1
121:1, 1, 1
123:1
engage 101:1
121:1
engaged
101:1 102:1
England
20:1 26:1
ensure 39:1
enter 63:1
87:1 88:1, 1
90:1
entered 90:1
93:1, 1 94:1
96:1 100:1
101:1 105:1,
1 108:1
111:1
entering 42:1
60:1 74:1
77:1 84:1
123:1
entire 8:1
entitled 57:1
entry 5:1
67:1, 1, 1
77:1 81:1
82:1, 1 84:1,

1 87:1 88:1,
1 90:1 105:1
125:1
Erie 49:1
errata 129:1,
1, 1 132:5
escalate 77:1
escape 98:1
especially
86:1 103:1
120:1 122:1
ESQUIRE
2:1, 1, 1, 1
established
15:1 91:1, 1
103:1
establishing
56:1
estimate 81:1
et 1:1 129:1
2:1
e-Tran 126:1,
1
euthanize
45:1
evaluated
81:1
evaluation
20:1 21:1
42:1 109:1
events 57:1
Eventually
35:1 104:1
evidence
20:1, 1 38:1
42:1 84:1
96:1 98:1
102:1 116:1
117:1
evidencing
112:1
evolving 32:1
exact 52:1
exactly 23:1
26:1 30:1
44:1 51:1
67:1 68:1, 1,
1 72:1, 1
73:1 92:1

98:1 105:1
121:1
Examination
1:1 3:1 4:1
44:1 122:1
examine 42:1
44:1 122:1
Examining
67:1, 1 105:1
exceeds 65:1
79:1
excepted 87:1
excerpt 8:1
9:1
excerpts 8:1
excused
126:1
execute 73:1
77:1 81:1, 1
85:1 120:1
executed
88:1 90:1
102:1 120:1
executing
37:1, 1 38:1
87:1 89:1
90:1 120:1
123:1
execution
119:1 120:1,
1, 1 121:1
exercised
41:1
EXHIBIT
3:1 6:1, 1, 1
11:1 27:1
32:1 33:1
109:1, 1, 1
110:1, 1, 1, 1,
1 111:1, 1, 1
117:1
exhibiting
22:1, 1
exhibits
111:1 126:1
exigency
84:1, 1 85:1,
1, 1, 1
exigent 84:1,
1, 1 86:1
exist 90:1

existence
31:1
existing 38:1
exists 63:1
expected 76:1
expecting
75:1 121:1
experience
41:1 79:1
84:1 85:1
88:1 94:1
100:1 120:1,
1, 1 121:1
122:1 123:1
expert 4:1
12:1 13:1, 1
46:1, 1, 1
47:1 56:1, 1
62:1, 1, 1
66:1 71:1, 1
85:1 113:1
114:1, 1
118:1
expertise
65:1 66:1
79:1 80:1
120:1
experts 55:1
expert's 14:1
65:1 79:1
expires
132:14
135:11
explain 5:1
39:1
explained
5:1, 1 6:1
58:1, 1
explosion
63:1
expressing
91:1
extensive
32:1
exterior
106:1
extra 40:1
115:1
extremely

Case: 4:17-cv-01522-PLC    Doc. #: 29-2    Filed: 06/11/18    Page: 144 of 151 PageID #: 368

Deposition of James Crosby                                    Angela Zorich vs. St. Louis County, et al

124:1

< F >
face 58:1
facing 77:1
fact 13:1
15:1 16:1
25:1 44:1
51:1 54:1
55:1 64:1
71:1 97:1
105:1 106:1
107:1 112:1
factor 82:1
84:1
factors 15:1
20:1 77:1
82:1 83:1, 1
facts 56:1, 1,
1, 1, 1 58:1, 1
failed 91:1
94:1 96:1
102:1 103:1,
1, 1
Failure 60:1
false 16:1
familiar 14:1
34:1 43:1
60:1 66:1
family 58:1
far 19:1
45:1 66:1
98:1, 1 108:1
109:1 115:1
116:1
fatal 20:1, 1,
1, 1 21:1, 1
24:1 25:1
116:1
fatalities
117:1, 1, 1
fatality 117:1
fault 103:1
favor 47:1
48:1 49:1
50:1, 1 51:1
52:1 53:1, 1
134:1, 7
fax 129:1

federal 13:1
46:1 47:1, 1
48:1 49:1, 1,
1 50:1, 1, 1
51:1 52:1, 1
53:1, 1
Fee 3:1 11:1,
1, 1, 1, 1, 1, 1,
1 12:1, 1
112:1
fees 49:1
feet 117:1
felons 37:1
felony 74:1
felt 95:1, 1
96:1, 1
field 35:1, 1
78:1
fighting
125:1
figure 98:1
113:1
file 12:1
filed 4:1
45:1 46:1
60:1
files 112:1
118:1
final 17:1
97:1 98:1, 1,
1, 1
financially
128:1
find 12:1
21:1 25:1
77:1 102:1
120:1
fine 40:1
113:1 118:1
finish 77:1
finished 77:1
fire 63:1
65:1
firearm 44:1
47:1
firearms
36:1 44:1, 1,
1 45:1 74:1
104:1

fired 106:1
firm 2:1
first 4:1
31:1 49:1
85:1 86:1
88:1 94:1
Fisher 50:1
51:1, 1
flags 115:1
flat 11:1, 1, 1
12:1
flight 10:1
Floor 2:1, 1
97:1 129:1
134:10
Florida 1:1
18:1 19:1
29:1 41:1
42:1 45:1
47:1, 1 52:1,
1 53:1, 1
69:1 75:1, 1,
1 86:1, 1, 1
87:1 88:1, 1,
1, 1 120:1
125:1 127:1,
1 128:1, 1, 1
flr 2:1
134:4
focused 44:1
follow 99:1
following
35:1 54:1
follows 4:1
follow-up
126:1
Force 3:1
7:1 31:1
35:1 36:1, 1
41:1, 1 44:1
46:1 47:1, 1
50:1 51:1
73:1 75:1, 1
77:1 81:1
83:1, 1 107:1
forcible 67:1,
1, 1 87:1
88:1, 1 90:1,
1

forcibly 87:1
foreign 5:1
form 8:1, 1,
1 21:1 33:1
41:1 57:1
59:1 60:1
63:1 65:1
66:1, 1 71:1
74:1 75:1
76:1 77:1
79:1 80:1
95:1 99:1
101:1 111:1
forth 7:1
8:1 9:1
22:1 35:1, 1
38:1 43:1
44:1 55:1
61:1 65:1
76:1 113:1
115:1, 1
forum 24:1
found 12:1
47:1 52:1
56:1
four 4:1
55:1, 1, 1
113:1 114:1
117:1
four-hour
19:1
frame 40:1
57:1 120:1
Francisco
29:1
Frankly
117:1
free 92:1
Friday 42:1
86:1 87:1
friendly 61:1,
1
front 6:1, 1
50:1 58:1
67:1
fugitive 74:1
full 19:1
44:1
full-time 18:1

