**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **ANGELA ZORICH,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) **Case No. 4:17-CV-1522 PLC** |
| | ) |
| **ST. LOUIS COUNTY, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM AND ORDER

This matter is before the Court[1] on two motions for summary judgment: (1) a motion for partial summary judgment filed by Plaintiff Angela Zorich [ECF No. 53]; and (2) a motion for summary judgment filed by Defendants St. Louis County ("County") and County police officers Robert Rinck, Corey Zavorka, John Pfanstiel, and Mike Fumagalli (collectively, "Defendants") [ECF No. 44].

Additionally, Plaintiff moves to strike, pursuant to Federal Rule Civil Procedure 56(e), (1) certain averments by each Defendant and another affiant, Jeffrey Young, on the ground they contain inadmissible hearsay; and (2) certain responses by Defendants to Plaintiff's statement of material facts, due to Defendants' alleged "failure to cite to any portion of the record or make any required showing to support their position." [ECF Nos. 85 & 94] Defendants oppose the motions to strike. [ECF No. 107]

### I.     Factual background[2]

Plaintiff's section 1983 action arises from the execution of a search warrant at her home

---

[1] The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c). (ECF No. 28).

[2] Unless otherwise noted, the facts recited are those which are properly supported and undisputed.

in April 2014. [ECF No. 1] Plaintiff filed a nineteen-count complaint pursuant to 42 U.S.C. § 1983 against the County and four of its law enforcement officers in their individual capacities, claiming they violated her rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution when, among other things, the individual Defendants entered her home to execute a search warrant for municipal ordinance violations and killed her dog. For each of her sixteen § 1983 claims, Plaintiff seeks an award of compensatory and punitive damages, attorneys' fees, expenses, and costs. For each of her three state law claims (Counts IV, VIII, and IX), Plaintiff seeks an award of compensatory damages, punitive damages, expenses, and costs.

A. *Alleged municipal code violations and preliminary inspection*

In early 2014, Plaintiff lived in a single-family home with her husband, three adult sons,[3] six-year-old daughter, and three dogs, including a pit bull named Kiya. At that time, Rinck was an officer with the St. Louis County Police Department's Problem Properties Unit ("PPU"). Plaintiff's neighbor, who was an investigator for Laclede Gas Company and an acquaintance of Rinck, had called the police department several times to complain about Plaintiff's dogs barking. On April 23, 2014, the neighbor called Rinck to inform him that the gas company had suspended Plaintiff's natural gas service.

Before visiting Plaintiff's residence, Rinck "ran" Plaintiff's address in the County's Crime Matrix program to determine whether any residents of the home had arrest/criminal histories or outstanding arrest warrants. Rinck's search revealed that Plaintiff's husband, Michael, and her three sons, Joseph, Zacariah, and Isaiah,[4] had criminal histories, which included

---

[3] Although police records listed Plaintiff's address as her sons', it is not clear from the record whether they all lived with Plaintiff.

[4] Plaintiff's youngest son, Isaiah, was eighteen years old in April 2014. [ECF No. 83-3 at 2]

arrests for violent offenses, and that Plaintiff and her sons had outstanding arrest warrants. Rinck also reviewed a list of all calls for police service to Plaintiff's address, including a report that Plaintiff's pit bull attacked a neighbor's dog.

On Friday, April 25, 2014, Rinck and two problem property specialists from the County's Department of Public Works went to Plaintiff's house for the purpose of investigating whether the property was safe for occupancy. The County Police Department's other problem properties officer, Officer Rehagan, met Rinck and the property specialists at the residence. When Rinck knocked on the front door and loudly announced himself, the door opened inward. Someone inside the house slammed and locked the front door, and Rinck heard a male voice shout, "fuck you." Rinck knocked several more times, but no one answered the door.

Officer LaChance responded to Rinck's call for assistance and informed Rinck that he was familiar with the Zorich family. According to LaChance, residents of Plaintiff's house were "hostile and combative with the police."[5] [ECF No. 54-1 at 5]. Rinck also spoke to one of Plaintiff's neighbors, who complained about Plaintiff's barking dogs and the "loud and offensive language and behavior of members of the Zorich family" and informed Rinck that an infant and a four- or five-year-old girl might reside there. [ECF No. 50-5 at ¶¶ 57, 59]. The neighbor allowed Rinck and the housing specialists to enter his backyard for the purpose of inspecting Plaintiff's property, and they observed that Plaintiff's deck "appeared to be in imminent danger of collapse[.]" [ECF No. 50-5 at ¶ 73] Rink also observed the lock on the natural gas meter. Before leaving the property, Rinck placed a problem properties notification sticker on Plaintiff's

---

[5] Defendants allege that Officer LaChance informed Rinck that he was familiar with Plaintiff's family, "members of the family had engaged in violent behavior, that Isaiah Zorich had an armed robbery history, that the Zoriches were not friendly toward the police, that they had outstanding warrants, that they would not respond to requests for an interior inspection, and that they would do what they could do to avoid arrest." [ECF No. 50 at ¶ 37]

window.

Later that day, Plaintiff "googled" the PPU and found a phone number, which she called. [ECF No. 54 at ¶ 38]  The first woman Plaintiff spoke to informed her "there was no indication of any issues at her address in the computer" and directed her to an employee named Kim.  [Id. at ¶ 39]  Plaintiff left Kim two messages requesting return telephone calls.  [Id. at ¶ 40]

Plaintiff called the number again the following Monday, April 28, 2014, and spoke to someone who instructed her to call either Rehagan or Rinck directly.  [Id. at ¶ 41]  Plaintiff first called Rehagan, who informed her that the PPU needed to inspect the interior of her house because they had received an anonymous report that her electricity and gas were off.    [Id. at ¶42-43; ECF No. 85-27 at 4].  Plaintiff replied that only her gas was off and, when Rehagan insisted that her electricity was off, Plaintiff said "That's bullshit," and Rehagan terminated the call.  [ECF No. 85-27 at 4]  Plaintiff called Rehagan back to apologize, and Rehagan advised her to call Rinck.  [Id.; ECF No. 54 at ¶ 44]

Plaintiff then called Rinck, who informed Plaintiff that he was investigating her home for lack of gas service and that someone in her house had said "fuck you" to him.  Rinck did not mention the condition of the exterior deck.  [ECF No. 54 at ¶¶ 45-47]  When Rinck advised Plaintiff that he wished to "meet at the property and conduct an inspection," she responded, "Well, I'll have to talk to my husband."  [ECF No. 50 at ¶  56]  Rinck told Plaintiff that "the investigation would continue."  [Id. at ¶ 59]

*B. Administrative search warrant*

The next morning, Rinck and a Public Works inspector went to the St. Louis County

Counselor's office to request an administrative search warrant.[6]   There, Rinck met with an assistant County counselor, explained "the need for the warrant, and the purpose behind the need for an interior inspection," and stated that he spoke to Plaintiff the day before and "she did not give consent to inspect."   [ECF No. 50-5 at ¶¶ 92, 97]

The assistant County counselor advised Rinck that there was probable cause to obtain a search warrant and she completed a warrant application.   The assistant County counselor also prepared a probable cause affidavit for Rinck, in which Rinck attested that:  Plaintiff's property posed a "serious and imminent risk to any person on or about the premises because of numerous serious violations creating a public nuisance which needs to be abated as soon as possible to avoid any danger to the health, safety, and welfare of the community and anyone on or near the premises."   [ECF No. 50-24]   Rinck stated that he believed the property was "being used in violation of St. Louis County Revised Ordinance, and/or [was] creating a public nuisance," for the following reasons:

1. St. Louis County has received complaints from citizens concerning code violations, animal control violations, and possible over occupancy of the property.
2. St. Louis County Police Problem Property Unit has responded to the property to investigate the complaints and were [sic] denied entry for inspection.
3. St. Louis County Police officers have confirmed that the gas service is disconnected to the property since March 2014.
4. Limited observation has indicated a potentially dangerous deck located at the rear of the residence which is in imminent danger of collapse.  This creates a life safety threat for the residence [sic] or anyone on or upon the property.
5. St. Louis County Police have been informed that a minor child is residing at the residence.
6. Inspection of the interior of the property is necessary for the health, safety and welfare of the occupants and nearby residents.

[Id.]

---

[6] St. Louis County Revised Ordinance (SLCRO) section 105.041.1(c) provides:  "A judge of the County Municipal Court of St. Louis County shall have the authority to issue warrants for….Entry onto private property in St. Louis County for the purpose of abating a public nuisance pursuant to any St. Louis County ordinance[.]"  [ECF No. 50-36]

Rinck presented the application, affidavit, and search warrant to a St. Louis County municipal judge, who signed the administrative warrant ("Warrant"). [ECF No. 54 at ¶ 68] The Warrant authorized Rinck to search Plaintiff's property for violations "of St. Louis County Revised Ordinance Chapters 1110 (Property Maintenance Code), 1102 (Electrical), 1103 (Plumbing), 1108 (Mechanical), and/or a public nuisance . . . ." [ECF No. 50-26 at 1 (emphasis original)]

### C. Search of Plaintiff's house

Upon obtaining the Warrant, Rinck contacted Pfanstiel, a Tactical Operations Unit ("TAC") supervisor, and requested he execute the Warrant. Approximately one hour after obtaining the Warrant, Rink met Pfanstiel and other TAC officers at a park close to Plaintiff's house. Rinck informed the TAC officers that residents of Plaintiff's home had histories of violent behavior, including numerous assaults and one armed robbery, and that someone inside Plaintiff's house had slammed the door and shouted "fuck you" at him several days earlier. Rinck also told the officers about the many complaints the police department received about Plaintiff's dogs, including a report that her pit bull attacked another dog. Rinck did not mention the telephone conversation that he and Plaintiff had the previous day.

Because Fumagalli was the "team leader" and Zavorka was the "point person,"[7] they reviewed the Warrant and drove by Plaintiff's property with Rinck in preparation for execution of the Warrant. Fumagalli created a plan for execution of the Warrant. Pfanstiel approved Fumagalli's plan and decided the TAC team would perform a no-knock entry.

That afternoon, Isaiah, Isaiah's coworker, Joseph, and Joseph's six-month-old son were in the living room. Joseph was seated on a couch, with the six-month-old on his lap. Plaintiff

---

[7] As "point person," Zavorka was the first officer to enter Plaintiff's house. [ECF No. 50 at ¶ 139]

and Bridget Haman, Joseph's girlfriend, were in the kitchen. The parties dispute whether Plaintiff's pit bull, Kiya, was in the living room or the kitchen. At approximately 12:40 p.m., ten TAC officers performed a "dynamic, no-knock entry" into Plaintiff's house[8] and, within seconds of entering the house, Zavorka fired two shots, followed by two more shots, at Kiya.

At this point, the versions of events diverge, as the parties dispute (1) whether Kiya behaved aggressively toward the officers and (2) the manner in which the officers searched the property. According to Plaintiff, Kiya was lying on the living room floor three or four feet from Joseph and her grandson when the TAC officers entered her house. [Doc. 1 at ¶ 76] Plaintiff further alleges that Kiya "had not acted aggressively, barked, or even moved other than to turn towards the noise before she was immediately and fatally wounded[.]" [Id.]

In her deposition, Plaintiff testified that, after Zavorka shot Kiya, she saw officers pointing guns at Isaiah and Joseph, who struggled to hold the baby with one arm in the air. As Plaintiff cried, an officer dressed in tactical gear, "[p]ulled me up to my feet and walked me to my dog and put me back on my knees" next to Isaiah. [ECF No. 50-35 at 7] Rinck then "squatted over my dog's body," showed Plaintiff the search warrant, and said, "We're here because your gas is off." [Id. at 7-8] Isaiah testified in his deposition that, when he asked, "Which one of you shot my fucking dog?," an officer pointed a gun "in [his] face" and threatened, "One word, motherfucker, and I'll put three in you." [ECF No. 50-32 at 9] After a "couple minutes," an animal control officer removed Kiya's body from the house. [Id. at 11]

The parties agree that the officers arrested Plaintiff for outstanding traffic tickets. After the officers removed everyone from the house, Rinck and two Public Works specialists inspected Plaintiff's house. The Public Works specialists subsequently issued citations for housing code

---

[8] Because the door was unlocked, the officers did not use a battering ram. [ECF No. 50-7 at ¶ 26]

violations and an order to vacate.[9]  Plaintiff alleged in her complaint that, when she returned to

her house, she discovered "that closets had been searched, drawers and boxes appeared to have

been opened, beds were overturned, and property that had been stored on shelves was thrown to

the floor."  [ECF No. 1 at ¶ 111]

Defendants, on the other hand, maintained that Kiya was in the kitchen when the TAC

Unit entered Plaintiff's house and immediately charged toward the officers.  In their affidavits,

Zavorka and Fumagalli averred that Kiya ran full speed toward the officers and they believed she

was going to attack.  Zavorka recounted that, after he fired two shots at Kiya, she continued to

advance.  He therefore fired two more shots at her, and she "died approximately six feet from the

front door, directly at [his] feet."  [ECF No. 50-7 at ¶ 31]

In his affidavit, Rinck stated that he did not enter Plaintiff's house until the TAC officers

had cleared it, and he declared that he neither spoke to Plaintiff nor observed the pit bull inside

the house.  For their parts, Zavorka, Fumagalli, and Pfanstiel denied searching Plaintiff's house

for evidence of crimes or municipal code violations.   They maintained that they merely

performed a "protective sweep," by looking in places where people might hide to ensure no one

was in the house, and they denied searching boxes or drawers.   Zavorka and Pfanstiel explained

in their affidavits that they entered Plaintiff's basement for the sole purpose of collecting bullets,

which they believed penetrated the subfloor, and assessing any resulting damage.   Zavorka

---

[9] Inspector Michael Cross completed and signed the Notice of Violation and Order to Vacate.  In
the Notice of Violation, Cross placed a letter "x" near the following code violations:  "Siding,
Missing or Deteriorated"; "Guardrail, Deteriorated or Missing"; Screens, Torn or Missing";
"Window Glass, Broken"; and "Deck, Porch or Patio, Deteriorated."    [ECF No. 54-8]  Cross
directed Plaintiff to:  "Secure rear deck door as not to open.  Repair and remove rear deck if
rebuilding permits required[.]"  [Id.]  Cross also completed the Order to Vacate, which identified
the following ordinance violations:  unsanitary conditions, illegal sleep areas, accumulation of
rubbish, no hot water, structural danger (rear deck), dangerous wiring, and obstructed egress.
[ECF No. 54-9]  Cross re-inspected Plaintiff's property and lifted the vacate order on May 29,
2014.  [Id.]

admitted searching the basement bookshelves for a bullet, but denied turning over beds or looking inside drawers or boxes.