Fumagalli
106:1, 1
Fumagalli's
106:1, 1
function 19:1
fur 14:1
future 110:1

< G >
gaining 81:1
gas 63:1, 1, 1,
1, 1, 1, 1 64:1,
1, 1, 1, 1, 1, 1,
1 65:1, 1
gathered
121:1
gathering
20:1
gatherings
22:1
general 5:1
7:1 70:1
112:1 113:1
generally
36:1 97:1
generic 13:1
gentleman
29:1
geographical
29:1, 1
Georgia 22:1,
1 125:1
getting 46:1
86:1 103:1
gist 5:1
give 38:1
46:1 51:1, 1
69:1 81:1
87:1 113:1
116:1
given 24:1
41:1 42:1
46:1, 1 55:1,
1, 1 90:1, 1
109:1 114:1
giving 83:1
88:1 109:1
glass 66:1
goes 9:1
15:1 31:1

39:1, 1 67:1
86:1 87:1
88:1
going 19:1, 1,
1 28:1 34:1
40:1 55:1, 1
56:1, 1 66:1
74:1 76:1
80:1, 1 81:1,
1 82:1 89:1
93:1 96:1
102:1 103:1
109:1 111:1
112:1, 1
113:1 121:1,
1 122:1, 1, 1
123:1 124:1
Goldberg
129:1 134:9
Gonzalez
48:1 52:1, 1
good 36:1
40:1 66:1
Google 118:1
governments
18:1
grab 104:1
Great 117:1
greatest 79:1
grounds 94:1
group 72:1,
1, 1, 1
groups 93:1
growing 44:1
guard 125:1
guesstimate
38:1
GUNN 2:1
3:1 4:1, 1, 1
6:1, 1, 1, 1
8:1 11:1, 1
14:1 15:1, 1
16:1 21:1
26:1 27:1, 1
28:1, 1, 1
31:1 32:1
34:1 40:1, 1
41:1, 1 42:1
54:1 55:1
57:1, 1, 1, 1, 1

Case: 4:17-cv-01522-PLC   Doc. #: 29-2   Filed: 06/11/18   Page: 145 of 151 PageID #: 369
Deposition of James Crosby
Angela Zorich vs. St. Louis County, et al

59:1  61:1
64:1  66:1, 1
67:1  71:1
75:1, 1  76:1
77:1, 1  78:1
79:1  80:1
82:1  83:1, 1
85:1  86:1
90:1  93:1
94:1  95:1, 1
96:1, 1, 1
98:1  99:1
101:1  103:1
106:1  107:1
108:1, 1, 1
109:1, 1
110:1, 1, 1
111:1, 1
119:1  120:1
124:1  126:1,
1  2:1  134:2
guns 121:1
guy 121:1
122:1  123:1
guys 121:1
122:1

< H >
half 44:1
80:1
Haman 8:1
hand 127:1
135:10
handed 11:1
31:1
handful
121:1
handing 27:1,
1
handle 45:1
61:1
handler 47:1,
1
handwritten
114:1
happen 90:1
happened
47:1  48:1, 1
49:1  50:1
89:1  97:1

happening
36:1  65:1
happy 58:1
113:1
hard 126:1, 1
harm 76:1
hated 122:1
hazard 90:1,
1  122:1
head 30:1
49:1
heads 14:1
health 63:1
65:1
heard 4:1
6:1  63:1
72:1, 1
heat 65:1, 1
heaters 65:1
heating 65:1,
1
heavily 123:1
he'd 92:1
94:1  95:1, 1,
1, 1, 1  96:1, 1,
1
help 39:1
hereinabove
132:7
hereto 132:4
hereunto
135:8
high 74:1
75:1  76:1, 1
highlighted
28:1, 1
highly 91:1,
1  92:1  104:1,
1  122:1
high-risk
73:1  74:1
75:1  77:1
highway
32:1, 1  34:1
Hill 19:1
52:1  53:1
hired 18:1
48:1  56:1
history 59:1,
1, 1, 1  60:1

74:1  75:1, 1
76:1, 1  84:1
holed 74:1
holidays 87:1
Holly 19:1
Hollywood
53:1
home 60:1
61:1, 1  63:1,
1  64:1  68:1,
1  90:1  123:1
124:1
honest 124:1
hope 80:1
hoping 19:1
horizontal
125:1
horses 45:1
hostage 122:1
hosted 15:1
24:1
hot 65:1, 1, 1,
1
hour 11:1
123:1  125:1
hours 11:1
41:1  42:1, 1
87:1  119:1
120:1  121:1
house 57:1, 1,
1  58:1, 1, 1
60:1  64:1
65:1  66:1
93:1, 1  94:1
96:1  97:1, 1
98:1  102:1
household
114:1
houses 39:1,
1  40:1
housing 38:1
Humane
23:1  26:1
27:1, 1
humans
117:1
hurry 85:1
103:1
hurt 12:1

76:1
husband 58:1
hypothetical
60:1  74:1
75:1  76:1
102:1

< I >
IACP 70:1, 1,
1  71:1
ID 114:1
Idaho 29:1
idea 119:1
identification
6:1  11:1
14:1  15:1, 1
27:1  32:1
109:1  110:1,
1  111:1
116:1  117:1
identified
15:1
identify 89:1
identifying
113:1
ignoring 93:1
illegal 45:1
imagine 63:1
immediately
58:1, 1
imminent
62:1  84:1
importance
124:1
imposed 42:1
improper
60:1  74:1
75:1  76:1
102:1
Improve
109:1
Improving
109:1
incident 42:1
94:1  112:1
124:1
Incidents
27:1  33:1
36:1, 1  109:1
115:1

include
117:1  121:1
included 7:1
22:1  24:1, 1
118:1  121:1
includes 8:1
25:1
including 7:1
17:1  35:1
98:1  99:1
107:1  112:1
120:1  129:1
income 113:1
114:1, 1, 1
incorporating
70:1
incorrectly
119:1
increased
84:1  90:1
INDEX 3:1
indicate 12:1
indicated
15:1  39:1
indication
100:1, 1
indifference
107:1
indifferent
93:1
individual
32:1
inform 75:1
116:1
information
55:1  61:1, 1
68:1  89:1
90:1  103:1
113:1
initial 8:1
initially 4:1
injured 13:1
45:1  74:1
76:1  97:1
innately
116:1
in-progress
120:1
input 44:1