### D. Complaint to Division of Family Services ("DFS")

On April 30, 2014, the day after the search, Rinck received a telephone call from Officer Logaglio, a St. Louis County Police School Resource Officer, who confirmed that Plaintiff's six-year-old daughter resided at the residence. Logaglio also informed Rinck that, on April 25, 2014, Isaiah posted on Facebook a video of County police officers and patrol vehicles outside of Plaintiff's residence. The title of the video was "St. Louis County Police Department thinks were [sic] stupid lol #FTP."[10] [ECF No. 54-1 at 13] In the video, a man's voice states, "fuck the police," and continues: "It's the 25th of April and we are being harassed by the St. Louis County Police Department again, just to let everybody know, no warrant, no entry, my nigga, no warrant, no entry, keep on knocking." [Id.]

After his conversation with Logaglio, Rinck called the child abuse/neglect hotline and reported what he alleged were "unsafe/inadequate shelter, unsanitary living conditions." [ECF No. 86-22] By letter dated June 17, 2014, a DFS caseworker informed Plaintiff that the agency found "insufficient evidence to determine by a preponderance of evidence that the children have been abused or neglected." [Id.]

## II.     Plaintiff's Motion to Strike

Under Rule 56(e), Plaintiff moves to strike certain averments on the ground they contain inadmissible hearsay. [ECF No. 85 at 15] Plaintiff specifically contends the following averments contain hearsay or double hearsay: paragraphs 5-10, 16, 29, 51-54, 56-58, 66-68, 82, 84, 89, 122, 130, and 133 in Rinck's affidavit [ECF No. 50-5]; paragraphs 16 and 36 in

---

[10] "FTP" stands for "fuck the police." [ECF No. 54-1 at 13]

Pfanstiel's affidavit [ECF No. 50-4]; paragraphs 14 and 20 in Fumagalli's affidavit [ECF No. 50-2]; paragraph 8 in Zavorka's affidavit [ECF No. 50-7]; and paragraphs 13 and 29 in Young's affidavit [ECF No. 50-6].  Plaintiff asserts that, under Rule 56(e), a court reviewing a motion for summary judgment may only consider facts set forth in support of or opposition to the motion that are admissible in evidence, citing <u>Shaver v. Independent Stave Co.</u>, 350 F.3d 716, 723 (8th Cir. 2003) (in resolving a summary judgment motion, the court "ignor[ed]" a witness's testimony because it was not based on personal knowledge and, therefore, was not admissible). Additionally, Plaintiff argues, a court resolving a motion for summary judgment may not use affidavits consisting of hearsay, citing <u>Murphy v. Missouri Dep't of Corr.</u>, 372 F.3d 979, 982 (8th Cir. 2004).  Because the challenged averments contain inadmissible hearsay, Plaintiff urges, the Court must strike them.

Defendants respond that the challenged statements are not hearsay "because they were not offered to prove the truth of the matters asserted, but to explain the reasons for Defendants' actions.  Fed. R. Evid. 801(c); <u>United States v. Parish</u>, 606 F.3d 480, 487-88 (8th Cir. 2010)." Because Plaintiff challenges the propriety of the investigation in this lawsuit and Defendants' actions regarding that investigation are at issue, Defendants assert they are "permitted to explain their knowledge and reasons for their actions through the use of out of court statements."  <u>United States v. Holmes</u>, 620 F.3d 836, 841 (8th Cir. 2010).

District courts enjoy considerable discretion when ruling on a motion to strike affidavits submitted in support of or opposition to a summary judgment motion.  <u>Jain v. CVS Pharmacy, Inc.</u>, 779 F.3d 753, 758 (8th Cir. 2015).  A court may strike an affidavit or declaration that does not comply with Rule 56(c)(4).  <u>Id.</u>; <u>McSpadden v. Mullins</u>, 456 F.2d 428, 430 (8th Cir. 1972) (when an affidavit submitted with respect to a motion for summary judgment does not meet the

requirements of Rule 56, including the requirement that it contain admissible evidence, "it is subject to a motion to strike").

Rule 56(c)(4) requires, in relevant part, that "[a]n affidavit or declaration used to support or oppose a motion [for summary judgment] . . . set out facts that would be admissible in evidence . . . ." Inadmissible hearsay is an out-of-court statement that "a party offers into evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). "When an affidavit contains an out-of-court statement offered to prove the truth of the statement that is inadmissible hearsay, the statement may not be used to support or defeat a motion for summary judgment." Jenkins v. Winter, 540 F.3d 742, 748 (8th Cir. 2008) (internal quotation marks omitted) (quoting Brooks v. Tri-Sys., Inc., 425 F.3d 1109, 1111 (8th Cir. 2005)); accord Brewington v. Keener, 902 F.3d 796, 802 (8th Cir. 2018).

Having reviewed each of the challenged averments, the Court finds they provide background showing the basis of the actions Defendants took in the course of the investigation at issue in this case. Therefore, the challenged averments do not constitute hearsay. See United States v. Velasquez-Rivera, 366 F.3d 661, 666 (8th Cir. 2004) ("An out-of-court statement used to explain why police took a certain action in their investigation is not hearsay"); accord United States v. Orr, 636 F.3d 944, 957 (8th Cir. 2011) (noting "an out-of-court statement is not offered for the truth of the matter asserted, and is thus not hearsay, when it is offered merely to show why police began surveilling an area or following a criminal suspect," citing Parish, 606 F.3d at 487-88); see also United States v. Davis, 154 F.3d 772, 778 (8th Cir. 1998) (out-of-court statements are not hearsay if they are offered "to explain the reasons for or propriety of a police investigation"). Accordingly, the Court concludes the affidavits submitted by Defendants do not violate the requirements of Rule 56(c)(4) and may be considered in resolving the summary

judgment motions.

Plaintiff also moves to strike certain responses by Defendants to Plaintiff's statement of material facts due to Defendants' alleged "failure to cite to any portion of the record or make any required showing to support their position." Specifically, Plaintiff asks the Court to strike Defendants' responses to paragraphs 51, 67, 73, 76, 78, and 94 of Plaintiff's statement of material facts and deem the statements in those paragraphs "admitted" for purposes of the Court's consideration of the summary judgment motions. Defendants respond that they admitted the portion of each challenged fact that is established by the cited evidence and did not admit the portion of each of those paragraphs Defendants view as not supported by the cited evidence.

Rule 56(c)(1) requires a party opposing another party's facts in support of summary judgment to, in relevant part, "support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute." If a party "fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . or issue any other appropriate order." Fed. R. Civ. P. 56(e)(2) and 56(e)(4).

Local Rule 7-4.01(E) requires a party disputing an opponent's statement of material facts in support of a summary judgment motion to "set forth [the matters in dispute] with specific references to portions of the record, where available, upon which the opposing party relies. . . . All matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party."

When a litigant fails to comply with Rule 56(c)(1) and Local Rule 7-4.01(E), this Court has deemed the relevant facts admitted. Joe Hand Promotions, Inc. v. Shepard, 4:12-CV-1728-SNLJ, 2015 WL 1976342, at *5 (E.D. Mo. Apr. 30, 2015); Franklin v. Pinnacle Entm't, Inc., 1

F.Supp.3d 979, 983-85 (E.D. Mo. 2014). Notably, however, Rule 56(e)(4), provides that the Court may enter "any other appropriate order."

Here, the record is replete with statements, arguments, and other material supporting the parties' positions on their cross-motions for summary judgment. Defendants provided over 700 pages of supporting material in response to Plaintiff's statements of material facts. See ECF Nos. 83 & 106. Plaintiff provided over 700 pages of supporting material in response to Defendants' statements of material fact. See ECF Nos. 85-1, 86, and 101. Additionally, the parties filed numerous statements of fact and over 700 pages of material supporting their own statements of facts. See ECF Nos. 50, 54, and 107.

While not expressly referring to evidentiary materials supporting their positions in opposition to each of the six fact statements Plaintiff now seeks to deem admitted, Defendants responded to each of the six paragraphs and set forth their positions on or objections to each of the paragraphs. Two of the contested responses address four St. Louis County Ordinances (paragraph 67) and a change in the Tactical Operations Unit Procedure 94-34 (paragraph 94) – matters that do not clearly require factual support different from the references provided by Plaintiff. Three of the contested responses address paragraphs focusing on Zavorka's role in planning entry into Plaintiff's home to execute the Warrant (73) and entering the home (76 and 78), matters clearly the subject of the parties' disputes in this case. The sixth challenged response (to paragraph 51) focuses on Rinck's response to Plaintiff's statement she was going to speak to her husband. While the six challenged responses do not explicitly satisfy the terms of Rule 56(c) and Local Rule 7-4.01, the Court concludes it is unreasonable to deem the facts subject to those six responses admitted based on the record in this case. Therefore, the Court denies Plaintiff's motion to strike certain averments [ECF No. 85] and motion to strike

Defendants' responses to Plaintiff's statement of material facts [ECF No. 94] under the circumstances.

### III.    Motions for Summary Judgment

In her nineteen-count complaint, Plaintiff asserts the following claims under 42 U.S.C. § 1983 and Missouri common law:  (1)  unlawful search[11] of Plaintiff's residence against Rinck (Count I); (2) unlawful search of Plaintiff's residence against Zavorka, Pfanstiel, and Fumagalli ("Defendant TAC Officers") (Counts V, X, XIII); (3) unlawful seizure for the killing of Kiya against Rinck and Defendant TAC Officers (Counts II, VI, XI, XIV); (4) unlawful retaliation for speech against Rinck (Count III); (5) failure to supervise and/or intervene against Defendant TAC Officers (Counts VII, XII, XV); (6) unlawful policy, practice, and/or custom against County (Counts XVI, XVII, XVIII, XIX); (7) intentional infliction of emotional distress against Rinck and Zavorka (Counts IV and IX); and conversion against Zavorka (Count VIII). Defendants move for summary judgment on each of Plaintiff's nineteen counts.  [ECF No. 44] Plaintiff moves for summary judgment on six of her counts.  [ECF No. 53]

### A. *Legal standard*

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Hill v. Walker, 737 F.3d 1209, 1216 (8th Cir. 2013).  The movant "bears the initial responsibility of informing the district court of the basis for its motion" and must identify "those portions of [the record]...which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant does so, the non-

---

[11] In her complaint, Plaintiff alleged in Counts I, V, X, and XII "unlawful search and seizure" of the residence.  [ECF No. 1]  However, because the facts alleged in the complaint and supported by the record establish only a search of the residence, the Court will not address Plaintiff's unlawful seizure claim.

movant must respond by submitting evidentiary materials that set out "specific facts showing that there is a genuine issue for trial." Id. at 324 (quotation marks omitted).

"On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)). The court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).

Where parties file cross-motions for summary judgment, each motion should be reviewed in its own right, with each non-moving party "entitled to the benefit of all inferences favorable to them which might reasonably be drawn from the record[.]" Wermager v. Cormorant Twp. Bd., 716 F.2d 1211, 1214 (8th Cir. 1983). See also Canada v. Union Elec Co., 135 F.3d 1211, 1212-13 (8th Cir. 1998). "[T]he filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits." Wermager, 716 F.2d at 1214.

*B. Unlawful search of Plaintiff's residence against Rinck (Count I)*

    1. Plaintiff's motion for partial summary judgment

Plaintiff asserts that she is entitled to summary judgment on her claim that Rinck unlawfully searched her home in violation of the Fourth Amendment because the undisputed facts establish that: (1) the Warrant was "facially defective"; (2) Plaintiff "never denied voluntary consent to conduct an interior inspection" of her property; and (3) Rinck obtained the

Warrant "through material falsehoods and/or withholding of relevant material facts in his supporting affidavit." [ECF No. 55 at 12-11] Defendants oppose Plaintiff's motion on the grounds that: (1) the Warrant obtained by Rinck satisfied the standard set forth by the Supreme Court in Camara v. Mun. Court of City & Cty. of San Francisco, 387 U.S. 523 (1967); (2) the probable cause affidavit did not contain false material statements or omissions; and (3) alternatively, Rinck is entitled to summary judgment based on qualified immunity because "it was not clearly established in 2014 that seeking a search warrant for the plaintiff's residence under the circumstances at hand amounted to a constitutional violation." [ECF No. 84 at 15]

If, as Defendants assert, Rinck is qualifiedly immune from Plaintiff's section 1983 suit for unlawful search of Plaintiff's house, the Court must enter summary judgment for Defendants. See Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) ("[E]ntitlement to [qualified immunity] is an immunity from suit rather than a mere defense to liability…."). The Court therefore begins its analysis with Rinck's claim of qualified immunity with respect to the search of Plaintiff's residence.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages, insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" Dist. of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)). "In analyzing a claim of qualified immunity, [a court] may examine the two key prongs . . . in either order." Moore v. City of Desloge, Mo., 647 F.3d 841, 846 (8th Cir. 2011) (citing

16

*Camreta v. Greene*, 131 S.Ct. 2020, 2031-32 (2011)).  See also *Pearson*, 555 U.S. at 243-245

(proceeding directly to the clearly-established prong may conserve judicial resources in "cases in

which it is plain that a constitutional right is not clearly established but far from obvious whether

in fact there is such a right.").

Where, as here, a defendant raises the defense of qualified immunity, the plaintiff "bears

the burden of proving that the law was clearly established."[12]  *Hess v. Ables*, 714 F.3d 1048,

1051 (8th Cir. 2013).  "If it was not clearly established, regardless of whether [the plaintiff] has

articulated a constitutional violation, the [municipal] employees are entitled to qualified

immunity."  *Id.* (citing *Livers v. Schenck*, 700 F.3d 340, 360 (8th Cir. 2012)).   "An officer

conducting a search is entitled to qualified immunity where clearly established law does not

show that the search violated the Fourth Amendment."  *Pearson*, 555 U.S. at 243-44.

It is settled law – and *was* settled law in April 2014 – that "[s]earches for administrative

purposes, like searches for evidence of crime, are encompassed by the Fourth Amendment."[13]

*Michigan v. Tyler*, 436 U.S. 499, 506 (1978).  See also *Camara*, 387 U.S. at 531 (Fourth

Amendment requires a warrant to enter a home for the purpose of inspecting for violations of

municipal fire, health, and housing codes).  Accordingly, except for emergency situations, an

inspector, if denied consent to enter by the owner or occupant of the premises, must obtain a

---

[12] "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that
a reasonable official would understand that what [the official] is doing violates that right.'"
*Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640
(1987)).  "While 'clearly established law should not be defined at a high level of generality…it is
not necessary, of course, that the very action in question has previously been held unlawful.'"
*Thompson v. Monticello, Ark.*, 894 F.3d 993, 999 (8th Cir. 2018) (quoting *Dean v. Searcey*, 893
F.3d 504, 518 (8th Cir. 2018)).