78:1
insert 89:1
inserted 64:1
inside 6:1
66:1  74:1, 1
98:1, 1  101:1
106:1
inspection
41:1, 1  42:1,
1, 1  43:1, 1, 1,
1  86:1  87:1,
1, 1, 1, 1, 1, 1
inspectors
38:1  39:1
instance 23:1,
1  74:1  121:1
122:1, 1
123:1
Institute
22:1  109:1, 1
110:1
instruct
129:1
instructed
9:1
insult 62:1
intend 94:1
intended
125:1
intent 93:1
94:1
interacted
38:1
interacting
21:1
interaction
31:1
interactions
20:1  28:1
29:1  116:1
interested
114:1  128:1
interfering
75:1, 1
International
70:1
Internet 4:1
118:1
interpret

Case: 4:17-cv-01522-PLC    Doc. #: 29-2    Filed: 06/11/18    Page: 146 of 151 PageID #: 370

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

119:1
invalid 15:1
investigate 20:1, 1
investigated 12:1 13:1, 1
investigating 21:1, 1 25:1 36:1
investigation 17:1 20:1, 1 35:1 36:1, 1
investigations 25:1
invited 25:1
involve 47:1 75:1
involved 15:1 22:1 25:1 37:1, 1 38:1, 1, 1 40:1 43:1, 1 44:1 76:1 78:1, 1, 1, 1 79:1 81:1 83:1, 1 84:1 90:1 117:1, 1, 1
involvement 4:1 40:1 43:1
involves 43:1
Isaiah 8:1
issuance 119:1 120:1, 1 123:1
issue 63:1 66:1 79:1 109:1
issued 31:1, 1 53:1 62:1 79:1 80:1, 1 87:1 120:1 121:1
issues 17:1 48:1, 1 105:1 122:1, 1
Italy 20:1
its 32:1 48:1,

1 49:1 99:1
Izzy 68:1

< J >
Jacksonville 1:1 17:1, 1 18:1, 1, 1, 1, 1, 1, 1, 1 19:1 34:1, 1 36:1, 1 38:1, 1, 1 39:1 42:1 44:1 45:1, 1 56:1 66:1 69:1 73:1, 1, 1 80:1 81:1
Jacksonville's 77:1 78:1
JAMES 1:1 3:1 4:1 127:1 128:1 129:1 132:1 2:1
Jennifer 25:1
JEROME 2:1 5:1
Jerry 85:1
Jersey 26:1
Jill 49:1
Jim 118:1
jobs 36:1
Joe 68:1
joined 85:1
Joseph 8:1
judge 42:1 55:1 79:1, 1, 1, 1, 1, 1 80:1, 1
judges 79:1 80:1, 1, 1
judgment 53:1
July 6:1 11:1, 1 31:1 114:1
June 19:1, 1 100:1 112:1
jurisdiction 49:1 81:1
jurisdictional 48:1

jurisdictions 19:1 54:1
Justice 17:1 27:1, 1 28:1 92:1 93:1 109:1, 1, 1 110:1 119:1
Justice's 32:1
justification 75:1, 1
justify 63:1

< K >
Kansas 24:1, 1, 1, 1
Karp 47:1
K-a-r-p 47:1
Kathryn 52:1
keep 23:1 113:1 115:1, 1 125:1
keeping 104:1
kept 39:1 125:1
Kern 53:1
K-e-r-n 53:1
kettles 65:1
kid 122:1
kids 44:1
kill 12:1 20:1
killed 5:1 6:1 14:1 15:1, 1 16:1, 1 47:1 49:1 51:1 53:1 58:1
Killing 12:1 53:1
killings 13:1
Kimberlin 25:1
kind 13:1 14:1 20:1 28:1 34:1, 1 40:1 50:1 51:1 72:1 74:1 90:1, 1 93:1

kinds 34:1 35:1
Kiya 13:1
knew 74:1 101:1, 1 123:1
knock 42:1 81:1 82:1, 1 83:1, 1
knocked 62:1
know 4:1 5:1, 1, 1 7:1 10:1, 1 13:1 14:1 21:1 23:1, 1 24:1 26:1 28:1 30:1, 1 32:1 33:1, 1, 1 34:1, 1 41:1, 1, 1, 1 42:1, 1 47:1, 1 48:1 57:1 59:1, 1, 1, 1 60:1 61:1 63:1, 1 66:1, 1 67:1, 1, 1 68:1, 1, 1, 1, 1, 1, 1 69:1 71:1, 1, 1 72:1, 1, 1, 1 73:1, 1, 1, 1 74:1 79:1, 1 80:1, 1, 1 81:1 82:1, 1 83:1 84:1 86:1, 1, 1, 1 91:1, 1 92:1, 1, 1, 1, 1 93:1, 1 94:1, 1 95:1 96:1, 1, 1, 1, 1 97:1 100:1, 1 101:1, 1 102:1, 1 104:1, 1 105:1 107:1, 1, 1 113:1 116:1 122:1 125:1
knowing 107:1 123:1

knowledge 41:1 42:1 43:1 79:1 86:1 90:1 106:1 117:1
known 13:1 15:1 41:1 74:1
KOLDE 2:1 4:1, 1 5:1, 1 9:1, 1 10:1, 1, 1 11:1, 1 12:1 57:1, 1 85:1 112:1, 1
Kolde's 113:1

< L >
label 76:1
labeled 112:1
Labradors 117:1
Lady 15:1, 1
Lake 46:1 47:1
land 19:1
language 21:1, 1 22:1 25:1, 1 30:1
laptop 12:1
large 36:1 127:1 128:1, 1
latest 110:1
Law 17:1 18:1 19:1, 1 20:1 21:1, 1 22:1, 1, 1, 1, 1, 1 23:1, 1, 1 24:1, 1 25:1, 1, 1 30:1, 1 32:1 33:1, 1, 1 34:1, 1 41:1 42:1, 1, 1 45:1 71:1, 1 72:1, 1 79:1, 1 80:1, 1, 1, 1 81:1 83:1 84:1 86:1, 1 88:1, 1, 1, 1,