[13]  Generally, an administrative warrant is a warrant issued by a judge authorizing an
administrative agency to "conduct a search to determine whether physical conditions exist which
do not comply with minimum standards prescribed in local regulatory ordinances."  79 C.J.S.
Searches § 250.  See also *Camara*, 387 U.S. at 530 (an administrative search is "a routine
inspection of the physical condition of private property").

search warrant. <u>Tyler</u>, 436 U.S. at 506. "Probable cause to issue an administrative warrant exists if reasonable legislative, administrative, or judicially prescribed standards for conducting an inspection are satisfied with respect to a particular dwelling." <u>Michigan v. Clifford</u>, 464 U.S. 287, 294 n.5 (1984). Probable cause also exists if there is "specific evidence sufficient to support a reasonable suspicion of a violation." <u>Matter of Inspection of Workplace Located at 526 Catalan St., St. Louis, Mo.</u>, 741 F.2d 172, 174 (8th Cir. 1984) (quoting <u>West Point-Pepperell, Inc. v. Donovan</u>, 689 F.3d 950, 958 (11th Cir. 1982)).

Plaintiff claims that the Warrant was facially deficient, and the search was therefore warrantless, because it "contained no particularized description of what was to be searched." [ECF No. 55 at 14] She further argues that, because the Warrant alleged that Plaintiff's property was "being used in violation of St. Louis County Revised Ordinance Chapters 1110 (Property Maintenance Code), 1102 (Electrical), 1103 (Plumbing), 1108 (Mechanical), and/or a nuisance exists at said place," it appeared to authorize Rinck to search, and even seize, "essentially the entire house" without limitations. [<u>Id.</u>]

Although the Fourth Amendment's probable cause requirement is modified in the context of an administrative search, "the Supreme Court has not as yet held that the other requirements of the amendment's warrant clause – that the warrant be (1) under oath and describe with particularity (2) the place to be searched and (3) the persons or things to be seized – are to be [relaxed] for administrative warrants...."[14] <u>Platteville Area Apartment Ass'n v. City of Platteville</u>, 179 F.3d 574, 580 (7th Cir. 1999) ("<u>Platteville</u>"). <u>See also</u> <u>Hamilton v. Floyd Cty., Ind.</u>, No. 4:16-CV-210-SEB-DML, 2018 WL 4680186, at *9 (S.D. Ind. Sept. 28, 2018); Wayne

_____

[14] In <u>Platteville</u>, the Seventh Circuit held that the challenged administrative inspection warrant was unreasonable because the warrant's citation to specific sections of the housing code could not have placed the judicial officer on notice that the search would involve "rummaging through closets and bureau drawers." 179 F.3d at 580, 582.

LaFave, 5 *Search & Seizure* § 10.1(c) (5th ed.).  However, Plaintiff fails to identify any authority for the proposition that an administrative search warrant must list the specific feature of the house to be inspected.  See e.g., Platteville, 179 F.3d at 580 (suggesting that citation to sections of municipal code might be "an adequate shorthand" to specify the object, and therefore the scope, of an administrative search).

In support of her argument that the Warrant was "exceedingly broad and generalized," Plaintiff relies on Groh v. Ramirez, 540 U.S. 551 (2004).  In Groh, an agent for the Bureau of Alcohol, Tobacco and Firearms (ATF), applied for a warrant to search the defendant's ranch for a "large stock of weaponry," believed to include an automatic rifle, grenades, a grenade launcher, and a rocket launcher.  Id. at 554.  However, in the portion of the form that called for a description of the "person or property" to be seized, the warrant contained a description of the plaintiff's "two-story blue house rather than the alleged stockpile of firearms."  Id.  Because the warrant "failed to identify any of the items that [the ATF agent] intended to seize," the Supreme Court held that the warrant "was so obviously deficient that we must regard the search as 'warrantless[.]'" Id. at 554, 558.

Groh is inapposite because it involved a search for evidence of a crime, rather than a search for municipal code violations at a residence.  Moreover, the search in Groh was unlawful because the warrant described only the place to be searched and not the items to be seized.  Here, the purpose of the search was not to seize anything, but to inspect the physical condition of the property to ensure compliance with building codes.  See e.g., Elkins v. District of Columbia, 690 F.3d 554, 563 (D.C. Cir. 2012) (warrant that listed the plaintiff's address and explained that the search was for unlicensed construction work in violation of construction codes was "sufficiently particular").  The Court's review of the relevant case law (and indeed, the relative paucity of

cases addressing the requisite specificity of warrants in the administrative inspection context) suggests that the law concerning administrative warrants was not clearly established at the time of the alleged violation. Thus, Rinck is entitled to qualified immunity on Plaintiff's claim that the search was unconstitutional because the Warrant was facially invalid.

To the extent Plaintiff claims that the Warrant, and thus the search, were unconstitutional because Plaintiff consented to the search (by saying, "let me talk to my husband") before Rinck obtained the Warrant, whether Plaintiff consented is a disputed question of fact.[15] Even if this fact were not in dispute and Plaintiff voluntarily consented to a search, Rinck is qualifiedly immune from liability because clearly-established law did not provide that refusal of entry was a precondition to obtaining an administrative warrant.

In support of her argument that the Warrant was invalid because she previously consented to an inspection, Plaintiff again relies upon Camara. There, the Supreme Court stated in dicta: "[A]s a practical matter, … it seems likely that warrants should normally be sought only after entry is refused unless there has a been a citizen complaint or there is other satisfactory reason for securing immediate entry." Camara, 387 U.S. at 539-40. Given that Camara involved a "routine area inspection"[16] and specifically acknowledged that refusal of entry might not be required in the case of a citizen complaint, the Court does not find it clearly-established law that a police officer or inspector may only seek an administrative warrant after a resident denies entry. See, e.g., William E. Ringel, "Administrative warrant for regulatory inspections,"

_____

[15] "The issue of consent is a question of fact that requires consideration of the totality of the circumstances." United States v. Severe, 29 F.3d 444, 446 (8th Cir. 1994). See also Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973).

[16] In Camara, an inspector of the Division of Housing Inspection of the San Francisco Department of Public Health entered an apartment building to perform "a routine annual inspection for possible violations of the city's Housing Code." Camara, 387 U.S. at 526. The city's municipal code required the Bureau of Housing Inspection to inspect apartment buildings at least once a year. Id. at 526 n. 1.

*Searches & Seizures, Arrests & Confessions* § 14:3 (2d ed.) ("[T]he Supreme Court does not require that consent be sought before the coercive power of a[n administrative] search warrant is used [for regulatory inspections].").

Finally, Plaintiff argues that the Warrant was invalid because Rinck "obtained his search warrant through material falsehoods and/or withholding of relevant material facts in his support affidavit." [ECF No. 55 at 20] More specifically, Plaintiff asserts that: (1) Rinck falsely attested in the affidavit that "St. Louis County [PPU] has responded to the property to investigate complaints and [was] denied entry for inspection"; and (2) Rinck failed to inform the municipal judge that he spoke to Plaintiff the previous day and she did not directly deny him entry, but rather communicated a desire to speak to her husband.

Where, as here, the defendant moves for summary judgment alleging qualified immunity, the plaintiff must demonstrate "*both…a substantial showing* of a deliberate falsehood or reckless disregard [for the actual facts] and establish that, without the dishonesty included or omitted information, the [judge] would not have issued the warrant." Hunter v. Namanny, 219 F.3d 825, 833 (8th Cir. 2000) (Beam, J., dissenting) (emphasis in original) (quoting Hervey v. Estes, 65 F.3d 784, 789 (9th Cir. 1995)). See also Moody v. St. Charles Cty., 23 F.3d 1410, 1412 (8th Cir. 1994). This is because a "presumption" of validity accompanies the affidavit supporting a search warrant, and "[t]o overcome this presumption requires no less than a specific affirmative showing of dishonesty by the applicant." Myers v. Morris, 810 F.2d 1437, 1458 (8th Cir. 1987), abrogated on other grounds by Burns v. Reed, 500 U.S. 478 (1991).

Keeping in mind that, for purposes of an administrative search warrant, "[p]robable cause in the criminal law sense is not required," Marshall v. Barlow's, Inc., 436 U.S. 307, 320 (1978), Plaintiff failed to demonstrate that the allegedly false or omitted information was material to the

finding of probable cause for the Warrant. Accordingly, Rinck is entitled to the protection of qualified immunity with respect to Plaintiff's claim that the Warrant was invalid. The Court therefore denies Plaintiff's motion for summary judgment on her section 1983 action against Rinck for unreasonable search in violation of the Fourth Amendment (Count I).

   2.   Defendants' motion for summary judgment

Rinck seeks summary judgment on Plaintiff's section 1983 claim that he unlawfully searched and seized her residence, arguing that his decision to request the TAC unit to execute the Warrant was reasonable.[17]   [ECF No. 45]  Alternatively, Rinck asserts that he is entitled to qualified immunity because "no Eighth Circuit case discusses the specific reasonableness of the decision to use a SWAT or TAC team to execute an administrative search warrant."  [ECF No. 45 at 10]  In response, Plaintiff asserts that "Rinck's request for summary judgment should be denied as there remains a central and fundamental dispute of material fact regarding Plaintiff's consent to allow him to voluntarily search her home."  [ECF No. 85 at 35]

Unlike Plaintiff's motion for partial summary judgment, which challenged the Warrant's validity, Defendants' motion for summary judgment on Plaintiff's Count I challenges the Warrant's execution.  In determining whether Rinck is entitled to qualified immunity on Plaintiff's claim that his decision to obtain the Warrant and request  TAC execute it violated her Fourth Amendment rights,  the Court considers:  (1) whether the facts, construed in the light most favorable to Plaintiff, establish that Rinck violated her constitutional rights; and (2) whether the rights were clearly established at the time of the search, such that a reasonable official would

_____

[17] Rinck also moves for summary judgment on Count I on the ground that the Warrant was valid. Having already determined in regard to Plaintiff's motion for partial summary judgment that the Warrant did not violate clearly established law governing administrative warrants in April 2014, the Court finds that Rinck is qualifiedly immune from liability based on the Warrant's alleged facial deficiencies.  Therefore, the Court need not further discuss the warrant validity aspect of Rinck's motion for summary judgment on Count I.

have known that his actions were unlawful.  See Pearson, 555 U.S. at 232.

"As with any search,…the scope and execution of an administrative inspection must be reasonable in order to be constitutional."  Bruce v. Beary, 498 F.3d 1232, 1244 (11th Cir. 2007). When a section 1983 plaintiff claims that the use of a TAC or SWAT team to execute a warrant was unconstitutional, a court reviews the decision to deploy the TAC team by "balanc[ing] the quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."  Z.J. v. Kansas City, Mo., No. 4:15-CV-621-FJG, 2017 WL 4390274, at *10 (W.D. Mo. Sept. 29, 2017) (quoting Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1190 (10th Cir. 2001)("Holland")).  "In calculating the necessity to use force to gain entry [for an administrative inspection], it is highly relevant that ordinarily there is no need to take the householder by surprise or to prevent him from remedying any defects before the inspection occurs."  Wayne LaFave, 5 *Search & Seizure* § 10.1(e) (5th ed.) (quotation marks omitted).

Viewing the facts in the light most favorable to Plaintiff, Rinck learned that the gas company had turned off natural gas service to Plaintiff's house.  Rinck believed that "in April 2014, it was against St. Louis County Building Code to occupy a residence where a gas water heater was the source of hot water, if the gas service was disconnected."[18]  [ECF No. 50-5 at ¶ 14]  Rinck also believed, based on his experience as a PPU officer, that "when gas service has been disconnected, there are almost always other serious building code violations that create health and safety hazards."  [Id. at ¶ 14]  When Rinck visited Plaintiff's house on Friday, April 25, 2014, he confirmed that Plaintiff's gas service was turned off and observed a back deck in disrepair.  Before leaving Plaintiff's property, Rinck left a "problem properties notification

---

[18] The parties dispute whether, in April 2014, St. Louis County's Revised Ordinances prohibited the occupancy of a residence without gas service.  [ECF Nos. 50 at ¶¶ 8-9, 101 at ¶¶ 8-9]

sticker on [Plaintiff's] window." [ECF No. 54 at ¶ 34]

After Rinck left the property, Plaintiff's son informed her of Rinck's visit and the notification sticker. Plaintiff "immediately" contacted what she believed was the appropriate St. Louis County office and left two messages. [ECF No. 54 at ¶¶ 38-40] Plaintiff called again on Monday, April 28 and eventually spoke to Officer Rehagan, who directed Plaintiff to contact Rinck. [ECF No. 54 at ¶¶ 41-44]

When Plaintiff and Rinck spoke by phone on April 28, Rinck informed Plaintiff that he wanted to inspect her property, and Plaintiff "indicated she would want to talk to her husband about that." [ECF No. 54-15 at 9] As Rinck acknowledged at his deposition, if Plaintiff had called him back and proposed a time for him to inspect the interior of her residence, "[t]here wouldn't have been a reason to get a warrant. We would have met at the property and been done." [Id. at 12] However, Rinck decided that day to obtain an administrative warrant, and he obtained one the next morning. The municipal judge signed the Warrant at 10:59 a.m. on Tuesday, April 29.

Rinck called Pfanstiel, the TAC sergeant on duty, to request a TAC team execute the Warrant.[19] The TAC officers assembled at a park near Plaintiff's house, where Rinck presented the Warrant and briefed the officers on the numerous complaints by Plaintiff's neighbors, Plaintiff's family's history of violent behavior, and his encounter with her son on April 25. Less than two hours after the municipal judge signed the Warrant, ten TAC officers bearing Rock River M-4 automatic rifles performed a no-knock entry, shot Plaintiff's dog, pointed their guns at the occupants of the house, and ordered them to the floor.

Defendants concede that "the decision to deploy a SWAT team to execute a warrant

---

[19] In his deposition, Fumagalli stated that the PPU was "the one that determines whether or not the TAC team should be called out." [ECF No. 85-24 at 3]

necessarily involves the decision to make an overwhelming show of force – force far greater than that normally applied in police encounters with citizens." [ECF No. 45 at 8 (quoting Holland, 268 F.3d at 1190)]. Defendants maintain, however, that the decision to use a TAC team to forcibly enter Plaintiff's property and execute the Warrant was reasonable because Rinck had reason to believe that multiple residents of the house, some with extensive criminal histories, would be present.[20]

In support of his position that deployment of a TAC team to execute the Warrant was justified because there was an immediate threat to officer safety, Rinck cites Holland. There, the Tenth Circuit held that the decision to deploy a SWAT team to execute search and misdemeanor arrest warrants at a 60-acre compound was reasonable because the owner and several other residents had histories of violence, officers suspected there would be firearms present, and the SWAT team's "goal was to effect the arrest and search warrant quickly, without injury, and to preserve evidence." 268 F.3d at 1190-91.