1, 1, 1 89:1 92:1 109:1 115:1, 1 120:1, 1 121:1, 1, 1 123:1
lawfulness 80:1
lawsuit 4:1 113:1 115:1
lawyer 43:1 84:1
layout 97:1 122:1, 1
lead 6:1
leading 34:1 120:1
leak 63:1
leave 44:1
ledgers 113:1, 1
Lee 53:1
L-e-e 53:1
left 10:1 38:1 123:1
Legal 22:1 49:1 68:1 82:1 83:1, 1, 1 85:1 89:1 115:1
legend 16:1
Legislation 24:1 30:1
legs 116:1
lethal 47:1 51:1 109:1
level 61:1 82:1 90:1, 1
levels 75:1
liabilities 48:1
liability 108:1
licensed 80:1
lieutenant 17:1 29:1 36:1, 1 37:1 46:1
likelihood 82:1 84:1

Case: 4:17-cv-01522-PLC    Doc. #: 29-2    Filed: 06/11/18    Page: 147 of 151 PageID #: 371

Deposition of James Crosby                                    Angela Zorich vs. St. Louis County, et al

limit  29:1, 1
limited  25:1
limits  18:1
line  16:1
  18:1
list  7:1, 1
  22:1  25:1
  32:1, 1  51:1
  88:1  111:1, 1,
  1  113:1
  115:1  116:1
  117:1  129:1
listed  7:1
  111:1
literally  45:1
  117:1
literature
  15:1, 1, 1, 1, 1
  16:1, 1, 1, 1
  115:1
Litigation
  129:1, 1
  135:5
little  13:1
  40:1  67:1
  124:1
live  18:1
lived  18:1
  68:1
lives  57:1
living  17:1
  57:1  61:1
LLP  129:1
  134:9
local  88:1
located  18:1
location
  100:1  102:1
  125:1
locations  97:1
lock  67:1
Lockwood
  26:1  29:1
logs  7:1
long  18:1
  19:1  21:1
  58:1  91:1
  123:1  124:1
  125:1
longer  17:1

Look  99:1
  118:1
looked  13:1
  89:1  102:1
  115:1  118:1
looking  12:1
  25:1  56:1
  88:1  89:1
  100:1  120:1
  122:1
looks  9:1
  13:1  84:1
loop  104:1
loose  125:1
Los  29:1
  30:1  31:1, 1,
  1, 1  116:1
lose  125:1
lot  14:1
  39:1  116:1
  117:1
LOUIS  1:1
  2:1  4:1, 1
  5:1  7:1, 1
  56:1  61:1
  62:1  63:1
  66:1  71:1
  73:1  91:1
  99:1, 1  105:1
  106:1, 1
  108:1, 1, 1, 1
  121:1  129:1,
  1, 1  2:1, 1, 1
  134:3, 5, 11
  135:7
Louisiana
  23:1
low  61:1
lump  14:1
lunged  78:1

< M >
Magazine
  109:1
magically
  93:1  96:1
magistrate
  87:1
main  129:1

maintenance
  69:1, 1  82:1
major  74:1
  82:1  93:1, 1
making  75:1
  81:1  84:1
  85:1  121:1
management
  36:1
Manchester
  129:1  135:6
mandate  30:1
mandatory
  29:1  30:1
  31:1, 1  32:1
manner  76:1,
  1
March  1:1
  112:1  127:1
  129:1
mark  6:1, 1
  11:1  27:1
  31:1  51:1
  109:1  110:1
  111:1
Marquez
  52:1
M-a-r-q-u-e-z
  52:1
massive  92:1
material
  89:1, 1  118:1
materials  7:1,
  1, 1, 1  12:1
  111:1, 1, 1, 1,
  1, 1
MATLOCK
  2:1  3:1  4:1
  5:1  8:1
  10:1, 1  14:1,
  1  15:1  16:1
  21:1  26:1
  28:1  33:1
  40:1, 1, 1
  41:1, 1  57:1
  59:1  60:1
  63:1  64:1
  65:1  66:1, 1
  71:1  74:1
  75:1  76:1

77:1, 1  78:1
  79:1  80:1
  82:1, 1  83:1
  85:1  89:1
  93:1  94:1
  95:1, 1, 1
  96:1, 1  97:1
  99:1  101:1
  102:1  107:1
  108:1  110:1
  119:1, 1, 1
  120:1  125:1
  126:1, 1
  129:1, 1
  134:8
matter  54:1
  56:1  71:1, 1
  84:1  122:1
  123:1  129:1
mean  28:1, 1
  29:1, 1  55:1
  62:1  72:1
  75:1  78:1
  82:1  100:1
  101:1  104:1
  112:1  113:1
means  75:1,
  1  81:1  88:1,
  1  92:1, 1
  93:1  103:1
  104:1  110:1

measurements
  98:1
meet  102:1
meeting  10:1
  35:1  58:1
meetings  70:1
members
  37:1  56:1
  58:1  71:1
  99:1
MEMO  2:1
menace  58:1
mentally
  123:1
mentioned
  29:1  30:1
  56:1  68:1

72:1  75:1
  92:1  132:7
mentions
  64:1
met  10:1
methods
  51:1  83:1
  96:1
metro  80:1
Metro-Maryla
nd  29:1
Michael  52:1
microwave
  65:1
middle  48:1
Midwest
  24:1  29:1
million  80:1
  81:1
mind  95:1
  97:1, 1  119:1
minding  48:1
mine  113:1
Miniature
  117:1
minimum
  11:1  44:1
minute  108:1
minutes
  125:1
mischaracteriz
es  96:1
misconduct
  36:1
misdeeds
  36:1
misdemeanor
  60:1, 1  75:1
  76:1

misinterpreted
  107:1, 1
misread
  118:1
missing  118:1
MISSOURI
  1:1  2:1, 1
  7:1  24:1, 1
  25:1, 1, 1, 1, 1
  26:1, 1  34:1,

1  42:1, 1
  80:1, 1  86:1
  88:1  89:1, 1,
  1, 1, 1, 1
  112:1  120:1
  135:7
mistake
  118:1, 1
  119:1, 1, 1
mix  14:1, 1
mixes  15:1
MO  129:1, 1
  2:1  134:5, 11
model  71:1, 1
moment  78:1
Monday
  42:1  86:1
  87:1  123:1
monitor  35:1
monitoring
  36:1
Moore  49:1
  51:1, 1
morning
  10:1, 1  12:1
Moses  46:1
  47:1
mouth  75:1,
  1, 1
moved  99:1,
  1
multi-letter
  72:1
multiple  23:1
municipal
  5:1  41:1
  42:1, 1  62:1,
  1  82:1  87:1,
  1
myth  16:1

< N >
name  4:1
  18:1  19:1
  24:1  25:1, 1
  29:1  47:1
  49:1  51:1
  105:1
named  45:1
  106:1