The instant case is inapposite. The SWAT team in Holland was deployed to arrest a criminal suspect and seize evidence of an assault. Here, the TAC officers' intended to gain entry and secure Plaintiff's house to enable Rinck and the housing inspectors to inspect Plaintiff's property for housing code violations, none of which were characterized as emergent. Viewing the facts in the light most favorable to Plaintiff, Rinck determined, in the absence of any exigency and without allowing Plaintiff a reasonable opportunity to consent to an inspection, that it would be appropriate for the TAC unit to execute the Warrant within hours of obtaining it.

---

[20] Significantly, Rinck does not posit that the suspected municipal code violations (suspended gas service and deteriorating deck) created a danger so urgent as to justify immediate, forcible entry. Importantly, as to Plaintiff's discontinued gas service, Rinck does not identify in his supporting memorandum a St. Louis County Revised Ordinance requiring a homeowner to have a natural gas connection. [See ECF No. 45]

Based on these facts, a reasonable jury could find that Rinck's conduct deprived Plaintiff of her Fourth Amendment right to be free from unreasonable searches and seizures.

Rinck may nevertheless be entitled to qualified immunity if the constitutional right he allegedly violated was not clearly established. Turning to the second step of the qualified immunity analysis, the Court must consider whether the law at the time of the events in question gave Rinck "'fair warning' that such conduct was unlawful in the situation he confronted." Wright v. United States, 813 F.3d 689, 695 (8th Cir. 2015) (citing Hope v. Pelzer, 536 U.S. 730, 741 (2002)).

Rinck argues that, in 2014, "it was not clearly established that requesting the assistance of a TAC Unit…to execute an administrative search warrant constituted an unlawful search and seizure of a residence." [ECF No. 45 at 11] While neither the Eighth Circuit Court of Appeals nor the United States Supreme Court has had the opportunity to review a case containing facts identical to the one here, "it is…permissible to look to decisions of other circuits to determine if the right is clearly established." Z.J., 2017 WL 4390274, at *6. "[B]ased on the case law of other circuits, the Court determines that it was clearly established at the time of the search that the decision to deploy a SWAT-type team to execute a search warrant must be reasonable under the Fourth Amendment." Mountain Pure, LLC v. Roberts, 27 F.Supp.3d 962, 970 (E.D. Ark. 2014) (addressing a 2012 search) (citing Estate of Smith v. Marasco, 430 F.3d 140, 149 (3d Cir. 2005); Holland, 268 F.3d at 1190; Alexander v. City & Cty. of San Francisco, 29 F.3d 1355, 1367 (9th Cir. 1994) (abrogated on other grounds by Cty. of Los Angelez v. Mendez, 137 S. Ct. 1539 (2017)). See also Bruce, 498 F.3d at 1249-50 (reversing grant of qualified immunity to police officers who deployed SWAT team to execute warrantless administrative search of the plaintiff's business).

Because disputed facts are material to a determination of whether use of a TAC team was reasonable, summary judgment is not appropriate. Accordingly, Rinck is not entitled to summary judgment based on qualified immunity with respect to Plaintiff's section 1983 claim in Count I that Rinck's use of the TAC team to execute the Warrant violated her constitutional rights.

C. *Unlawful search and seizure of residence against Defendant TAC Officers* (Counts V, X, and XIII)

Defendant TAC Officers assert that they are entitled to summary judgment on Plaintiff's section 1983 claims for unlawful search and seizure of her residence. [ECF No. 45 at 26-30] More specifically, Defendant TAC Officers argue that their recommendation and/or decision to perform a no-knock entry was reasonable and the search itself, which extended to Plaintiff's basement, did not exceed the scope of the Warrant. In the alternative, Defendant TAC Officers claim that they are entitled to qualified immunity because clearly-established law proscribed neither the officers' no-knock entry nor their search of Plaintiff's basement. Plaintiff counters that Defendant TAC Officers are not entitled to summary judgment on Plaintiff's unlawful search and seizure claims because the Warrant was invalid[21] and the officers improperly searched boxes and shelves in her basement. [ECF No. 85 at 41-43]

"[R]easonableness is always the touchstone of Fourth Amendment analysis, and reasonableness is generally assessed by carefully weighing the nature and quality of the intrusion

---

[21] As discussed in regard to Plaintiff's motion for summary judgment on her claim of unlawful search of the residence against Rinck, the law regarding the particularity requirements for administrative search warrants was not so clearly established that the Defendant TAC Officers would have "fair and clear warning" that conducting the search pursuant to the Warrant was unconstitutional. Thus, to the extent that Plaintiff claims that the search was unconstitutional because the Warrant itself was invalid, Defendant TAC Officers are entitled to qualified immunity. Because the "clearly established law" prong of the analysis is dispositive of this issue, the Court need not decide whether the Warrant was valid. See Pearson, 555 U.S. at 243-45.

on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Mendez, 137 S.Ct. at 1546 (quotations and citations omitted). "The reasonableness of a search may depend, in part, on whether law-enforcement officers knocked and announced their presence before entering[.]" United States v. Scroggins, 361 F.3d 1075, 1081 (8th Cir. 2004). See Wilson v. Ark., 514 U.S. 927, 934 (1995) ("[W]e have little doubt that the Framers of the Fourth Amendment thought that the method of an officer's entry into a dwelling was among the factors to be considered in assessing the reasonableness of a search or seizure.").

While the Fourth Amendment does not forbid no-knock entries, "it requires that searching officers justify dispensing with the knock-and-announce requirement." Scroggins, 361 F.3d at 1081. "In order to justify a no-knock entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence."[22] Richards v. Wisconsin, 520 U.S. 385, 394 (1997). The Supreme Court has held that "[t]his showing is not high." Hudson v. Michigan, 547 U.S. 586, 589-90 (2006). "In the qualified immunity context, the relevant inquiry is whether the officer had 'arguable reasonable suspicion' that a sufficient exigency existed to justify a no-

---

[22] Here, surprise did not advance the purpose of the search, which was to identify municipal housing code violations, and any attendant safety risks, inside Plaintiff's house. "[C]onditions which are generally the subject of inspections are not readily disguised or hidden by any method other than correction of the condition." William E. Ringel, *Searches & Seizures, Arrests & Confessions* § 14:9 (2d ed.). Moreover, "[i]f correction is the result of the advance notice given to the property owner by an attempt at consensual entry by the inspector, then the purposes of the administrative code have been equally served with discovery of the condition, citation of the owner, and subsequent correction." Id.; see also Wayne R. LaFave, et al., 2 *Crim. Proc.* § 3.9(b) (4th ed.) ("Most housing code violations cannot readily be concealed without being corrected; to the extent that householders take advantage of notice to correct deficiencies, the purposes of the housing code are advanced rather than thwarted.").

knock entry." Santana v. Miami-Dade Cty., 688 Fed.Appx. 763, 768 (11th Cir. 2017) (citation omitted).

According to Defendant TAC Officers' affidavits, Fumagalli was the team leader of the search warrant operation and Zavorka was the point person. Fumagalli and Zavorka "reviewed the search warrant to make sure that it was signed by a judge" and determined that the Warrant "appeared to be valid." [ECF No. 83-8 at ¶¶ 10-11] Rinck briefed Fumagalli, Zavorka, and their immediate supervisor, Pfanstiel, "on the history of the occupants," including his belief "that two occupants of the residence had extensive violent history and were known to be armed and violent." [ECF No. 83-9 at ¶¶ 35-36] Rinck also informed the Defendant TAC Officers that, on his previous attempt to inspect Plaintiff's house, "one of the occupants would not allow entry or open the door" and told "Officer Rinck fuck off or fuck you." [ECF No. 83-10 at ¶ 9] Neither Rinck nor the Defendant TAC Officers aver that Rinck informed them of his subsequent telephone conversation with Plaintiff. Based on the information provided by Rinck, Fumagalli prepared a plan for execution of the Warrant and recommended a no-knock entry. Pfanstiel approved the plan.

It is undisputed that Fumagalli and Zavorka planned the search, and Pfanstiel approved the plan and authorized the no-knock entry, based on information provided to them by Rinck. Based on their briefing by Rinck, Defendant TAC Officers reasonably believed that the Zorichs had criminal histories, which included violent offenses, and long-standing, hostile relationships with local law enforcement. They also knew, based on Rinck's briefing, that Rinck sought consent to inspect and a member of Plaintiff's family slammed the door and swore at him. Importantly, Defendant TAC Officers did not know that Rinck had spoken to Plaintiff the previous day and she had stated that she wished to speak to her husband about consenting to an

inspection. "[L]aw enforcement officers may rely on information provided by others in the law enforcement community, so long as the reliance is reasonable." Doran v. Eckold, 409 F.3d 958, 965 (8th Cir. 2005). But see United States v. Lucht, 18 F.3d 541, 551 (8th Cir. 1994) (SWAT leader could not "assume" the situation was "high risk," and therefore decide to force entry, solely because SWAT "was being used.")

 "[I]f a reasonable officer might not have known for certain that the conduct was unlawful – then the officer is immune from liability." Ziglar v. Abbasi, 137 S.Ct. 1843, 1867 (2017). Defendant TAC Officers are therefore entitled to qualified immunity on Plaintiff's claim that they violated her Fourth Amendment rights when they executed a no-knock entry.

The specific conduct of Defendant TAC Officers during the search is another matter. As previously discussed, the "scope and execution of an administrative inspection must be reasonable in order to be constitutional." Bruce, 498 F.3d at 1244. Several circuits have held that "an administrative inspection regime cannot support armed raids, broad searches, and extended detentions." Club Retro, LLC v. Hilton, 568 F.3d 181, 201 (5th Cir. 2009). See also Bruce, 498 F.3d at 1244; Swint v. City of Wadley, Ala., 51 F.3d 988, 997 (11th Cir. 1995).

Plaintiff asserts that Defendant TAC Officers exceeded the scope of the Warrant when they searched the entire house, including the basement and contents of closets, drawers, and boxes. Defendant TAC Officers denied searching the contents of drawers and boxes. Pfanstiel and Zavorka admitted searching the basement, but maintained that, after they cleared the house, the sole purpose of the search, which "included the removal of items from a shelf in the basement," was to recover "missing projectiles and casings from the shots that Defendant Zavorka fired." [ECF Nos. 50-4 at ¶ 64, 50-7 at ¶ 55, 108 at ¶ 113]

However, according to Plaintiff, TAC officers thoroughly searched her entire house.[23]  In her deposition, Plaintiff testified that, after TAC officers escorted her from the house,

> I could hear things being broken in my garage.  They were like throwing things, and like I believe the SWAT Team was already in a full-on search of my house at that point, and they were breaking things.  Like I could hear glass breaking and I could hear things being thrown around inside of my garage.

[ECF No. 85-27 at 15]  In regard to the condition of her house after the search, Plaintiff testified in her deposition that "there was a very horrible mess to clean up."  [ECF No. 85-27 at 18].  Plaintiff explained:  "Every closet was emptied.  My beds were upside down….Every closet [sic] was pulled out, destroyed.  Things were broken….Lots of things, like pictures, bowls, glass bowls, things like that….Lots of glass, broken glass inside my house.  In my garage and in my basement."  [ECF No. 85-27 at 18]  Similarly, Isaiah stated at his deposition that "drawers [were] flipped out and stuff…[t]hroughout the house."  [ECF No. 86-15 at 5].  In his bedroom, on the main level of the house, "[t]he bed was flipped out of the way and drawers all taken out….Closet was a mess….Everything was thrown around…."  [Id.]

The record before the Court demonstrates the existence of genuine issues of material fact regarding whether Defendant TAC Officers' search of the house exceeded the scope of the Warrant and the purported purposes of a protective sweep and bullet recovery.  Thus, genuine issues of fact exist to preclude a finding that Defendant TAC Officers are entitled to qualified immunity.  The Court therefore denies Defendant TAC Officers' motion for summary judgment as to Counts V, X, and XIII to the extent they are based on the scope of the search.

### D. Unlawful seizure for killing Kiya against Zavorka, Pfanstiel, and Fumagalli (Counts VI, XI, XIV)

Plaintiff and Defendant TAC Officers filed cross-motions for summary judgment as to

---

[23] The "Tactical Operations Search Warrant Log" reflects that the TAC team entered Plaintiff's house at 12:40 p.m., and searched the house from 12:53 pm to 1:48 pm.  [ECF No. 85-29]

Plaintiff's section 1983 claim that they wrongfully seized Kiya in violation of the Fourth Amendment. Plaintiff asserts that she is entitled to judgment as a matter of law because Defendant TAC Officers acted unreasonably in failing to develop a plan for handling Plaintiff's dogs prior to executing the Warrant. [ECF No. 55 at 22-25] Defendant TAC Officers counter that the Constitution did not require them to develop a particularized plan for encountering Plaintiff's dogs. [ECF No. 84 at 16-21] They further argue that, even if there were such a requirement, they are entitled to qualified immunity.

Conversely, Defendant TAC Officers move for summary judgment on Plaintiff's unlawful seizure claim, arguing that Pfanstiel and Fumagalli did not participate in the shooting. In regard to Zavorka, the officer who shot Kiya, Defendant TAC Officers argue that Plaintiff failed to demonstrate an unconstitutional seizure because she "does not allege that [Zavorka's] actions amounted to deliberative [sic] indifference." [ECF No. 45 at 31] Alternatively, Defendant TAC Officers argue they are entitled to qualified immunity because clearly established law in 2014 did not require officers "to develop a particularized plan for containing a dog during the execution of a search warrant under circumstances that Officer Zavorka faced." [Id. at 33] In response, Plaintiff contends that: (1) Pfanstiel and Fumagalli's "direct participation is not required" for section 1983 liability; and (2) disputed questions of material fact relating to Zavorka's motive and whether Kiya displayed aggression preclude summary judgment for Zavorka.

The Fourth Amendment protects "persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." Hansen v. Black, 872 F.3d 554, 558 (8th Cir. 2017) (quoting United States v.