Case: 4:17-cv-01522-PLC    Doc. #: 29-2    Filed: 06/11/18    Page: 148 of 151 PageID #: 372

Deposition of James Crosby                                                    Angela Zorich vs. St. Louis County, et al

names 48:1 49:1

narcotics 73:1

Narrative 109:1

National 17:1, 1 19:1 23:1 24:1 28:1 70:1, 1 71:1, 1, 1 73:1 109:1, 1, 1 110:1

nationally 27:1 33:1 91:1

natural 64:1, 1 65:1, 1

nature 76:1

near 63:1

nearly 58:1 110:1

necessarily 16:1 17:1 58:1 67:1 76:1

necessary 11:1 43:1 85:1 93:1

necessity 84:1

neck 104:1

need 51:1 63:1 78:1, 1 84:1 95:1 108:1 126:1, 1, 1

needed 96:1 97:1 121:1 124:1

needlessly 47:1 48:1

negative 96:1

Nevada 70:1

never 6:1 37:1 41:1 44:1 45:1 60:1 62:1, 1 66:1, 1 73:1, 1 78:1, 1 82:1 92:1

95:1, 1 96:1, 1

New 26:1, 1, 1 30:1 31:1 35:1 110:1 112:1

Newnan 1:1

NICOLE 2:1 5:1

night 42:1 86:1, 1

Ninth 2:1

nmatlock@do bsongoldberg. com 2:1

no-knock 82:1, 1, 1 84:1, 1 85:1 86:1, 1, 1 90:1

non 120:1

nonaggressive 119:1

non-dangerous 20:1

nonlethal 50:1 51:1

normal 35:1 135:3

normally 103:1

Notary 1:1 127:1 128:1, 1

noted 40:1

notes 108:1 114:1 115:1, 1 118:1 128:1

Notice 3:1 41:1 42:1 87:1 88:1 90:1 111:1, 1 121:1

noticed 121:1

notices 55:1

notification 42:1 100:1

notified 106:1

nuisance 61:1

number 5:1 7:1 13:1 14:1, 1 15:1 21:1 23:1 29:1 30:1 31:1 34:1, 1 39:1 46:1 70:1 73:1 90:1 94:1 99:1 111:1, 1 112:1, 1 114:1, 1 116:1 129:1

numbers 113:1, 1 114:1

numerous 24:1 63:1

Nye 70:1

< O >

oath 4:1 127:1

object 4:1 14:1 16:1 21:1 26:1 33:1 41:1 57:1 59:1 60:1 63:1 65:1 66:1, 1 71:1 74:1 75:1 76:1 77:1 79:1 80:1 82:1 83:1 93:1 94:1 95:1, 1 96:1 99:1 101:1 102:1 120:1 124:1

Objection 14:1 82:1 89:1 95:1 96:1

objective 90:1

obtain 41:1 42:1 86:1

obtained 41:1

obtaining

62:1

obtains 43:1

OC 103:1 124:1

occasionally 40:1

occupant 42:1 87:1

occupants 57:1 58:1 60:1, 1 61:1 74:1, 1 90:1

occupation 15:1

occupied 87:1

occurred 117:1 124:1

o'clock 123:1

Ocoee 47:1, 1

offenses 74:1

offer 93:1

offered 92:1

offhand 35:1

office 5:1 18:1, 1, 1 19:1 36:1 38:1 39:1 44:1, 1 45:1, 1 92:1 113:1 123:1 129:1 2:1 134:3

officer 6:1 8:1, 1 18:1 30:1 31:1 34:1, 1 39:1 40:1 41:1 43:1, 1, 1, 1, 1 44:1 45:1, 1, 1, 1 47:1 49:1, 1, 1 52:1 53:1 58:1, 1, 1 59:1, 1, 1 61:1 62:1, 1, 1 66:1 67:1 68:1 69:1, 1, 1 77:1, 1 84:1 88:1 89:1 91:1 92:1, 1 93:1

94:1 95:1 97:1 100:1, 1 101:1, 1 102:1 103:1 105:1, 1, 1, 1 106:1, 1 107:1, 1, 1, 1, 1 108:1 116:1 120:1, 1, 1 121:1, 1 123:1 124:1 2:1

officers 4:1 19:1, 1 20:1 21:1 23:1, 1 24:1, 1, 1, 1, 1, 1 25:1, 1 28:1 29:1, 1, 1 30:1, 1 35:1, 1, 1, 1 36:1, 1, 1, 1 37:1 38:1, 1 40:1, 1 45:1 50:1 51:1 56:1 60:1 61:1 72:1 74:1 75:1, 1, 1 76:1, 1, 1 77:1, 1, 1 79:1, 1 82:1 83:1, 1 85:1 90:1, 1, 1, 1 91:1 93:1, 1, 1 94:1 102:1 103:1 104:1, 1, 1, 1 110:1 118:1 119:1, 1, 1 122:1 124:1, 1, 1 125:1, 1

officer's 67:1

official 127:1

Ohio 26:1, 1

old 112:1

oleoresin 110:1

once 45:1 46:1

ones 22:1 23:1 24:1 112:1 118:1

one's 75:1

online 115:1, 1, 1, 1 116:1 118:1

open 25:1 67:1

operated 35:1

operating 102:1

operation 91:1

Operations 7:1 28:1 40:1 112:1

opine 43:1

opinion 8:1, 1, 1, 1 60:1 82:1 83:1 85:1 90:1 91:1 99:1, 1 106:1 107:1 108:1, 1, 1 124:1

opinions 7:1 84:1 88:1, 1, 1, 1 91:1, 1, 1 106:1 107:1, 1 111:1 114:1, 1 116:1

opportunity 44:1

Orange 47:1

Order 7:1 86:1 87:1, 1 88:1 112:1

ordered 129:1

ordering 126:1

ordinance 5:1 82:1

organization 24:1 25:1, 1 26:1 27:1 28:1 72:1 73:1

**organizations** 72:*1*

**organization's** 27:*1*

**organizing** 125:*1*

**Oriented** 27:*1* 28:*1*

**original** 2:*1*

**originally** 109:*1* 112:*1*

**Orlando's** 48:*1*

**Osorio** 29:*1*

**O-s-o-r-i-o** 29:*1*

**outcome** 47:*1*

**outlook** 74:*1*

**outside** 14:*1* 19:*1* 24:*1* 63:*1* 66:*1* 120:*1*

**outstanding** 60:*1*

**overall** 36:*1*

**overreacted** 107:*1*

**overseeing** 38:*1*

**oversees** 72:*1, 1, 1*

**owner** 46:*1* 48:*1* 87:*1, 1, 1, 1*

**owner-occupied** 41:*1*

**owners** 83:*1* 109:*1*

**< P >**

**p.m** 1:*1* 126:*1*

**PAGE** 3:*1, 1* 7:*1* 8:*1* 9:*1, 1, 1, 1, 1* 101:*1* 105:*1* 129:*1, 1, 1*

**pages** 7:*1* 132:*5*

**paid** 135:*2, 3*

**pain** 98:*1*

**Palm** 52:*1*

**paperwork** 64:*1*

**paragraph** 99:*1*

**parameters** 83:*1*

**Parish's** 23:*1*

**part** 20:*1* 21:*1, 1* 25:*1* 35:*1* 36:*1* 38:*1* 50:*1* 56:*1, 1, 1* 73:*1* 86:*1, 1, 1* 89:*1* 107:*1* 125:*1, 1, 1, 1*