Jacobsen, 466 U.S. 109, 113 (1984)).  The Eighth Circuit has held that "[a] dog is considered property for Fourth Amendment purposes."  Andrews v. City of West Branch, Iowa, 454 F.3d 914, 918 (8th Cir. 2006).  See also Hansen, 872 F.3d at 558.

The use of deadly force against a household pet may be constitutional "when there is reason to believe the pet poses an imminent danger."  Andrews, 454 F.3d at 918 (internal quotation marks omitted) (quoting Brown v. Muhlenberg Twp., 269 F.3d 205, 210 (3d Cir. 2010)).  See also Brown v. Battle Creek Police Dep't, 844 F.3d 556, 566 (6th Cir. 2016) (use of deadly force against a household pet is "reasonable under the Fourth Amendment when, given the totality of the circumstances and viewed from the perspective of an objectively reasonable officer, the dog poses an imminent threat to the officer's safety."); Viilo v. Eyre, 547 F.3d 707, 710 (7th Cir. 2008) ("[U]se of deadly force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable.").  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer; it does not turn on the subjective intent of the officer."  Andrews, 454 F.3d at 918 (citing Graham v. Connor, 490 U.S. 386, 396-97 (1989)).  Analyzing the question of whether a pet poses an "imminent threat" from the perspective of a reasonable officer on the scene, "allow[s] for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."  Robinson v. Pezzat, 818 F.3d 1, 8 (D.C. Cir. 2016) (quoting Graham, 490 U.S. at 396-97)).

The question before the Court is whether, given all of the circumstances and viewed from the perspective of a reasonable officer on the scene, Kiya posed an imminent threat to Officer Zavorka before the shooting.  See, e.g., Andrews, 454 F.3d at 918.  In his deposition, Plaintiff's

son Isaiah testified that he and Kiya were in the living room with Joseph, Joseph's six-month-old son, and Isaiah's coworker, when the TAC officers "blew the door open and shot my dog." [ECF No. 50-32 at 6]  Kiya was lying by the couch and, when the door opened, she "went to turn…went to stand up to look who it was, and they [shot] her and she just was down." [Id. at 3] Isaiah stated that it "[d]idn't seem like" any time passed between the door opening and the shots firing. [ECF No. 86-15 at 2]  Kiya died "pretty much" in the same place she was laying when the SWAT officers entered the house, "maybe ten feet" from the door. [Id.]

Joseph likewise stated in his deposition that the officers "shot the dog and then swarmed in [the house]." [ECF No. 85-30 at 2]  When the door opened, Kiya "didn't really have time to do anything other than stand up. [She h]eard the noise and like lifted her two front paws up…and looked that direction." [Id.]  Joseph stated that Kiya did not move toward the door, but rather, "landed and died in the same place where she was when the police opened the door." [Id.]  Joseph estimated that he was less than five feet away from Kiya when she died, and his son was "[o]n my lap screaming and crying with guns pointed at me and him pretty much." [ECF No. 85-30 at 3]

Plaintiff was in the kitchen when the TAC team entered the house and did not see Zavorka shoot Kiya. [ECF No. 54-24]  However, Plaintiff stated in her deposition that she "heard a big boom from [TAC] opening the door" and then she heard "[t]hree shots immediately." [ECF No. 85-27 at 8-9]

In contrast, Defendant TAC Officers maintain that Zavorka shot Kiya because Kiya was charging toward him.  Zavorka testified at his deposition that he was the first TAC officer to enter Plaintiff's house and he observed Kiya "closing the distance at us as we entered the residence…[at] a quick pace." [ECF No. 85-26 at 2]  According to Zavorka, Kiya was about

twenty-two feet from the door when he entered the house, and she ran four to seven feet before Zavorka fired the first two shots. [Id.] Zavorka stated that Kiya continued to approach him, so he "fired two more quick shots" and she fell two feet from him. [Id. at 2, 10] Zavorka confirmed that Kiya did not bark, but he could not recall whether she was growling or wagging her tail. [Id.] Fumagalli similarly stated in his affidavit that, "[a]s soon as I entered, I saw a pit bull dog charging at full speed toward the officers in the house. Because the dog was moving so quickly toward us, I thought the dog was going to attack us." [ECF No. 83-8 at ¶¶ 34-35] Pfanstiel stated that Kiya had already been shot and was lying six feet from the door when he entered Plaintiff's house. [ECF No. 83-9 at 6]

    1. Zavorka

    The Court first considers Plaintiff's and Zavorka's cross-motions for summary judgment. There is no dispute that Zavorka killed Kiya. Whether killing Kiya violated Plaintiff's Fourth Amendment rights turns on whether a reasonable officer in Zavorka's position could believe that Kiya posed an imminent threat to Zavorka or the other TAC officers. See, e.g., Andrews, 454 F.3d at 918.

    In light of the conflicting testimony, genuine issues of fact exist relating to whether Kiya charged toward the TAC officers so that a reasonable officer in Zavorka's circumstances would have believed it necessary to shoot her. Based on the evidence presented, a reasonable jury could find that Kiya posed an imminent threat to TAC officers' safety and no amount of planning would have prevented the shooting. See e.g., Carroll v. Monroe, 712 F.3d 649, 653 (2d Cir. 2013). A determination of what Zavorka perceived and considered requires a credibility determination that cannot be made at the summary judgment stage. See, e.g., Anderson., 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions."). For this reason, the Court cannot determine at this stage of the proceedings whether Zavorka's seizure of Kiya was unreasonable and, therefore, denies Plaintiff's motion for summary judgment as to Count VI.

The Court must now consider whether Zavorka is entitled to qualified immunity. As Zavorka acknowledges in his motion for summary judgment, "the state of the law in 2014 was that an officer who reasonably deemed a pet dog to pose an imminent risk of harm to him was entitled to shoot and kill it, including during the course of executing a search warrant." [ECF No. 45 at 33] Given that the constitutional right at issue was clearly established, Zavorka is only immune from section 1983 liability on Plaintiff's unlawful seizure claim if his conduct did not violate that right. Based on the record before the Court, a reasonable jury could find that Kiya did not pose an imminent threat and Zavorka's conduct therefore deprived Plaintiff of her Fourth Amendment right to be free from unreasonable seizures. The Court therefore denies Zavorka summary judgment as to Plaintiff's Count VI.

2. Pfanstiel and Fumagalli

Plaintiff does not allege that either Pfanstiel or Fumagalli directed Zavorka to shoot Kiya. Rather, Plaintiff argues that Pfanstiel and Fumagalli are liable for seizing and killing Kiya because they planned and participated in the search that resulted in Kiya's death. Plaintiff maintains that she is entitled to summary judgment on her section 1983 claim against Pfanstiel and Fumagalli because the undisputed evidence shows that Pfanstiel and Fumagalli knew that Plaintiff owned at least one dog but failed to develop a nonlethal plan for containing it.

In opposition to Plaintiff's motion for partial summary judgment, and in support of their own motion for summary judgment, Pfanstiel and Fumagalli contend that they cannot be liable for the unlawful seizure of Kiya because: (1) they were not directly involved in the shooting;

and (2) their failure to develop an individualized plan did not constitute deliberate indifference. Pfanstiel and Fumagalli argue, in the alternative, that they are entitled to qualified immunity because clearly established law did not require officers to "develop a particularized plan for containing a dog during the execution of a search warrant[.]" [ECF No. 45 at 33]

Prior to the search, Rinck informed Fumagalli, the TAC team leader, that "there's a possibility of a dog that had a report written that it bit another dog previous [sic]." [ECF No. 85-24 at 11] In regard to preparing the TAC team for an encounter with Plaintiff's dog, Fumagalli stated in his deposition that he "had the discussion there was a history with a dog that could be in there or could not be in there….And basically, we reminded everybody of the [catch pole] being on the outside. Depending on where the dog's at, if we needed to get it. And that's pretty much it." [Id. at 13] Fumagalli stated that he decided to leave catch pole in the van. [Id. at 15] Pfanstiel was also aware that there "may be one or more dogs on the scene." [ECF No. 85-25 at 6] Like Fumagalli, Pfanstiel recalled in his deposition that the TAC officers discussed the possibility of encountering a dog but provided no "explicit instructions" for handling it. [ECF No. 85-25 at 6]

In support of her argument that Pfanstiel's and Fumagalli's failure to plan adequately for the presence of dogs caused the Fourth Amendment violation, Plaintiff cites San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose, 402 F.3d 962 (9th Cir. 2005) ("Hells Angels"). There, the Ninth Circuit affirmed the denial of qualified immunity to seven police officers who, in executing search warrants at two different residences, shot and killed three guard dogs. Id. at 976. The plaintiffs, who were not potential suspects in the police officers' murder investigation, claimed that the shooting of the dogs was unreasonable because despite having "a week to plan [the search]" and "advance knowledge of the presence of…guard dogs," the police

officers "failed to develop a realistic plan for incapacitating the dogs other than shooting them."[24] Id. at 966, 976. The court held that the police officers were not entitled to qualified immunity because a reasonable officer should have known that killing a dog would violate the Fourth Amendment if the officer knew dogs were present but failed to consider a nonlethal method of subduing them. Id. at 978. See also Carroll, 712 F.3d at 652 (agreeing with the Ninth Circuit that "the failure to plan adequately for the presence of dogs during a search could contribute to a Fourth Amendment violation under certain circumstances"); Flint v. City of Milwaukee, 91 F.Supp.3d 1032, 1047-48 (E.D.Wis. 2015) (same); Baskerville v. Perez, No. 15-C-3143, 2017 WL 4122632 (N.D.Ill. Sept. 18, 2017) (same).

Pfanstiel's and Fumagalli's effort to distinguish the instant case from Hells Angels is not particularly persuasive. Pfanstiel and Fumagalli maintain that Hells Angels is "entirely distinguishable" because they faced "heightened safety concerns" and "imminent threat…[from] the aggressive dog" when they executed the Warrant. [ECF No. 84 at 17] However, the defendants in Hells Angels faced similar safety concerns as Pfanstiel and Fumagalli, as one of the plaintiffs had been arrested "for weapons and narcotics charges" and "owned a Rottweiler that was known to attack without provocation" and the other plaintiff "had prior weapons-related convictions." Id. To the extent that Pfanstiel and Fumagalli suggest that their case is distinguishable from Hells Angels because Kiya presented a threat of imminent harm, this fact is disputed.

Neither Plaintiff nor Defendant TAC Officers identify objective undisputed facts

---

[24] At one residence, the "full extent of the plan to protect the entry team from the dogs was to either 'isolate or shoot the dogs," but the police officers "had no specific plan for isolating the dogs." Hells Angels, 402 F.3d at 976. At the other residence, one of the officers had a "little plan," which consisted of "hoping the dogs would not appear at the gate" and, if they did, "he planned to poke them through the fence with his shotgun to try to scare them. If that did not work, he planned to 'engage' the dogs to ensure the safety of the entry team." Id.

establishing that the seizure and killing of Kiya was either reasonable under the circumstances or unrelated to any failure to plan for the encounter. Accordingly, whether Pfanstiel and Fumagalli caused the alleged violation of Plaintiff's Fourth Amendment rights is a question for the jury to decide. The Court denies Plaintiff's motion for summary judgment on Counts XI and XIV.

The question remains whether Pfanstiel and Fumagalli are entitled to qualified immunity on Plaintiff's unlawful seizure claims. Pfanstiel and Fumagalli argue they are qualifiedly immune from liability because "the state of the law in 2014" did not clearly establish that "an officer was constitutionally bound to develop a particularized plan for containing a dog during the execution of a search warrant[.]" [ECF No. 45 at 33]

At the time of Kiya's death, the law was clearly established that, absent a sufficiently compelling public interest, killing a person's dog constituted an unconstitutional seizure. Andrews, 454 F.3d at 918; Lesher v. Reed, 12 F.3d 148 (8th Cir. 1994). Although the Eighth Circuit has not specifically addressed an officer's duty to develop a plan to contain pets prior to executing a search warrant, "a court should look to all available decisional law, including decisions of state courts, other circuits and district courts." Hill v. McKinley, 311 F.3d 899, 910 (8th Cir. 2002) (quoting Buckley v. Rogerson, 133 F.3d 1125 (8th Cir. 1988)). In that regard, Hells Angels clearly established that "[a] reasonable officer should have known that to create a plan to enter the perimeter of a person's property, knowing all the while about the presence of dogs on the property, without considering a method for subduing the dogs besides killing them, would violate the Fourth Amendment." 402 F.3d at 978. See also Cook v. Gibbons, 308 Fed.Appx. 24, 31 (8th Cir. 2009) (citing Hells Angels). The Court therefore finds that Pfanstiel and Fumagalli are not entitled to qualified immunity on Plaintiff's section 1983 claims for unlawful seizure of Kiya (Counts XI and XIV).

*E. Unlawful seizure for killing Kiya against Rinck (Count II)*

Plaintiff also alleged a section 1983 claim against Rinck for seizing Kiya in violation of the Fourth Amendment by: (1) "unlawfully and unreasonably executing a search warrant…which resulted in the shooting and killing of Kiya"; (2) requesting deployment of a TAC team to execute the administrative warrant "with full awareness [that] the tactics that would be employed by that Unit…would likely result in the injury [to] and/or death" of Plaintiff's pets; and (3) "failing to develop any non-lethal plan for confronting any animals…." [ECF No. 1 at 26]

Rinck asserts he is entitled to summary judgment on this unlawful seizure claim because he "had no personal involvement in executing the search warrant, in shooting the dog, in determining the method of entry into the house, or in developing a plan for confronting animals."[25] [ECF No. 45 at 13] In the alternative, Rinck maintains that he is entitled to qualified immunity.

"Government officials are personally liable only for their own misconduct." <u>S.M. v. Krigbaum</u>, 808 F.3d 335, 340 (8th Cir. 2015). "Liability under § 1983 requires a causal link to, and direct responsibility for, the deprivation of rights." <u>Madewell v. Roberts</u>, 909 F.2d 1203, 1208 (8th Cir. 1990).