**participate** 43:*1*

**participated** 39:*1* 123:*1* 125:*1*

**participation** 39:*1*

**particular** 14:*1* 15:*1* 24:*1* 29:*1* 35:*1* 49:*1* 56:*1* 69:*1* 79:*1* 81:*1* 100:*1* 123:*1*

**particularity** 89:*1*

**particularly** 13:*1* 17:*1* 29:*1* 61:*1* 84:*1* 116:*1*

**passed** 30:*1* 119:*1*

**patrol** 32:*1, 1* 34:*1, 1, 1* 35:*1, 1* 36:*1*

**pay** 60:*1*

**paying** 100:*1*

**penetrated** 92:*1*

**people** 12:*1, 1, 1* 13:*1, 1* 14:*1, 1, 1*

**15**:*1, 1* **16**:*1, 1, 1, 1* 20:*1* 26:*1, 1* 39:*1* 46:*1* 60:*1* 61:*1* 66:*1* 75:*1* 76:*1* 81:*1* 84:*1* 86:*1* 104:*1* 117:*1, 1, 1* 121:*1*

**people's** 113:*1*

**Pepper** 109:*1* 110:*1* 124:*1*

**percent** 114:*1*

**percentage** 33:*1, 1, 1* 92:*1*

**perceptions** 61:*1, 1*

**Perea** 29:*1*

**P-e-r-e-a** 29:*1*

**performed** 34:*1*

**period** 36:*1* 45:*1* 120:*1, 1, 1* 121:*1, 1* 122:*1*

**permanently** 73:*1*

**permission** 86:*1* 88:*1*

**permitted** 102:*1*

**person** 11:*1* 45:*1* 63:*1* 76:*1* 80:*1* 88:*1* 89:*1, 1* 104:*1* 122:*1, 1* 123:*1* 2:*1*

**personal** 113:*1*

**personally** 34:*1* 37:*1, 1, 1* 45:*1* 69:*1* 77:*1* 127:*1*

**personnel** 21:*1* 23:*1* 69:*1*

**persons** 57:*1* 83:*1, 1*

**pet** 5:*1* 6:*1* 109:*1*

**Pfanstiel** 105:*1* 106:*1* 107:*1, 1*

**P-f-a-n-s-t-i-e-l** 105:*1*

**pgunn@stlouisco.com** 2:*1*

**phone** 61:*1*

**photographs** 97:*1, 1* 98:*1* 112:*1*

**physical** 14:*1* 20:*1* 75:*1* 93:*1* 97:*1, 1* 116:*1*

**pick** 105:*1*

**picked** 105:*1*

**Pico** 48:*1*

**picture** 66:*1*

**pictures** 13:*1*

**pin** 67:*1*

**pit** 13:*1, 1, 1, 1* 14:*1, 1, 1, 1* 15:*1, 1, 1* 16:*1, 1* 48:*1*

**PLACE** 1:*1* 2:*1* 11:*1* 12:*1* 97:*1* 98:*1, 1, 1, 1, 1, 1* 103:*1* 118:*1* 124:*1* 134:*10*

**Place3rd** 129:*1*

**places** 54:*1* 125:*1*

**plain** 63:*1*

**Plaintiff** 1:*1* 2:*1* 12:*1* 47:*1* 48:*1, 1* 49:*1, 1, 1* 50:*1, 1, 1, 1, 1* 51:*1, 1, 1* 52:*1* 53:*1, 1, 1, 1, 1, 1* 59:*1*

**Plaintiffs** 9:*1* 52:*1* 56:*1, 1* 94:*1* 95:*1* 96:*1* 101:*1* 103:*1* 114:*1* 123:*1, 1* 124:*1*

**planning** 9:*1* 110:*1* 124:*1*

**plans** 96:*1* 97:*1*

**plate** 65:*1*

**plates** 65:*1*

**Pleasant** 52:*1* 53:*1*

**please** 31:*1* 129:*1, 1*

**plug** 64:*1*

**plus** 49:*1*

**point** 28:*1* 30:*1* 40:*1* 47:*1* 48:*1* 52:*1* 68:*1* 81:*1* 98:*1*

**pointing** 76:*1*

**points** 119:*1*

**Poland** 20:*1*

**pole** 94:*1* 103:*1* 104:*1*

**poles** 124:*1*

**police** 4:*1, 1* 5:*1, 1* 7:*1, 1* 17:*1, 1* 18:*1, 1* 19:*1, 1* 20:*1, 1* 23:*1, 1, 1* 24:*1, 1, 1* 27:*1* 28:*1, 1, 1, 1* 29:*1, 1, 1, 1* 30:*1, 1* 31:*1, 1* 32:*1, 1* 33:*1* 34:*1, 1* 35:*1, 1* 39:*1* 40:*1, 1* 41:*1* 43:*1, 1, 1, 1* 44:*1, 1* 45:*1, 1* 46:*1, 1* 47:*1, 1* 48:*1, 1*

**Plaintiffs** (continued right column)

**49**:*1, 1, 1* 50:*1, 1* 52:*1, 1, 1* 53:*1, 1* 54:*1, 1* 56:*1, 1, 1, 1, 1* 58:*1* 61:*1, 1, 1* 62:*1, 1* 69:*1, 1* 70:*1* 71:*1, 1* 74:*1* 75:*1, 1* 76:*1* 77:*1* 78:*1, 1* 79:*1* 86:*1* 88:*1* 91:*1* 92:*1, 1, 1* 93:*1, 1* 97:*1* 104:*1, 1* 105:*1* 108:*1* 110:*1* 114:*1* 116:*1, 1, 1* 118:*1* 121:*1* 124:*1*