The evidence before the Court demonstrates that Defendant TAC Officers, not Rinck,

---

[25] Rinck also argues that he is entitled to summary judgment because Plaintiff failed to "prove that Officer Rinck exhibited deliberate indifference to her to recover against him for a Fourth or Fourteenth Amendment violation." [ECF No. 45 at 14] However, the cases that Rinck cited do not support the proposition that a plaintiff in a section 1983 case must prove a defendant's deliberate indifference to her Fourth Amendment rights. <u>See</u> <u>Luckert v. Dodge Cty., Neb.</u>, 684 F.3d 808, 818 (8th Cir. 2012) (deliberate indifference to prisoner's serious medical need); <u>Scheeler v. City of St. Cloud, Minn.</u>, 402 F.3d 826 (8th Cir. 2005) (deliberate indifference to plaintiff's right to access the court); <u>Rellergert by Rellergert v. Cape Girardeau Cnty.</u>, 924 F.2d 794, 796 (8th Cir. 1991) (deliberate indifference to plaintiff's serious medical need).

decided to execute a no-knock entry and developed the plan for entering and clearing Plaintiff's house. The evidence also establishes that Rinck did not participate in the entry, but entered Plaintiff's house after Zavorka shot Kiya and the TAC team performed its protective sweep. As to Plaintiff's claim that Rinck requested that the TAC team execute the Warrant with the understanding that TAC's involvement would likely result in the seizure and death of Kiya, Plaintiff presents no evidence to support that claim. Viewing the evidence in the light most favorable to Plaintiff, Plaintiff has not presented sufficient evidence to show that Rinck was directly responsible for the deprivation of Plaintiff's Fourth Amendment rights with respect to the seizure and death of Kiya. The Court therefore grants Rinck summary judgment on Plaintiff's Count II.

### F. Unlawful retaliation for speech against Rinck (Count III)

Rinck asserts a right to summary judgment on Plaintiff's First Amendment retaliation claim, contending that: (1) Plaintiff lacks standing to assert a First Amendment retaliation claim based on her son Isaiah's protected speech; and (2) "there is no genuine issue of material fact as to the causal connection between the Zorich family's protected speech and the TAC team's conduct." [ECF No. 45 at 15] In response, Plaintiff claims that: (1) she has standing to assert First Amendment violations based on the protected speech of her family members; and (2) evidence in the record creates an issue of material fact as to a causal connection between protected speech and Rinck's actions.[26] [ECF No. 85 at 47-51]

---

[26] Plaintiff also argues that she has standing to sue for First Amendment retaliation based on her own conduct because she told Rehagan, Rinck's partner, that his accusation regarding the discontinuation of her electric service was "bullshit." [ECF No. 85 at 48] However, in her deposition, Plaintiff testified that she believed Rinck was angry "because my son said 'fuck you' to [him]." [ECF No. 50-35 at 95-96] Considering the evidence and all reasonable inferences in the light most favorable to the Plaintiff, the evidence does not establish a causal connection between Plaintiff's comment to Rehagan and Rinck's actions toward her.

"[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions…for speaking out." Hartman v. Moore, 547 U.S. 250, 257 (2006). "To establish a First Amendment retaliation claim under 42 U.S.C. § 1983, the plaintiff must show (1) [s]he engaged in a protected activity, (2) the government official took adverse action against h[er] that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." Revels v. Vincenz, 382 F.3d 870, 876 (8th Cir. 2004) (citing Naucke v. City of Park Hills, 284 F.3d 923, 927–28 (8th Cir. 2002)).

In the complaint, Plaintiff alleged that Rinck secured the Warrant, "orchestrated" TAC's no-knock entry, and "made unfounded allegations of child abuse and neglect to state authorities" in retaliation for protected speech by Plaintiff "and/or persons associated with her, including family members and/or persons inside her home[.]" [ECF No. 1 at 27]  Rinck does not dispute that Isaiah's "fuck you" comment and posting of the "FTP" video on Facebook were protected speech.  However, he argues that Plaintiff lacks standing to assert a First Amendment retaliation claim because she did not engage in protected speech, her son did.

In general, a litigant does not have standing to assert the constitutional rights of a third party.  See Kowalski v. Tesmer, 543 U.S. 125, 129 (2004).  "Third party standing is an exception to the general rule that a plaintiff may only assert his own injury in fact and permits a litigant who lacks a legal claim to assert the rights of a third party."  Hodak v. City of St. Peters, 535 F.3d 899, 904 (8th Cir. 2008).  To invoke this "narrow" exception, a plaintiff must demonstrate: (1) injury to the plaintiff; (2) a "close relation[ship]" between the plaintiff and the third party; and (3) the third party "was hindered in his ability to protect his own interests."  Id.  In regard to the third factor, or hindrance, a plaintiff "must show that some barrier or practical obstacle (e.g.,

third party is unidentifiable, lacks sufficient interest, or will suffer some sanction) prevents or deters the third party from asserting his or her own interest." Id. (quotation omitted).

Plaintiff has demonstrated an injury to herself and a close relationship with the third party, Isaiah, but failed to show "some hindrance" – a barrier or practical obstacle – to Isaiah's ability to protect his own interests. See Id. Thus, Plaintiff does not have third-party standing to assert First Amendment retaliation claims on behalf of Isaiah. See id. at 905.

Addressing the issue of third-party standing, Plaintiff argues that Rinck's retaliation "against Plaintiff for the protected speech of her son constitutes a violation of Plaintiff's own constitutional rights." [ECF No. 85 at 49] However, the cases upon which Plaintiff relies to support her own standing to assert this First Amendment retaliation claim are not helpful.[27] The Court therefore grants Rinck summary judgment on Plaintiff's Count III.

### G. Failure to intervene against Zavorka (Count VII) and failure to supervise and/or intervene against Pfanstiel and Fumagalli (Counts XII and XV)

Defendant TAC Officers argue that they are entitled to summary judgment on Plaintiff's failure to intervene claims because Plaintiff did not allege the use of excessive force and the Eighth Circuit has not recognized a duty to intervene with respect to constitutional violations outside the excessive-force context. [ECF No. 45 at 34] Plaintiff counters that "[t]he use of

---

[27] For example, in Young v. Pleasant Valley Sch. Dist., the court stated that it was "skeptical that for First Amendment purposes a child could claim retaliation based on her parent's speech," but declined to consider the issue because "it has not been preserved." No. 3:07-CV-854, 2012 WL 1827194, at *7 n.9 (M.D. Pa. May 18, 2012). In Horstkoetter v. Dep't of Pub. Safety, the court held that it was unconstitutional for the state highway patrol to discipline a state trooper for political signs displayed by his wife on property in which she had an ownership interest. 159 F.3d 1265, 1275-76 (10th Cir. 1998). The Tenth Circuit did not address what role, if any, standing played in its analysis. Finally, in Thompson v. Adams, the Eighth Circuit found that the husband, who was allegedly fired in retaliation for his wife's protected speech, lacked standing because he failed to demonstrate that the firing had "any actual or potential inhibitory effect" on his speech. 268 F.3d 609, 614 (8th Cir. 2001). The court did not discuss what effect the fact that he did not engage in the protected speech had on his standing.

Defendant St. Louis County's TAC unit to serve the search warrant on Plaintiff is itself excessive force" and Defendant TAC Officers are not entitled to qualified immunity because the "unlawfulness of Defendants' actions" was clearly established. [ECF No. 85 at 58-59]

While the Eighth Circuit has held "[a] law enforcement officer who knows another officer is using excessive force has a duty to intervene," it has declined to recognize an officer's duty to intervene to prevent other constitutional violations. Livers v. Schenck, 700 F.3d 340, 360 (8th Cir. 2012); see also Hess, 714 F.3d at 1052. Plaintiff did not allege that she was subjected to excessive force or that any of the Defendant TAC Officers failed to intervene to prevent such force. Instead, Plaintiff claimed that Defendants violated her constitutional rights by: serving an invalid search warrant; engaging TAC to execute the Warrant and conducting a no-knock entry; failing to plan for the presence of dogs before executing the Warrant; seizing and killing Plaintiff's dog; exceeding the scope of the Warrant in executing the search; and executing the Warrant in retaliation for protected speech directed at Rinck. Because there is no clearly established law regarding a law enforcement officer's duty to intervene outside of the excessive force context, Defendant TAC Officers are entitled to qualified immunity on Plaintiff's section 1983 claim that they failed to intervene to prevent Defendant TAC Officers' allegedly unconstitutional conduct.[28] See e.g., Brown v. City of Pine Lawn, Mo., No. 4:17-CV-1542-ERW, 2018 WL 950211, at *5 (E.D. Mo. Feb. 20, 2018); Busby v. Lohmar, No. 4:14-CV-1365-CDP, 2016 WL 145763, at *5 (E.D. Mo. Jan. 12, 2016); Goza v. City of Ellisville, No. 4:15-CV-775-CAS, 2015 WL 4920796, at *6 (E.D. Mo. Aug. 18, 2015); Glasper v. City of Hughes, Ark.,

---

[28] Plaintiff attempts to circumvent Livers by asserting that the use of TAC was, in and of itself, an excessive use of force. In support of her position, Plaintiff cites Bailey v. Lawson, 614 Fed. Appx. 752, 755-56 (5th Cir. 2012). However, the Fifth Circuit held that the use of a special response team was neither clearly excessive nor objectively unreasonable, and affirmed summary judgment for the defendants on the basis of qualified immunity. Id. at 755.

269 F.Supp.3d 875, 896–97 (E.D. Ark. 2017).

Although Defendant TAC officers did not address Plaintiff's failure-to-supervise claims against Pfanstiel and Fumagalli in their motion for summary judgment, they challenge those claims in their reply brief.  [ECF No. 107 at 45-47]   As to Fumagalli, Defendant TAC Officers assert that Fumagalli was not a supervisor in April 2014, as his role as team leader was limited to developing a plan for execution of the Warrant and submitting it to Pfanstiel for his approval. Defendant TAC Officers acknowledge that Pfanstiel was Zavorka's and Pfanstiel's supervisor, but not Rinck's.

A supervisor can incur § 1983 liability "for a violation of a federally protected right when the supervisor is personally involved in the violation or when the supervisor's corrective inaction constitutes deliberate indifference toward the violation."  Wagner v. Jones, 664 F.3d 259, 275 (8th Cir.2011) (quoting Ottman v. City of Independence, Mo., 341 F.3d 751, 761 (8th Cir. 2003)).  "The standard of liability for failure to supervise is 'demonstrated deliberate indifference or tacit authorization of the offensive acts.'"  Thomas v. Forrest City Police Dep't, 28 F.3d 802, 807 (8th Cir. 1994) (quoting Bolin v. Black, 875 F.2d 1343, 1347) (8th Cir. 1989)).

The Court agrees that Plaintiff failed to demonstrate Fumagalli was a supervisor in April 2014.  Therefore, he is entitled to summary judgment on the supervisory claim against him in Count XV.

The remaining issue, then, is whether there exists a question of material fact as to whether Pfanstiel's alleged failure to supervise the other TAC officers caused the alleged Fourth Amendment violations.[29]   "If the supervisor was personally or directly involved in the

_____

[29] Plaintiff also claims that Pfanstiel is liable for the alleged violation of her First Amendment rights based on his failure to supervise.  "A prerequisite to a claim for failure to intercede is a finding of a Constitutional violation."  Dowell v. Lincoln Cty., 927 F.Supp.2d 741, 757 (E.D.

constitutional violation, there is no need to resort to a supervisory liability theory to link the defendant to the constitutional violation." Clay v. Conlee, 815 F.2d 1164, 1170 n. 2 (8th Cir. 1987). Here, it is uncontroverted that Pfanstiel participated in the allegedly unlawful search. The Court therefore grants Defendant TAC Officers summary judgment on Plaintiff's Counts VII, XII, and XV for failure to supervise and/or intervene.

H. *Monell claims against Defendant County (Counts XVI, XVII, XVIII, XIX)*

Plaintiff seeks damages against Defendant County alleging that the unconstitutional municipal customs, policies, and practices were the "moving forces behind" the violations of her constitutional rights. [ECF No. 1 at 46-56] More specifically, Plaintiff claims that Defendant County is liable because the alleged constitutional violations were the result of Defendant County's: (1) official policy; (2) unlawful practice or custom; (3) failure to train; and (4) failure to train, supervise, and/or discipline. Plaintiff moves for partial summary judgment on her official policy and unlawful practice or custom claims. Defendant County asserts that it is entitled to summary judgment on all four Monell claims.

Local government bodies may be sued under section 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officer." Marsh v. Phelps Cty., 902 F.3d 745, 752 (8th Cir. 2018) (quoting Monell v. New York Dep't of Soc. Servs., 436 U.S. 658, 690 (1978)). A municipality may be liable under Section 1983 for a violation of an individual's constitutional or statutory rights if the violation resulted from: (1) an official municipal policy; (2) and unofficial custom; or (3) a deliberately indifferent failure to train or

---

Mo. 2013). The court has determined that Plaintiff lacks standing to bring a First Amendment retaliation claim. Consequently, Plaintiff cannot demonstrate that Pfanstiel's alleged failure to supervise caused a violation of her First Amendment rights. See, e.g., id.

supervise.  City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989); Monell, 436 U.S. at 694.

1.  Official policy and unlawful practice or custom (Counts XVI and XVII)

Plaintiff and Defendant County both seek summary judgment on Plaintiff's official policy and unlawful practice or custom claims.  Plaintiff claims she is entitled to summary judgment because she demonstrated that Defendant County's blanket policy or practice of using the TAC Unit to serve all warrants, including administrative warrants, without evaluating the need for such force on a case-by-case basis resulted in the violation of her constitutional rights. [ECF No. 55]  In response, Defendant County argues that Plaintiff's claims fail because:  (1) TAC Procedure 94-34 was not County-wide policy; and (2) Plaintiff failed to demonstrate that Defendant County's custom or practice was for the TAC unit to serve all warrants. [30]  [ECF No. 84 at 24]

Defendant County asserts that it is entitled to summary judgment on these two claims because Plaintiff failed to demonstrate either (1) an unconstitutional policy or practice of having TAC serve all warrants or (2) that any alleged policy or practice was the moving force behind the claimed constitutional violations.  [ECF No. 45 at 37-42]  Alternatively, Defendant County argues that "Plaintiff's constitutional rights were not violated."  [Id. at 39]  Plaintiff counters that the evidence established that "she was aggrieved and harmed by [Defendant's] blanket

_____

[30] The Supreme Court has rejected blanket exceptions to the Fourth Amendment, such as allowing no-knock entries in all felony drug cases.  Richards v. Wisconsin, 520 U.S. 385, 388 (1997).  See also United States v. Murphy, 69 F.3d 237, 243 (8th Cir. 1992) (reasonable belief that residence contained firearms, standing alone, is "clearly insufficient" to justify no-knock entry.).  Instead, the reasonableness of the method used to execute a search warrant must be evaluated on a fact-dependent, case-by-case basis.  United States v. Banks, 540 U.S. 31, 36 (2003).  See also Lucht, 18 F.3d at 551 (A decision to force entry "requires consideration of the particular facts and circumstances surrounding the execution of the warrant"); Walker v. St. Louis, No. 4:15-CV-1254-CDP, 2016 WL 7474989, at *6 (E.D.Mo. Dec. 29, 2016) (reversed on other grounds by 881 F.3d 1056 (8th Cir. 2018)).  Defendant County does not dispute that a blanket policy or practice of having the TAC Unit execute all search warrants, including administrative warrants, would be unconstitutional.