**policies** 31:*1* 62:*1, 1* 70:*1, 1, 1* 71:*1, 1* 72:*1* 73:*1* 77:*1* 78:*1, 1, 1, 1, 1* 111:*1*

**Policing** 27:*1* 28:*1*

**policy** 70:*1, 1* 99:*1, 1, 1, 1, 1* 100:*1, 1, 1, 1* 101:*1* 102:*1* 103:*1, 1* 121:*1, 1*

**Pomeranians** 117:*1*

**poorly** 119:*1*

**pop** 67:*1*

**popped** 124:*1*

**popular** 15:*1* 16:*1, 1, 1*

**population** 80:*1* 81:*1, 1*

**position** 17:*1*

**positive** 32:*1*

**possession** 124:*1*

**possibilities** 98:*1*

Case: 4:17-cv-01522-PLC    Doc. #: 29-2    Filed: 06/11/18    Page: 150 of 151 PageID #: 374

Deposition of James Crosby

Angela Zorich vs. St. Louis County, et al

possibility 43:*1*
possible 42:*1* 63:*1* 122:*1*
POST 30:*1*
potential 39:*1*
potentially 63:*1* 83:*1*
power 99:*1*
practice 80:*1* 91:*1* 92:*1* 121:*1*
practices 32:*1* 33:*1, 1, 1* 78:*1* 91:*1, 1* 92:*1, 1* 93:*1, 1* 108:*1, 1*
preliminary 114:*1*
premier 71:*1*
premises 63:*1, 1* 88:*1* 101:*1*
prepare 121:*1* 124:*1*
prepared 6:*1* 114:*1*
presence 9:*1* 39:*1, 1* 63:*1* 93:*1* 96:*1* 99:*1* 100:*1* 101:*1* 102:*1, 1* 107:*1, 1*
present 25:*1* 43:*1, 1, 1, 1* 50:*1* 51:*1* 58:*1* 64:*1* 68:*1* 100:*1, 1, 1* 101:*1, 1* 102:*1* 103:*1* 106:*1* 122:*1* 123:*1* 124:*1*
presentation 25:*1, 1* 26:*1*
presentations 24:*1* 25:*1*
presented 21:*1* 23:*1, 1* 24:*1, 1, 1, 1,*

1, 1 25:*1, 1* 26:*1* 62:*1* 77:*1*
presenting 22:*1* 26:*1*
presents 74:*1* 76:*1* 102:*1*
pretense 62:*1*
pretty 7:*1*
previous 15:*1* 39:*1*
previously 60:*1*
price 11:*1*
primary 14:*1* 123:*1*
print 10:*1, 1*
prior 22:*1* 23:*1, 1* 34:*1* 42:*1* 61:*1, 1, 1* 71:*1* 94:*1, 1*
PRISCILLA 2:*1* 4:*1* 40:*1* 57:*1* 85:*1*
proactively 36:*1*
probable 62:*1* 63:*1*
probation 53:*1, 1, 1*
Problem 27:*1* 38:*1, 1* 39:*1* 114:*1* 115:*1*
procedural 48:*1*
Procedure 7:*1* 112:*1, 1*
procedures 62:*1, 1* 72:*1* 92:*1*
process 39:*1* 73:*1*
processing 129:*1*
produce 111:*1*

produced 4:*1* 27:*1, 1* 28:*1, 1*
producing 89:*1* 97:*1*
program 28:*1* 29:*1, 1* 30:*1, 1* 31:*1, 1* 32:*1* 34:*1* 35:*1* 40:*1* 78:*1*
prompt 129:*1*
prongs 104:*1*
proper 9:*1* 29:*1* 30:*1, 1* 31:*1* 35:*1* 39:*1* 55:*1* 91:*1*
properly 39:*1* 47:*1*
properties 38:*1, 1* 39:*1*
property 5:*1* 6:*1* 38:*1* 39:*1, 1* 69:*1, 1* 74:*1* 82:*1* 83:*1* 87:*1, 1* 89:*1* 102:*1* 122:*1, 1, 1, 1* 123:*1, 1, 1* 125:*1*
prosecutions 22:*1*
protect 96:*1*
protection 39:*1*
Protective 17:*1, 1, 1* 38:*1* 69:*1*
proved 14:*1*
provide 9:*1* 40:*1* 42:*1* 93:*1* 103:*1, 1*
provided 7:*1* 8:*1* 9:*1* 12:*1* 27:*1* 41:*1, 1* 45:*1* 59:*1* 89:*1* 99:*1* 103:*1, 1*

111:*1* 112:*1* 115:*1* 118:*1*
providing 9:*1*
provision 100:*1*
psychic 15:*1*
Public 1:*1* 25:*1, 1* 127:*1* 128:*1, 1* 132:*18* 135:*13*
publication 33:*1* 118:*1* 119:*1*
Publications 115:*1*
publish 109:*1* 114:*1*
published 16:*1* 108:*1* 109:*1, 1* 114:*1, 1* 116:*1*
publishing 109:*1* 110:*1*
pulling 75:*1*
pure 14:*1*
purpose 40:*1* 42:*1* 109:*1* 122:*1*
purposes 74:*1*
pursuing 108:*1*
put 62:*1* 67:*1* 99:*1* 115:*1*
puts 103:*1*
putting 121:*1*

< Q >
qualified 79:*1*
questionable 117:*1*
questioned 6:*1*
questioning 16:*1*
quick 119:*1*

quite 7:*1* 26:*1* 29:*1* 30:*1* 32:*1, 1* 33:*1* 61:*1* 73:*1* 85:*1* 94:*1*

< R >
raid 125:*1*
raids 125:*1*
raised 119:*1*
ram 67:*1, 1, 1, 1, 1* 68:*1*
Randall 26:*1* 29:*1*
ranged 37:*1*
rap 59:*1*
rare 12:*1*
Ray 51:*1*
read 42:*1* 59:*1, 1, 1, 1* 83:*1* 94:*1, 1* 97:*1, 1* 101:*1, 1* 117:*1* 126:*1* 129:*1, 1* 130:*1, 4, 7, 10, 13, 16, 19, 22* 131:*1, 4, 7, 10, 13, 16, 19, 22* 132:*2*
readily 89:*1*
reading 84:*1*
real 90:*1* 97:*1*
reality 90:*1*
really 32:*1* 105:*1* 115:*1* 117:*1*
reason 48:*1* 61:*1* 62:*1, 1* 64:*1* 77:*1* 93:*1, 1* 94:*1, 1, 1* 97:*1, 1, 1*
reasonability 83:*1*
reasonable 77:*1* 83:*1*
reasonably 76:*1* 124:*1*