47

policy, which is in clear opposition to the well-established case law requiring each and every warrant to be 'evaluated on a fact-dependent, case-by-case basis.'" [ECF No. 85 at 60]

"To prove the existence of a policy, a plaintiff must point to 'an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters.'" Marsh, 902 F.3d at 752 (quoting Shaffer v. Beringer, 842 F.3d 585, 596 (8th Cir. 2016)). "Further, the plaintiff must prove that the policy was the 'moving force' behind a constitutional violation." Id. (quoting Shaffer, 842 F.3d at 596).

A 'custom' is an unofficial practice characterized by a "continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees." Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999). To establish municipal liability based on a custom, a plaintiff bears a "heavy burden" to demonstrate: (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the municipality's policy-making officials after notice to the officials of the misconduct; and (3) that the plaintiff was injured by acts pursuant to the municipality's custom, meaning that the custom was the moving force behind the constitutional violation. Mick v. Raines, 883 F.3d 1075, 1079 (8th Cir. 2018) (citing Mettler, 165 F.3d at 1200).

In support of her official-policy claim, Plaintiff points to St. Louis County Tactical Operations Procedure 94-34, entitled "Execution of Search Warrants," which was in effect in April 2014. [ECF No. 50-28] The first paragraph of TAC Procedure 94-34 stated: "The Tactical Operations Unit is responsible for executing *all* search warrants. This includes securing the scene and searching for any and all evidence pertaining to said search warrants issued for St. Louis County Police Department." Id. (emphasis added).

Defendant County acknowledges that, in April 2014, the TAC Procedure was "the policy the TAC Unit was required to follow on April 29, 2014 when executing search warrants." [ECF No. 50 at ¶ 97] However, Defendant County argues that TAC Procedure 94-34 was not official policy for purposes of municipal liability because "[i]t was not adopted or promulgated by the final policy making authority for St. Louis County, which is the Board of Police Commissioners."[31] [ECF No. 84 at 23] According to Defendant County, St. Louis County Police Department's General Order 07-53 was the official policy governing execution of administrative search warrants in April 2014. [ECF No. 50-27] General Order 07-53(VI)(B) provided: "Execution of County Municipal Court warrants will normally be conducted by only the case officer and the Problem Properties Unit Detective who shall use routine knock and serve procedures…." [Id.] The General Order further stated that "under extenuating circumstances…the Tactical Operations Unit will be responsible for the execution of the [administrative] warrant and securing of the premises." [Id.]

The testimonial evidence in the record provides little clarity as to Defendant County's policy or custom for the execution of administrative search warrants. In his deposition, Sgt. Charlie Rodriguez, Rinck's former supervisor, stated that he did not expect Rinck to notify him before referring administrative warrants to the TAC Unit because "when [PPU officers] apply for the search warrant, by general order, the TAC team has to execute the search warrant, so it just falls in line with that." [ECF No. 86-3 at 6] Rodriguez affirmed his "understanding" that "once the search warrant is obtained for housing code violations, it's going to be served by the TAC

_____

[31] In his affidavit, Gerald Lohr, the TAC Unit's deputy commander, stated that TAC Procedure 94-34 was "signed off by and approved by the Commander of the Tactical Operations Unit and by the Commander of the Division of Patrol," but was "not adopted by the final policy making authority of St. Louis County Police Department, which is the Board of Police Commissioners." [ECF No. 83-5]

team[.]"  [Id.]  Similarly, Rehagan, the other PPU officer, testified in his deposition that "protocol" was "that the TAC team serves all search warrants[.]"  [ECF No. 85-22 at 5] Rehagan stated that the TAC unit had served every administrative warrant for property code violations that he could recall.  [Id.]

Pfanstiel's deposition testimony also suggested that TAC served every warrant referred to it, including administrative search warrants.  [ECF No. 85-25]  Pfanstiel stated that TAC served "[a]ll search warrants we're notified about, whether they're property, drugs, guns….[I]f we're notified, we respond and we execute the search warrant."  [Id. at 3]   According to Fumagalli's deposition testimony, PPU was "the one that determines whether or not the TAC team should be called out."  [ECF No.85-24 at 3]

In support of its position that Defendant County did not have a policy or practice of using the TAC Unit to serve all administrative search warrants, Defendant County relies on the affidavits of Pfanstiel and Rinck.  [ECF No. 50-5]    In his affidavit, Pfanstiel stated that the manner in which the TAC Unit executed search warrants "generally depends on the perceived safety risks involved."  [ECF No. 83-9 at ¶ 9]  Likewise, Rinck attested in his affidavit that he only referred administrative search warrants to the TAC Unit "where there are extenuating circumstances, such as officer safety," and he "contact[ed] the TAC Unit in only a small percentage of the search warrants I obtain."  [Id. at ¶¶ 124-25]  However, at his deposition, Rinck could recall only two search warrants that he served without a TAC team.  [ECF No. 85-21 at 5-6]

Based on the above, the Court finds that material factual disputes remain regarding whether Defendant County's policy or practice was to use the TAC Unit to serve all administrative warrants without considering the facts of each case and the need for force on a

case-by-case basis.  See Walker, 2016 WL 7474989, at *8.[32]  As previously discussed, there are

also factual disputes relating to whether Rinck and/or the Defendant TAC Officers violated

Plaintiff's Fourth Amendment rights.  See, e.g., Los Angeles v. Heller, 475 U.S. 796, 799 (1986)

("If a person has suffered no constitutional injury at the hands of the individual police officer, the

fact that the department regulations might have *authorized* the use of constitutionally excessive

force is quite beside the point.").  If at trial, the jury determines that any individual defendant

violated Plaintiff's Fourth Amendment rights, then the jury can reasonably consider whether

---

[32] The district court's decision in Walker is instructive because the plaintiffs filed section 1983 claims against Wallace, a building inspector for the City of St. Louis ("City"), and the City alleging that their constitutional rights were violated by, among other things, a City building inspection.  Walker, 2016 WL 7474989, at *1.  In Walker, Wallace inspected the plaintiffs' residence pursuant to the City's Project 87 Program, which allowed police officers to request inspections of nuisance and problem properties after executing search warrants. Id. at 6.  The parties filed cross-motions for summary judgment on the plaintiffs' Monell claims against the City.  Id. at *8.  The district court denied both motions for summary judgment.  With respect to the City's policy, the district court concluded that "factual disputes as well as legal issues remain regarding exactly what the [C]ity policy is and whether a policy that allows a search whenever a homeowner refuses consent for an inspection is constitutional." Id.

On appeal, the Eighth Circuit addressed only the question of Wallace's qualified immunity.  Walker, 881 F.3d at 1060.  Indeed, in a concurring opinion, Judge Kelly specifically noted that the issue of municipal liability was not before the Eighth Circuit in Walker.  Judge Kelly wrote:

> One of [the plaintiffs'] claims sought to hold Wallace personally liable—this appeal disposes of that claim. The remaining two claims seek to hold the City of St. Louis liable for an unconstitutional policy under Monell v. Dep't of Social Servs. of N.Y.C., 436 U.S. 658 (1978). We express no opinion on the district court's denial of summary judgment on these Monell claims. And, because we grant Wallace qualified immunity based on a lack of clearly-established law, our ruling is not determinative of whether his employer is liable for effectuating an unconstitutional policy. See Owen v. City of Independence, Mo., 445 U.S. 622, 657–58 (1980). Thus, our opinion does not foreclose the plaintiffs from pursuing their Monell claims based on Project 87 searches.

881 F.3d at 1062 (Kelly, J., concurring).  See also Cross v. Mokwa, 547 F.3d 890, 899 (8th Cir. 2008) (noting genuine fact disputes existed regarding the validity of the Project 87 form, the legitimacy of the building code citation, and whether police officers "ransacked and damaged" the plaintiff's property).

Defendant County's policy or custom of having TAC serve all administrative warrants caused the constitutional violation.  See Kuha v. City of Minnetonka, 365 F.3d 590, 607 (8th Cir. 2003), abrogated on other grounds by Szabla v. City of Brooklyn Park, Minn., 486 F.3d 385, 391-92 (8th Cir. 2007).  The Court therefore denies Plaintiff's and Defendant County's motions for summary judgment on Counts XVI and XVII.

2.  Policy of failure to train (Count XVIII)

Defendant County moves for summary judgment on Plaintiff's claim that it is liable for the killing and seizure of Kiya because its training program with respect to encounters with canines was constitutionally deficient.  [ECF No. 45 at 41]   In particular, Defendant County asserts that it is entitled to summary judgment on this count because:  (1) "the need for additional training on canine behavior was not so patently obvious to substantiate a conclusion that St. Louis County was deliberately indifferent"; and (2) Plaintiff cannot establish the requisite deliberate indifference.  [Id. at 41-42]  Plaintiff counters that the need to train was obvious and the absence "of a non-lethal plan to deal with dogs effectively leaves officers with no option but to shoot any dog 'quite predictably' attempting to guard the home from invasion."  [ECF No. 85 at 63]

Under a failure-to-train theory, a municipality may be liable under Section 1983 if:  (1) the municipality's training practices were inadequate; (2) the municipality was "deliberately indifferent to the rights of others in adopting them, such that the failure to train reflects a deliberate or conscious choice" on the part of the municipality; and (3) an alleged deficiency in the training procedures actually caused the plaintiff's injuries.  Parrish v. Ball, 594 F.3d 993, 997 (8th Cir. 2010) (quoting Andrews v. Fowler, 98 F.3d 1069, 1076 (8th Cir.1996)).   "A

municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Connick v. Thompson, 563 U.S. 51, 61 (2011).

To survive a motion for summary judgment, a plaintiff must provide evidence that the municipality "was on notice that its training procedures were inadequate and likely to result in violation of constitutional rights." Larkin v. St. Louis Hous. Auth. Dev't Corp., 355 F.3d 1114, 1117 (8th Cir. 2004) (quotation omitted). A plaintiff may prove notice by showing either that: (1) "the failure to train is so likely to result in a violation of constitutional rights that the need for training is patently obvious"; or (2) "a pattern of misconduct indicates that the [municipality's] responses to a regularly recurring situation are insufficient to protect the [people's] constitutional rights." Id. (quotations and citations omitted).

The undisputed evidence shows that, Defendant County's TAC officers received special training on executing search warrants. [ECF No. 50 at ¶ 99] In fact, every quarter, TAC members trained together as a unit for forty hours on the various operations they were called upon to perform, and at least eight of those hours were dedicated to the execution of search warrants. [Id. at ¶¶ 100-01] However, Defendant County did not train its TAC officers with live dogs or instruct on dog behavior. [ECF Nos. 50-7 at ¶ 38, 83-9 at ¶ 28] Training relating to encounters with dogs was limited to regular "discussions" about how to handle aggressive dogs without shooting them. [Id.] However, the fact that an officer's training was unsatisfactory "will not alone suffice to fasten liability on the [local government]…" Parrish, 594 F.3d at 997 (quoting City of Canton, 489 U.S. at 390-91).

Plaintiff did not present evidence that Defendant County was on notice that its training relating to canine encounters before April 2014 was inadequate. To the contrary, the evidence suggests that TAC officers regularly encountered dogs while serving search warrants and rarely

injured them. [See ECF No. 50-4 at 4] In the five years preceding the April 2014 incident, only one dog was killed by a TAC officer during the execution of a search warrant. [ECF No. 50 at ¶¶ 130, 237] Nor is there evidence to suggest an inevitability by April 2014 that Defendant County's police officers would violate citizens' constitutional rights by shooting and killing household pets during residential searches. Plaintiff has failed to set forth sufficient evidence from which a reasonable jury could find that the inadequacy of Defendant County's training was so "patently obvious" such that it had notice of the risk of constitutional violations and was nevertheless deliberately indifferent to such risk. See, e.g., Jenkins v. St. Louis Cty, No. 4:10-CV-827-SNLJ, 2011 WL 5868310, at*13 (E.D.Mo. Nov. 22, 2011). The Court therefore grants Defendant County's motion for summary judgment as to Plaintiff's failure-to-train claim in Count XVIII.

### 3. Policy of failure to train, supervise and/or discipline (Count XIX)

Defendant County also moves for summary judgment on Plaintiff's claim that its failure to train, supervise, and/or discipline Rinck caused the alleged unconstitutional search and seizure of her residence. [ECF No. 45 at 43-45] Plaintiff argues that, based upon the numerous complaints about Rinck and Defendant County's failure to either investigate complaints or discipline Rinck, a reasonable jury could find that Defendant County failed to discipline Rinck and that failure resulted in the alleged constitutional violations.[33]

"Evidence that a police department has failed to investigate previous incidents similar to the incident in question may support a finding that a municipal custom exists, and that such a custom encourages or allows officers to [engage in the misconduct] without concern for

---

[33] Because Plaintiff does not argue that the evidence in the record establishes a failure to train or supervise Rinck, the Court will consider those claims abandoned and limit its analysis to the failure-to-discipline claim.

punishment." Mettler, 165 F.3d at 1205. "To establish a city's liability based on its failure to prevent misconduct by employees, the plaintiff must show that city officials had knowledge of prior incidents of police misconduct and deliberately failed to take remedial action." Andrews, 98 F.3d at 1075 (quoting Parrish v. Luckie, 963 F.2d 201, 204 (8th Cir. 1992)).

Between 2001 and April 2014, St. Louis County's Police Department's Bureau of Professional Standards ("BPS") received seventeen citizen complaints against Rinck. [ECF No. 50-3 at ¶ 8] Fifteen of the complaints, filed separately and at different times by different persons, were classified as "oppressive conduct and/or oppressive exercise of authority" by Rinck.[34] [ECF No. 86-25 at ¶¶ 3, 8] Four of those complaints included more than one allegation of misconduct against Rinck. [ECF No. 50-3 at ¶ 18] According to BPS's Commander, Lieutenant Kevin Lawson, BPS investigated each complaint and interviewed each complainant. [Id. at ¶¶ 12-12] BPS classified nine of the complaints as "unfounded," eight as "exonerated," three as "not sustained," and one was closed when the complainant withdrew it.[35] [Id. at ¶¶ 14-17]

The record also reflects that Rinck has been the defendant in at least one other section 1983 case alleging, among other things, violations of the plaintiffs' Fourth Amendment rights. [ECF No. 86-19] In the complaint, the plaintiffs alleged that, in November 2011, Rinck and the

---

[34] There was also a BPS complaint alleging a warrantless search by Rinck and a BPS complaint alleging that Rinck used unreasonable force. [ECF No. 86-25 at ¶ 4] Additionally, two internal complaints were filed with BPS regarding Rinck – one involving a vehicular accident and one charging Rinck with disobedience of orders and insubordinate conduct. [Id. at ¶ 5] Both of the internal complaints were "sustained in whole or in part" by Defendant County, and Rinck received a written reprimand for disobedience of orders.