recall 26:*1* 29:*1* 51:*1* 52:*1* 68:*1, 1* 98:*1* 102:*1, 1* 105:*1* 120:*1* 121:*1, 1, 1, 1*
receive 9:*1, 1* 10:*1*
received 7:*1* 10:*1, 1* 90:*1* 91:*1* 111:*1*
recertification 30:*1*
recognition 21:*1* 25:*1* 30:*1* 32:*1* 33:*1* 124:*1*
recognize 21:*1* 26:*1* 91:*1* 110:*1*
recognized 28:*1* 33:*1* 72:*1, 1* 85:*1* 91:*1*
recognizing 20:*1* 21:*1* 22:*1, 1*
recollection 123:*1*
recommendations 28:*1* 70:*1* 72:*1* 93:*1*
recommended 30:*1* 91:*1* 92:*1, 1*
reconnaissance 99:*1* 100:*1*
record 54:*1* 57:*1* 108:*1* 110:*1* 128:*1*
records 23:*1* 113:*1, 1, 1*
recovered 105:*1*
redact 113:*1, 1*
redirect 85:*1*
Reduce 109:*1*

Case: 4:17-cv-01522-PLC    Doc. #: 29-2    Filed: 06/11/18    Page: 151 of 151 PageID #: 375
Deposition of James Crosby
Angela Zorich vs. St. Louis County, et al

referenced 129:1
references 115:1
referrals 118:1
referred 33:1 68:1 70:1
referring 106:1
refused 88:1
refuses 88:1
refusing 54:1, 1
regarding 7:1, 1 9:1 31:1 54:1 70:1 91:1 114:1 116:1, 1 125:1
regular 68:1
relation 98:1
Relations 109:1
relative 128:1, 1
release 113:1
releasing 19:1
relevance 114:1
reliable 117:1
reliably 30:1
relied 16:1 111:1
rely 79:1
remember 25:1 30:1 35:1 38:1 44:1 46:1 47:1 48:1, 1 49:1, 1 51:1 67:1 68:1, 1 72:1, 1, 1, 1 73:1 85:1 123:1
remind 8:1 15:1 64:1 97:1

removed 99:1 106:1
render 7:1
renewed 17:1
rental 87:1, 1
rephrase 78:1, 1 91:1
Report 3:1 6:1, 1, 1 7:1 10:1 11:1, 1, 1, 1 46:1, 1, 1, 1, 1 51:1, 1 56:1, 1, 1 57:1 62:1, 1 67:1, 1 82:1 88:1 89:1 99:1 101:1 105:1, 1, 1, 1, 1, 1, 1 106:1 111:1 114:1 115:1 128:1
reported 67:1, 1, 1
reporter 8:1 105:1 126:1, 1
Reporting 1:1 105:1, 1
reports 7:1 51:1, 1 115:1
represent 4:1 48:1 51:1
represented 49:1, 1 50:1, 1 51:1 52:1 53:1, 1, 1
reprimand 46:1
requested 128:1
require 32:1 34:1 67:1 87:1
required 30:1 84:1 86:1
requirement 86:1 102:1

requirements 33:1 34:1 85:1
requires 63:1
requiring 30:1
research 72:1 83:1 89:1 109:1 117:1
residence 38:1 41:1, 1 62:1, 1 63:1, 1, 1, 1 66:1 68:1 74:1 77:1 79:1 84:1, 1 87:1, 1 88:1 90:1, 1 98:1 100:1 101:1 106:1, 1 122:1 123:1
residences 38:1
resident 42:1 87:1
residential 5:1
residents 59:1 61:1 64:1 68:1 84:1
resides 66:1
resistance 82:1 122:1
resolved 54:1
resource 125:1
resources 123:1 124:1
respect 63:1
respected 91:1
responded 4:1 106:1
responding 36:1 50:1
response 35:1 36:1 45:1 78:1

responses 30:1
responsibilities 18:1 36:1
responsibility 36:1 81:1, 1
responsible 35:1 83:1
resting 97:1 98:1, 1, 1, 1, 1
restore 64:1
restroom 40:1
retain 4:1 17:1
retained 4:1
retention 14:1
retired 17:1 44:1 69:1 73:1 81:1
retirement 39:1 44:1, 1
return 28:1 129:1
returns 113:1, 1, 1
reveal 54:1
review 19:1 36:1 44:1, 1, 1 56:1 58:1 79:1 108:1 119:1 128:1
reviewed 7:1, 1, 1, 1 8:1, 1, 1 9:1 56:1 89:1 107:1 111:1 115:1, 1 119:1
reviewing 36:1
Revised 7:1 89:1, 1, 1, 1 112:1
revision 100:1
revisions 11:1, 1
rewrite 112:1

Rich 129:1 134:9
ridiculous 65:1
riding 34:1
rights 83:1
Riles 4:1 10:1, 1
Rinck 58:1, 1 59:1 61:1 62:1, 1 105:1, 1, 1 107:1 108:1
Rinck's 8:1 59:1 100:1, 1 102:1 107:1
ring 125:1
rises 82:1
risk 62:1 64:1 74:1, 1 76:1, 1 77:1 84:1 104:1
risks 60:1
Rivera 48:1
Road 129:1 135:6
robbery 60:1 76:1
Robinson 52:1
role 106:1, 1
routine 92:1
rude 61:1
rules 9:1, 1 10:1
rumors 16:1
run 122:1
running 38:1 75:1, 1, 1 123:1
Ryther 49:1
R-y-t-h-e-r 49:1

< S >
safe 19:1 26:1 27:1 91:1 92:1, 1 110:1 125:1, 1

safely 21:1 25:1 49:1 92:1
safety 39:1 63:1, 1 64:1, 1, 1 65:1 66:1 84:1 95:1 122:1
San 28:1 29:1
sanitation 40:1
sat 36:1
saw 58:1 66:1 68:1 97:1 121:1
saying 19:1 33:1 64:1 76:1 84:1 101:1 102:1 118:1
scattered 54:1
scattering 22:1
scenario 51:1
scene 97:1 104:1, 1 106:1
scenes 36:1
Schedule 3:1 11:1 12:1 112:1
school 79:1 80:1, 1, 1, 1 122:1
scientific 15:1, 1 16:1 116:1
scientist 15:1
scope 65:1 66:1 79:1 120:1
seal 127:1 135:10
search 4:1 5:1, 1 7:1 37:1, 1 38:1 41:1, 1, 1, 1, 1 42:1, 1, 1, 1, 1