[35] In his affidavit, Lawson explained that a finding that a complaint is "unfounded" meant that BPS found that the allegation was false or that the incident did not occur. [Id. at ¶ 20] If an officer is "exonerated" of misconduct, the BPS found that incident occurred, but the officer's conduct was lawful and proper. [Id. at ¶ 21] A finding that a complaint was "not sustained," meant there was insufficient evidence to prove or disprove the allegation, and a finding of "sustained" meant there was sufficient evidence to support the allegation. [Id. at ¶¶ 22-23]

other defendants: accompanied an Ameren U.E. employee to the plaintiff's residence to access an electric meter; when one of the plaintiffs opened the door, Rinck and the other defendants "drew their weapons and forced their way into the…residence"; Rinck and the other defendants threatened to shoot one of the plaintiffs and that plaintiff's dog in the heads; and Rinck and another defendant "harassed" the plaintiffs and their family members for a period of over twelve months. [Id.] The BPS file reflected the plaintiffs filed a BPS complaint based on this incident, and BPS found one allegation of misconduct unfounded and exonerated Rinck of another. [ECF No. 50-3 at ¶ 19] The parties settled the section 1983 action.

Plaintiff also presented evidence suggesting that Rinck did not receive discipline for the events at issue in this case. Plaintiff filed her citizen complaint with BPS on September 7, 2014, stating: "This is an excessive force and civil rights violation complaint pertaining to Incident Number 14-23211 that occurred on April 29, 2014….when my dog, Kiya, was shot by Officer Zavor[k]a…." [ECF No. 86-17] Two days later, Lawson sent Plaintiff a letter informing her that BPS had investigated "the officer's use of force" and determined it was proper. [ECF No. 86-18] Neither Lawson nor any other member of BPS spoke to Plaintiff, her family members, or the other officers involved in the incident.[36] [ECF No. 86-1 at 5-6]

Based on the above evidence, a reasonable jury could find that Defendant County had a custom of ignoring citizen complaints about Rinck. Over the thirteen years preceding the incident at issue in this case, BPS received over twenty allegations of misconduct by Rinck. Fifteen of those complaints involved "oppressive conduct and/or oppressive exercise of authority." While this is a broad classification, it appears that the prior complaints involved

---

[36] In his deposition, Lawson explained that he read Plaintiff's BPS complaint as relating only to Zavorka's act of shooting Kiya. [ECF No. 86-1 at 4] Because Zavorka's TAC supervisors had already determined the shooting was justified, Lawson did not investigate the April 2014 any further. [Id. at 5-7]

misconduct similar to the alleged unconstitutional actions in this case. Based on the present record, Plaintiff has presented sufficient evidence that Defendant County arguably had knowledge of prior incidents of misconduct and deliberately failed to take remedial action.

Further, the evidence presented by Plaintiff could allow a reasonable jury to conclude that Defendant County's custom of inaction towards allegations of "oppressive" conduct was the "moving force" behind Plaintiff's injury. "[W]here it becomes clear that an employee…needs close and continuing supervision and 'the municipality fails to provide such supervision, the inevitable result is a continuation of the misconduct.'" Ware v. Jackson Cty., Mo., 150 F.3d 873, 885 (8th Cir. 1998) (quoting Harris v. City of Pagedale, 821 F.2d 499, 508 (8th Cir. 1987)). Accordingly, the Court denies Defendant County's motion for summary judgment on Plaintiff's failure-to-discipline claim in Count XIX.

I.  *State law claims*

1.  Intentional infliction of emotional distress against Rinck and Zavorka (Counts IV and IX)

Rinck and Zavorka move for summary judgment on Plaintiff's state law claims for intentional infliction of emotional distress on the ground that "Plaintiff cannot prove that she has suffered 'severe emotional distress resulting in bodily harm,' or that her injury was caused by the conduct of a defendant whose sole intent was to cause emotional distress[.]"[37] [ECF No. 45 at 21] Plaintiff counters that: (1) her injuries were severe enough to support a claim of intentional infliction of emotional distress; and (2) whether Rinck's and Zavorka's sole intent was to inflict

---

[37] Because the Court finds that Plaintiff failed to demonstrate that Rinck's and Zavorka's sole intent was to cause emotional distress, the Court need not consider whether Plaintiff demonstrated sufficient injury to sustain a claim of intentional infliction of emotional distress. The Court notes, however, that "medically documented damages need not be proven for the tort of intentional infliction of emotional distress." Bogan v. Gen. Motors Corp., 500 F.3d 828, 832 (8th Cir. 2007) (predicting "how the Missouri Supreme Court would resolve this issue").

emotional distress "is a question of fact that is clearly in dispute." [ECF No. 85 at 52-53]

To establish a claim for intentional infliction of emotional distress under Missouri law, a plaintiff must demonstrate that: "(1) the defendant's conduct was extreme and outrageous; (2) the defendant acted in an intentional or reckless manner; and (3) the defendant's acts caused plaintiff severe emotional distress that resulted in bodily harm." St. Anthony's Med. Ctr. v. H.S.H., 974 S.W.2d 606, 611 (Mo.Ct.App. 1998). Additionally, "it is essential that the conduct be intended *only* to cause emotional distress to the victim." Conway v. St. Louis Cty., 254 S.W.3d 159, 166 (Mo.Ct.App. 2008) (emphasis added).

With respect to Rinck, Plaintiff identified three actions that she alleged were motivated by an intent to cause her emotional distress. Specifically, Plaintiff claimed that Rinck acted with the sole intent of causing her emotional distress when he: (1) "authorize[ed] and deploy[ed] a tactical operations unit to conduct a no-knock entry" to serve the Warrant; (2) forced Plaintiff "to kneel next to her dying pet while he accused her of failing to pay her natural gas bill"; and (3) detained Plaintiff in a police car for over one hour "just feet from where the body of her dead pet lay uncovered[.]" [ECF No. 1 at 29]

Rinck argues that causing emotional distress was not the sole motivation for obtaining the Warrant and involving TAC in its execution because the evidence establishes that he intended to search for municipal code violations. Plaintiff counters that Rinck's intent is "a question of fact that is clearly in dispute" because there exists a material question of fact as to whether Plaintiff consented to the inspection before Rinck obtained the Warrant. [ECF No. 85 at 53] Plaintiff suggests that, if a jury were to find that Plaintiff consented to the search by telephone on April 28, it would necessarily follow that Rinck's sole intent in obtaining and executing the Warrant was to cause her emotional distress.

Even accepting Plaintiff's allegations as true, there is insufficient evidence to create a material issue of fact as to whether Rinck's *sole* intent was to cause Plaintiff emotional distress. Rinck presented evidence that he obtained the Warrant to investigate building code violations and requested TAC's involvement because residents of Plaintiff's household had violent and/or criminal histories. Additionally, the evidence before the Court demonstrates that TAC frequently executed search warrants for the County police department's PPU. Indeed, at his deposition, Rinck recalled only two properties that he searched without TAC's assistance. [ECF No. 85-21 at 5] Likewise, Pfanstiel stated in his deposition that, during his three years as a TAC sergeant, his team executed approximately fifty warrants for the PPU, and 90 percent of those warrants were at Rinck's request. [ECF No. 85-25 at 3]. This evidence suggests that Rinck's decision to involve TAC in Plaintiff's case was not based solely upon an intent to cause Plaintiff emotional distress.

Plaintiff also alleged that Rinck intentionally inflicted emotional distress when he forced her to kneel next to Kiya as the dog was dying. However, the evidence presented before the Court shows that a TAC officer, and not Rinck, placed Plaintiff near Kiya. In her deposition, Plaintiff testified that an officer wearing tactical gear "[p]ulled me up to my feet and walked me to my dog and put me back on my knees." [ECF No. 85-27 at 11]. Plaintiff specifically stated that Rinck "wasn't in tactical gear," and she was already kneeling near Kiya when Rinck confronted her with the Warrant. [Id.]

Finally, the evidence before the Court does not support Plaintiff's claim that Rinck detained her in the police car near Kiya's body, let alone that he did so with the sole intent of causing her emotional distress. Plaintiff explained at her deposition that Officer Jacobsmeyer "put me in the car and put a seatbelt on me[.]" [ECF No. 50-35 at 11] Plaintiff's testimony also

suggests that Officer Jacobsmeyer stayed with Plaintiff when she was detained in the police car because later, when Plaintiff "started to maybe panic," Officer Jacobsmeyer "helped me and talked to me[.]" Id. Nothing in the record suggests that Officer Jacobsmeyer detained Plaintiff in the police car at Rinck's order or request. Because the evidence in the record is insufficient to raise a genuine issue of material fact as to whether Rinck's sole intent in any of the acts identified by Plaintiff was to cause her emotional distress, Rinck is entitled to summary judgment on Count IV.

With respect to Zavorka's act of shooting Kiya, Plaintiff contends that summary judgment is not appropriate because the issue of Zavorka's sole intent is "a question of fact that is clearly in dispute" because the parties dispute whether Kiya charged toward him before he shot her. [ECF No. 85 at 53] However, Plaintiff provides no evidence suggesting that Zavorka or any other TAC officer entered Plaintiff's house with the intent to shoot Kiya or cause Plaintiff emotional distress. As to the no-knock entry, Zavorka presented evidence that the purpose of the search was to investigate building code violations and the decision to enter unannounced was based on officer safety concerns.

It is also relevant that there does not appear to be any evidence as to why Zavorka would wish to cause Plaintiff emotional distress. Nothing in the record suggests that Zavorka had a prior relationship or experience with either Plaintiff or Plaintiff's family that would have motivated him to cause her harm. See Fischer v. Steward, No. 4:07-CV-1798-ERW, 2010 WL 147865, at *15 (E.D. Mo. Jan. 11, 2010). Plaintiff offers nothing but her conclusory allegation to support the claim that Zavorka's sole intent in either conducting a no-knock entry or shooting the dog was to cause her emotional distress. Zavorka is entitled to summary judgment on Plaintiff's Count IX.

### 2. Conversion for killing Kiya against Zavorka (Count VIII)

Zavorka moves for summary judgment on Plaintiff's conversion claim, arguing that he is entitled to official immunity. More specifically, Zavorka asserts that, because Plaintiff's injuries resulted from a discretionary act, and Plaintiff cannot establish that he acted with bad faith or malice, he is protected by the doctrine of official immunity. [ECF No. 45 at 34] Plaintiff opposes summary judgment on the ground that Zavorka's "motive in shooting the dog Kiya is an issue of material fact in this case." [ECF No. 85 at 46]

Under Missouri law, official immunity shields officers from liability for their discretionary acts, so long as those acts are not done in bad faith or with malice. Southers v. City of Farmington, 263 S.W.3d 603, 610 (Mo. banc 2008); State ex rel. Twiehaus v Adolf, 706 S.W.2d 443, 446 (Mo. banc 1986). "The relevant definition of bad faith or malice in this context ordinarily contains a requirement of actual intent to cause injury." Twiehaus, 706 S.W.2d at 447. "A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." Id. "Bad faith…embraces more than bad judgment or negligence." Id. "It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud." Id. (brackets and quoted case omitted). See also Blue v. Harrah's N. Kansas City, LLC, 170 S.W.3d 466, 479 (Mo.Ct.App. 2005) ("The official immunity defense can also be overcome by showing conscious wrongdoing.").

Plaintiff presented several facts that might suggest a "conscious wrongdoing." See, e.g., Blue, 180 S.W.3d at 480. As previously discussed with respect to Count VI, there exists a genuine dispute as to whether Kiya acted aggressively and Zavorka reasonably believed it

necessary to shoot her. According to Isaiah and Joseph, Kiya had not yet risen to her feet when Zavorka shot her. Additionally, Plaintiff alleged that, after shooting Kiya, Zavorka pointed his gun at Isaiah and said, "One word, motherfucker, and I'll put three in you." [ECF No. 85-27 at 10] These facts create a genuine dispute about whether Zavorka acted in bad faith or with malice, thereby precluding a finding of official immunity. The Court denies Zavorka summary judgment on Plaintiff's Count VIII.

## IV. Conclusion

For the reasons set forth above, Plaintiff's motion for partial summary judgment is denied [ECF No. 53] and Defendants' motion for summary judgment [ECF No. 44] is granted in part and denied in part. Due to the Court's disposition of the parties' motions for summary judgment, the following claims remain for trial on March 11, 2019:

(1) Plaintiff's section 1983 claim against Rinck in Count I for his alleged violation of Plaintiff's Fourth and Fourteenth Amendment rights to a reasonable search of her home through the manner in which he executed the April 2014 Warrant with a TAC team;

(2) Plaintiff's section 1983 claims against Zavorka, Pfanstiel, and Fumagalli in Counts V, X, and XIII for their alleged violation of Plaintiff's Fourth and Fourteenth Amendment rights to a reasonable search during their April 29, 2014, execution of the Warrant through their search of the basement in Plaintiff's home;

(3) Plaintiff's section 1983 claim against Zavorka in Count VI for his alleged violation of Plaintiff's Fourth and Fourteenth Amendment rights to a reasonable seizure based on Zavorka's shooting and killing of Plaintiff's dog, Kiya, inside Plaintiff's home during execution of the Warrant on April 29, 2014;

(4) Plaintiff's common-law conversion claim against Zavorka in Count VIII based on Zavorka's shooting and killing of Plaintiff's dog, Kiya, inside Plaintiff's home during execution of the Warrant on April 29, 2014;

(5) Plaintiff's section 1983 claims against Pfanstiel in Count XI and Fumagalli in Count XIV for their alleged violation of Plaintiff's Fourth and Fourteenth Amendment rights to a reasonable seizure based on their failure to develop before the search a plan for safely containing any dog at the home during execution of the Warrant on April 29, 2014;

(6) Plaintiff's section 1983 claims against Defendant County based on the County's alleged policy (Count XVI) and custom and/or practice (Count XVII) prior to April 29, 2014, to use the TAC unit to serve all administrative warrants without considering the facts of each case and the need for force on a case-by-case basis; and

(7) Plaintiff's section 1983 claim against Defendant County in Count XIX for the County's alleged failure to discipline Rinck.


_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 18th day of December, 2018